**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JASON HUGHES, Individually and on Behalf of all Others Similarly Situated, | Master File No. 09-CV-4734 |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | **ECF CASE** |
| HURON CONSULTING GROUP, INC., et al. | Honorable Elaine E. Bucklo |
| Defendants | |

**CONSOLIDATED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.      NATURE AND SUMMARY OF THE ACTION .................................................................. 2

II.     JURISDICTION AND VENUE ............................................................................................ 7

III.    THE PARTIES...................................................................................................................... 7

        A.      Plaintiffs................................................................................................................... 7

        B.      Defendants ............................................................................................................... 9

IV.     BACKGROUND FACTS AND NATURE OF THE FRAUD........................................... 11

        A.      Huron's Acquisition Spree Brings Positive Reported Results.............................. 11

        B.      Relevant Accounting And Business Concepts...................................................... 15

        C.      Defendants Fraudulently Accounted For Huron's Acquisitions Throughout
                The Class Period .................................................................................................... 20

V.      THE DEFENDANTS ACTED WITH SCIENTER.......................................................... 24

        A.      Each Individual Defendant Had Extensive Accounting Knowledge And
                The Applicable Accounting Rules That Defendants Violated Are
                Straightforward And Have Been In Place For Decades......................................... 25

        B.      Numerous Confidential Witnesses Have Confirmed That The Individual
                Defendants Were Aware Of Or Recklessly Disregarded The Improper
                Earn-Out Payment Arrangements .......................................................................... 27

        C.      "Resignation" Of The Individual Defendants Without Severance ....................... 30

        D.      Defendants Misrepresented Facts To Huron's Independent Auditors.................. 31

        E.      Defendant Holdren Profited Enormously From The Artificially Inflated
                Performance ........................................................................................................... 33

VI.     THE DEFENDANTS' FALSE AND MISLEADING STATEMENTS .......................... 35

        A.      Defendants' False And Misleading Statements In 2006....................................... 35

        B.      Defendants' False And Misleading Statements In 2007....................................... 40

        C.      Defendants' False And Misleading Statements In 2008....................................... 44

        D.      Defendants' False And Misleading Statements In 2009....................................... 48

VII.   THE TRUTH BEGINS TO EMERGE .......................................................................... 50

VIII.  LOSS CAUSATION ........................................................................................................ 53

IX.    PRESUMPTION OF RELIANCE .................................................................................. 55

X.     NO SAFE HARBOR ....................................................................................................... 56

XI.    LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS ............................................ 57

XII.   CAUSES OF ACTION .................................................................................................... 59

       COUNT I  FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT
       AND SEC RULE 10b-5 PROMULGATED THEREUNDER (Against Defendants
       Huron, Holdren and Burge) .............................................................................................. 59

       COUNT II  FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE
       ACT  (Against Defendants Holdren, Burge and Lipski) .................................................. 63

XIII.  PRAYER FOR RELIEF .................................................................................................. 65

XIV.   JURY DEMAND ............................................................................................................. 66

Lead Plaintiffs Public School Teachers' Pension & Retirement Fund of Chicago ("Chicago Teachers"), Arkansas Public Employees Retirement System ("Arkansas"), the City of Boston Retirement Board ("Boston"), the Cambridge Retirement System ("Cambridge"), and the Bristol County Retirement System ("Bristol") (collectively "Lead Plaintiffs"), by their undersigned attorneys, bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder, on behalf of themselves and all other similarly situated purchasers of the common stock of Huron Consulting Group, Inc. ("Huron" or the "Company") from April 27, 2006 through July 31, 2009, inclusive (the "Class Period").

Lead Plaintiffs allege the following upon personal knowledge as to themselves and their acts, and upon information and belief as to all other matters, based on the investigation of Court-appointed Co-Lead Counsel, Bernstein Litowitz Berger & Grossmann LLP, Cohen Milstein Sellers & Toll PLLC, and Labaton Sucharow LLP (collectively, "Co-Lead Counsel"). The investigation of Co-Lead Counsel is predicated upon, among other things, review and analysis of: (i) documents filed publicly by Huron with the United States Securities and Exchange Commission (the "SEC"); (ii) press releases, news articles, and other public statements issued by or concerning Huron and other Defendants named herein; (iii) research reports issued by financial analysts concerning Huron's securities and business; (iv) other publicly-available information and data concerning Huron and its securities, including information concerning investigations of Huron by the SEC; and (v) interviews of numerous former Huron employees. Lead Plaintiffs believe that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery. Many of the facts supporting the

allegations contained herein are known only to the Defendants or are exclusively within their custody or control.

I.    **NATURE AND SUMMARY OF THE ACTION**

1.      This is an egregious accounting fraud perpetrated by Huron and its three most senior officers during the Class Period:  CEO and Chairman Gary E. Holdren ("Holdren"), Chief Financial Officer Gary L. Burge ("Burge"), and Chief Accounting Officer Wayne E. Lipski ("Lipski").  As alleged herein, for more than three years, Defendants intentionally inflated Huron's bottom line by hiding employee compensation expenses from investors, thereby creating the false impression that Huron was more efficient and profitable than it actually was, and that Huron was outperforming its competitors.

2.      Defendant Huron provides accounting, finance and corporate transaction consulting services, and was founded in 2002 by approximately twenty former Arthur Andersen ("Andersen") partners and professionals after Andersen collapsed in the wake of the Enron accounting scandal.  From 2005 through 2007, Huron grew in large part by acquiring other consulting firms in multimillion dollar transactions.  The most important assets of the acquired consulting firms – as in any other professional services business – were its professionals.  As Defendant Holdren told the financial analyst community on an August 7, 2007 conference call, "Retaining our best people is my highest priority at Huron."

3.      Accordingly, when Huron acquired these firms, Defendants took measures to ensure that the owners, or "selling shareholders" of the companies which Huron purchased, incentivized their key personnel over a number of years to remain with Huron after the acquisition.  However, rather than properly account for the payments necessary to keep the key

2

personnel from the newly-acquired businesses in place, Defendants engaged in a scheme that would allow Huron to report artificially inflated income.

4.      Specifically, when acquiring these companies, Huron agreed to make payments to the selling shareholders of the businesses that were purportedly in direct proportion to the ownership interests that the selling shareholders held at the time of the acquisition.  In truth, however, such acquisition-related payments were made by Huron with the contemporaneous knowledge that the selling shareholders would reallocate material amounts of these payments (1) to employees at the acquired companies who were not eligible to receive such payments because they were not "selling shareholders;" (2) to other selling shareholders in amounts disproportionate to their ownership interests; and (3) even to employees hired by Huron <u>after</u> the acquisition occurred.

5.      Under plain and unambiguous accounting rules that had been in place for decades, and that Huron had helped its clients implement in their own businesses, Huron was required to account for these payments for what they were:  employee compensation expenses.  However, because such expenses would have dramatically reduced Huron's publicly reported net income and earnings per share, Defendants violated Generally Accepted Accounting Principles ("GAAP"), and instead accounted for the payments as "goodwill."  Under GAAP, goodwill is the difference between the purchase price paid for a business and the fair value of the net assets being acquired, and is accounted for as an asset that does not reduce income (unlike expenses).

6.      As a result of Defendants' improper accounting for the redistributed acquisition-related payments, the Company's reported net profits grew dramatically, increasing from $27 million in 2006 to $41 million in 2008.  During the Class Period, Defendants consistently touted Huron's "strong earnings growth" and reported income which often exceeded analysts'

expectations, and analysts repeatedly noted how Huron's margins were consistently superior to its competitors, reflecting the Company's profitability. The Company's stock price increased concomitantly, rising from $33.36 per share on April 27, 2006 to a high of $83.25 on December 26, 2007. Defendant Holdren benefitted enormously from the rising stock price, selling 275,500 shares during the Class Period at inflated prices as high as $65.81 per share, for total proceeds of more than $16 million.

7.      However, as the Company ultimately admitted, Huron's impressive growth was the result of fraudulent accounting. On Friday, July 31, 2009, after the markets closed, Huron revealed that the Company's financial statements for 2006, 2007, 2008, and the first quarter of 2009 were materially misstated, should no longer be relied upon, and would have to be restated as a result of the Company's improper accounting for its acquisition-related payments. As the Company disclosed, while Defendants represented that the acquisition-related payments had been made to the selling shareholders of the acquired businesses in amounts proportionate to their ownership stake in the acquired firms, the Audit Committee had discovered a side agreement pursuant to which the selling shareholders of at least one business had reallocated these payments to other employees. Following this discovery, the Audit Committee commenced an inquiry and learned that, in connection with at least <u>four significant acquisitions</u>, tens of millions of dollars had been reallocated to (1) Huron employees who were <u>not</u> selling shareholders of the acquired companies; and (2) selling shareholders in amounts disproportionate to their ownership stakes in the acquired businesses. Huron also disclosed that, in many cases, Huron recorded as "goodwill" money it paid to employees of the acquired companies hired by Huron <u>after</u> the acquisitions were complete. Each type of payment described above was also tied to continuing employment with Huron and/or the achievement of

"personal performance measures" – in other words, these payments being recorded as goodwill were, in effect, salaries and bonuses paid to Huron employees.  As the Company explained, GAAP precluded Huron from accounting for these substantial payments as goodwill, and instead required the Company to record these massive amounts as compensation expenses.

8.  As a result, the Company announced that its publicly reported net income for this more than three-year long period would be reduced by $57 million, from $120 million to only $63 million – or nearly 50%.  Huron also announced that, because of the restatement, Defendants Holdren, Burge and Lipski had immediately been forced to "resign" without severance.  As explained below, the only way Defendants would not have been entitled to substantial severance payments in the event of their departure was if they were terminated for cause.

9.  The Company's stunning announcement caused the price of Huron's stock to drop 70% in a single day, from a closing price of $44.35 per share on July 31, 2009 to a closing price of $13.69 per share on Monday, August 3, 2009 – a staggering decline of $30.66 per share, on extraordinary volume.  In sum, the disclosure of the fraud had a devastating impact on the Company's shareholders, wiping out more than $650 million in market capitalization in one day.

10.  Immediately following the announcement, the SEC launched an investigation into the facts and circumstances surrounding the restatement, which is continuing.  In addition, the United States Attorney's Office for the Northern District of Illinois ("USAO") has also requested information from Huron regarding the facts and circumstances surrounding the restatement.  Huron has provided the USAO with documents that were previously provided to the SEC.

11.     Defendants' failure to comply with the clear and long-standing requirements of GAAP for over three years in connection with these payments was hardly accidental.   On August 17, 2009, Huron filed an amended Form 10-K ("Form 10-K/A"), which stated that senior management was well "aware" that the redistributions had taken place and had "misapplied" the applicable accounting rules, and that Defendants had also deliberately misrepresented the facts and circumstances surrounding the acquisition-related payments to the Company's independent auditors.   Specifically, the Audit Committee determined, among other things, that:

> [S]enior management was aware of the redistributions [of payments, which were inconsistent with Huron's accounting for those payments] but either misunderstood or misapplied the appropriate accounting guidance.   As a result, the facts and circumstances surrounding [those payments] were not fully described in representation letters previously provided to [Huron's] independent auditors.

12.     The suggestion that senior management may have "misunderstood" the accounting rules governing compensation expenses defies credulity.   Defendants Holdren, Burge and Lipski were all Certified Public Accountants ("CPAs") with decades of accounting experience who, before running Huron, had held senior leadership and accounting positions at Andersen and/or other publicly held companies.   Indeed, Defendants held themselves out as among the foremost accounting experts in the world, and they were specifically responsible for Huron's internal control systems, which were supposed to prevent this massive fraud from occurring, and which Huron has since admitted were deficient because of a "material weakness."   Moreover, the GAAP rules that Defendants violated were simple, unambiguous, and have been in place for decades.   In sum, any suggestion that these extraordinarily

experienced CPAs somehow misunderstood the applicable accounting rules when overstating the Company's net income for 13 consecutive quarters by nearly 50% is meritless.

## II.     JURISDICTION AND VENUE

13.     The claims asserted herein arise pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).  Huron maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

16.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and facilities of the national securities markets.

## III.    THE PARTIES

### A.     Plaintiffs

17.     Lead Plaintiff Chicago Teachers is a public pension fund in Chicago, Illinois, and operates for the exclusive benefit of teachers and certain other employees of the Chicago Public Schools.  Chicago Teachers serves over 24,000 retirees and 32,000 contributing members, and has over $9.2 billion in assets under management.  As reflected in the certification already on file with the Court and attached hereto as Exhibit A, Chicago Teachers purchased or acquired

shares of common stock of Huron during the Class Period on the open market, and suffered damages as a result of the violations of the federal securities laws alleged herein.

18.     Lead Plaintiff Arkansas is a public pension fund that provides retirement benefits for public employees in the state of Arkansas, including state, county, municipal, university, and public school employees.  Arkansas was created in 1957 and manages assets totaling approximately $5.6 billion.  As reflected in the certification already on file with the Court and attached hereto as Exhibit B, Arkansas purchased or acquired shares of common stock of Huron during the Class Period on the open market, and suffered damages as a result of the violations of the federal securities laws alleged herein.

19.     Lead Plaintiff Boston is an institutional investor that provides retirement benefits for over 10,000 current and former employees of the city of Boston, Massachusetts, and manages approximately $3 billion in total assets.  As reflected in the certification already on file with the Court and attached hereto as Exhibit C, Boston purchased or acquired shares of common stock of Huron during the Class Period on the open market, and suffered damages as a result of the violations of the federal securities laws alleged herein.

20.     Lead Plaintiff Cambridge is an institutional investor that provides retirement benefits to all half-time and full-time employees working for the City of Cambridge, Cambridge Housing Authority, Cambridge Public Health Commission and Cambridge Redevelopment Authority or who are retired from one of the above entities.  Cambridge manages approximately $500 million in assets.  As reflected in the certification already on file with the Court and attached hereto as Exhibit D, Cambridge purchased or acquired shares of common stock of Huron during the Class Period on the open market, and suffered damages as a result of the violations of the federal securities laws alleged herein.

21.     Lead Plaintiff Bristol was organized under the laws of the Commonwealth of Massachusetts in 1936, and is an institutional investor that represents more than 5,800 active and retired public employees of Bristol County, Massachusetts.  Bristol manages approximately $276 million in assets and is the 11th largest of the 106 contributory retirement systems for public employees in Massachusetts.  As reflected in the certification already on file with the Court and attached hereto as Exhibit E, Bristol purchased or acquired shares of common stock of Huron during the Class Period on the open market, and suffered damages as a result of the violations of the federal securities laws alleged herein.

**B.     Defendants**

22.     Defendant Huron is a Delaware corporation with its principal place of business in Chicago, Illinois.  Huron was founded by former employees of the accounting firm Andersen on March 19, 2002 and commenced operations in May 2002.  Huron describes itself as a leading provider of accounting and finance consulting services that helps clients in diverse industries to, among other things, "improve performance [and] comply with complex regulations."  Huron became a publicly traded company after an initial public offering in October 2004.

23.     Defendant Holdren was a co-founder of Huron.  Holdren was, at all relevant times, the Chief Executive Officer and Chairman of Huron's Board of Directors.  Until May 21, 2009, Holdren was also President of Huron.  Before founding Huron, Holdren was a partner at Andersen where he served on Andersen's U.S. Management Committee from 1991 to 1998 and on its Executive Council from 1994 to 1998.  Holdren has been a CPA since 1978.  During the Class Period, Holdren reviewed, approved, and signed false and misleading Huron filings with the SEC.  Holdren also participated in conference calls with securities analysts in which Huron's false and misleading filings with the SEC, including the false and misleading financial

statements complained of herein, were presented and discussed.  Holdren had a strong financial incentive to engage in the misconduct alleged herein.  During the Class Period, Holdren sold approximately 275,500 shares of his personally held or controlled Huron stock for proceeds of approximately $16,016,217.  Holdren "resigned" his positions at Huron – without severance – on July 27, 2009.

24.     Defendant Burge was at all relevant times the Chief Financial Officer of Huron.  Burge is a CPA who began his career with the major accounting firm Haskins & Sells (now Deloitte LLP).  Burge reviewed, approved, and signed false and misleading Huron filings with the SEC during the Class Period.  Burge also participated in conference calls with securities analysts in which Huron's false and misleading filings with the SEC, including the false and misleading financial statements complained of herein, were presented and discussed.  Burge "resigned" his position as Huron's CFO – without severance – on July 31, 2009.

25.     Defendant Lipski was, during the Class Period, the Controller and later the Chief Accounting Officer of Huron.  Lipski is a CPA who, among other positions, worked as a senior auditor at Andersen before joining Huron.  At Huron, Lipski's responsibilities included ensuring that Huron's accounting was in accordance with GAAP, including Huron's internal controls, accounting policies, internal financial statements, and acquisition accounting.  Lipski was actively involved in Huron's acquisitions.  Lipski resigned his position as Huron's Chief Accounting Officer – without severance – on July 31, 2009.

26.     Defendants Holdren, Burge and Lipski are collectively referred to as the "Individual Defendants" and, together with Huron, as the "Defendants."  The Individual Defendants, because of their high-level positions within the Company, directly participated in the management of Huron's operations, including its accounting and reporting functions, had the

ability to and did control Huron's conduct, and were privy to confidential information concerning Huron and its business, operations and financial statements, as alleged herein. The Individual Defendants were involved in drafting, reviewing, publishing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued, and approved or ratified these misstatements in violation of the federal securities laws.

## IV.   BACKGROUND FACTS AND NATURE OF THE FRAUD

### A.   Huron's Acquisition Spree Brings Positive Reported Results

27.   During the Class Period, the Company provided financial consulting services to a wide variety of sophisticated clients through its four business segments: Accounting and Financial Consulting, Legal Consulting, Corporate Consulting, and Health and Education Consulting. With respect to its Accounting and Financial Consulting segment, the Company represented that:

> Our Accounting and Financial Consulting segment assists corporations with complex accounting and financial reporting matters, financial analysis in business disputes, international arbitration and litigation, as well as valuation analysis related to business acquisitions. This segment also consults with clients in the areas of corporate governance, Sarbanes-Oxley compliance, internal audit, and corporate tax. Additionally, the Accounting and Financial Consulting segment provides experienced project leadership and consultants with a variety of financial and accounting credentials and prior corporate experience on an as-needed basis to assist clients with finance and accounting projects. This segment is comprised of certified public accountants, economists, certified fraud examiners, chartered financial analysts and valuation experts who serve attorneys and corporations as expert witnesses and consultants in connection with business disputes, as well as regulatory or internal investigations.[1]

---

[1] Throughout this Complaint, emphasis is added unless otherwise indicated.

28.     Throughout the Class Period, Huron consistently reported strong growth and impressive financial results.  While Huron had approximately 770 full-time professionals at the start of 2006, it grew to employ over 2,100 professionals as of December 31, 2008.  Reported earnings increased substantially during this time, rising from approximately $26 million in 2006 to approximately $41 million in 2008.  Based on these positive reported results, Huron's stock price also increased substantially, from an average of $29 per share in April 2006 to an average of $49 per share in July 2009.  As described in detail in Section VI, below, securities analysts that covered Huron reacted positively to Huron's apparent success in meeting or exceeding earnings estimates, while maintaining an impressive rate of growth.

29.     Huron's positive results and growth were attributable to its strategy to acquire businesses that occupied the same market segments as Huron.  Specifically, between 2005 and 2007, Huron spent over $200 million to acquire the following seven consulting firms:

- May 9, 2005 – <u>Speltz & Weis LLC</u> ("S&W") for $17.2 million plus earn-out payments if S&W would meet certain performance targets;

- April 3, 2006 – <u>MSGalt & Co LLC</u> ("Galt") for $20.4 million plus earn-out payments if Galt would meet certain performance targets;

- July 31, 2006 – <u>Document Review Consulting Services LLC</u> ("DRCS") for approximately $16.7 million plus earn-out payments if DRCS would meet certain performance targets;

- July 31, 2006 – <u>Aaxis Technologies, Inc.</u> ("Aaxis") for approximately $7.9 million plus earn-out payments if Aaxis would meet certain performance targets;

- January 2, 2007 – <u>Wellspring Partners</u> ("Wellspring") for $68 million plus earn-out payments if Wellspring would meet certain performance targets;

- January 2, 2007 – <u>Glass & Associates</u> ("Glass") for $31.8 million plus a payment to the selling shareholders in proportion to their respective ownership percentage of 5% of the combined revenues of Glass and Huron's restructuring consulting business, up to a maximum of $2 million; and

12

- July 2007 – <u>Callaway Partners, LLC</u>, ("Callaway") for $64.9 million plus earn-out payments if Callaway would meet certain performance targets.

30.     Huron's acquisitions appeared to be the product of prudent planning and savvy negotiations.  Indeed, Defendants' descriptions of the favorable terms of Huron's acquisitions contributed to Huron's strong reported results and boosted Huron's stock price.  For example, on January 4, 2007, investment analysts at William Blair & Co. ("WB") published a report about Huron's January 2, 2007 acquisitions of Wellspring and Glass, stating that those acquisitions would be "accretive right away," which resulted in WB "raising [its] 2007 [earnings per share] estimate [for Huron] to $1.95 (representing 28% year-over-year growth) and [its] 2008 [earnings per share] estimate to $2.27 (representing 16% growth)."

31.     Huron's reported strong results and growth were, as was later revealed, a mirage created and perpetuated by Defendants' fraudulent accounting.  Specifically, as explained in detail below, in connection with at least four of Huron's acquisitions,[2] the Defendants caused the Company to account wrongfully for payments that were essentially salaries and bonuses as goodwill – an <u>asset</u> which has no negative effect on the Company's reported income and related financial metrics – rather than as compensation <u>expenses</u>, which would have significantly reduced the Company's reported income.  Defendants' accounting improprieties had the effect of making Huron appear as if it outperformed its competitors, which attracted investors to the stock.  For example, on October 17, 2006, SunTrust Robinson Humphrey ("SunTrust") initiated coverage of Huron with a "Buy rating" because Huron "operates at superior margin at every level of the income statement despite its relatively smaller size."

---

[2] Based on Lead Plaintiffs' investigation to date, these improper arrangements were made in connection with the purchases of S&W, Galt, Callaway and Wellspring.

32.     Defendants' manipulations of the Company's accounting allowed Huron to report results which nearly always met or exceeded analysts' earnings expectations.   Indeed, as the chart below shows, Huron's reported results met or exceeded analyst expectations almost every quarter of the Class Period – when in reality the Company materially underperformed throughout the Class Period:

| Reporting Period | Reported Diluted Earnings Per Share ("EPS") | Analyst Consensus Expectations | Margin By Which Huron Appeared To Beat Expectations | Restated Diluted EPS |
|---|---|---|---|---|
| Q1 2006 | $0.33 | $0.30 | $0.03 | $0.26 |
| Q2 2006 | $0.36 | $0.33 | $0.03 | $0.32 |
| Q3 2006 | $0.39 | $0.38 | $0.01 | $0.33 |
| Q4 2006 | $0.46 | $0.43 | $0.03 | $0.41 |
| Q1 2007 | $0.55 | $0.51 | $0.04 | $0.34 |
| Q2 2007 | $0.56 | $0.55 | $0.01 | $0.35 |
| Q3 2007 | $0.58 | $0.57 | $0.01 | $0.31 |
| Q4 2007 | $0.63 | $0.63 | $0.00 | $0.35 |
| Q1 2008 | $0.56 | $0.54* | $0.02* | $0.17 |
| Q2 2008 | $0.54 | $0.54 | $0.00 | $0.16 |
| Q3 2008 | $0.44 | $0.42 | $0.02 | $0.12 |
| Q4 2008 | $0.59 | $0.61 | $(0.02) | $0.18 |
| Q1 2009 | $0.51 | $0.55 | $(0.04) | $0.35 |

---

*     In March 27, 2008, Huron pre-announced an earnings shortfall for the first quarter of 2008 because of a softening business pipeline and the winding down of certain projects.  As a result, the analyst consensus was revised downward from $0.66 earnings per share to $0.54 earnings per share (the number reflected in the chart above).  Huron exceeded the revised expectations by $0.02 per share.  If, however, Huron had accurately accounted for acquisition related payments, Huron would not have met even the initial (*i.e.*, unrevised) analyst consensus expectation because the restated earnings per share were $0.17 per share.

33. While the nature of the fraud and Defendants' role in it is detailed below, the following chart – which reflects both Huron's false year-end financial statements and the restated amounts contained in Huron's Form 10-K/A – illustrates how dramatically Defendants' accounting fraud distorted Huron's reported financial condition:



| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|
| Reported | $1,063,000 | $10,864,000 | $17,769,000 | $26,689,000 | $41,901,000 | $40,651,000 |
| Restated | | | $17,769,000 | $22,859,000 | $24,280,000 | $10,081,000 |

**B.    Relevant Accounting And Business Concepts**

34. Defendants' sham accounting related to a portion of purported purchase consideration that Huron agreed to pay in connection with at least four of the seven companies it acquired during the Class Period. In its purchase agreements with the acquired companies, Huron typically agreed to pay (1) an agreed-upon purchase price at the time of the closing of the acquisition to the selling shareholders of the businesses Huron acquired and (2) future "earn-out payments" to the selling shareholders of these businesses which were supposedly tied to the

acquired companies' achievement of specific financial performance targets over a period of time.  These earn-out payments arrangements were typically structured to apply for a period lasting between 3 to 5 years following the acquisition.

35.  Throughout the Class Period, Huron accounted for these payments as goodwill, which is a balance sheet asset.  Goodwill is the difference between the purchase price and the fair value of the net assets being acquired.  Basic accounting rules clearly mandate that acquisition-related payments may be booked as goodwill by the acquiring company <u>only if certain conditions are met</u>.  Indeed, the accounting rules governing these transactions are simple and have been in existence for years.

36.  Under GAAP, an acquiring company may account for acquisition-related payments as goodwill <u>only</u> if the payments are made (1) exclusively to the selling shareholders and not to any other employees; (2) only in direct proportion to the selling shareholders' ownership interests in the firm they had sold; and (3) without any strings attached to those earn-out payments (for example, by requiring the continuing employment of the selling shareholders (or others) with the acquirer).  If any of these criteria are not satisfied, then GAAP <u>requires</u> that the payments be booked as expenses, because the payments have been offered for something other than the value of the company.[4]  Put another way, if the amounts received were truly for the value of the acquired company, then the amounts would obviously be shared proportionately by the owners – or selling shareholders.

---

[4]      GAAP provides mandatory rules of accounting that all registered offerors of securities are required to follow.  The accounting rules are clear that compensation expenses are not part of the purchase price for an acquired company.  GAAP does not provide an alternative other than to expense as compensation over the benefited period amounts paid to non-selling shareholders or to employees hired after an acquisition.

37.     The relevant GAAP provision that was in effect at the time the Company issued the false and misleading financial statements was Financial Accounting Statement No. 141 ("FAS 141"), *Business Combinations*, issued in June 2001.  Paragraph 34 of FAS 141 states:  "If the substance of the agreement for contingent consideration is to provide compensation for services or use of property or profit sharing, the additional consideration given shall be recognized as an expense of the appropriate periods."  FAS 141 is consistent with the prior applicable GAAP standard, Accounting Principles Board Opinion No. 16 ("APB 16"), which had been effective since 1970.  The accounting rules, thus, sought to preclude the acquiror from including the future salaries and bonuses of the selling shareholders as part of the cost of the acquisition, when in reality they reflected a salary and bonus expense of the merged company.

38.     Indeed, during the time when Defendant Holdren served on the U.S. Management Committee of Andersen, Andersen expressly warned its clients that the SEC would presume that contingent payments made to senior personnel who continued at newly-combined entities were compensation expenses.   Specifically, in a document entitled "Accounting for Business Combinations", which was updated in January 1995, Andersen informed its clients that the SEC "will presume that contingent payments are compensatory if they are to be made to former shareholders who (a) continue as management, directors, consultants or contractors of the combined entity and (b) by virtue of their positions, could affect the contingencies' outcome."

39.     The clear principles set forth in APB 16 and FAS 141 are underscored by related accounting guidance.  Specifically, the Emerging Issues Task Force ("EITF") of the Financial Accounting Standards Board ("FASB") issued additional guidance for accounting practitioners,

entitled, "Accounting for Contingent Consideration Paid to the Shareholders of An Acquired Enterprise In A Purchase Business Combination," which is referred to as EITF No. 95-8.[5]

40.     EITF No. 95-8 provides "criteria [that] should be used to determine whether contingent consideration based on earnings or other performance measures should be accounted for as (1) an adjustment of the purchase price of an acquired enterprise or (2) compensation for services, use of property, or profit sharing."  Those criteria directly address facts present in the instant Action.   For example, one of the criteria is whether "all selling shareholders receive the same amount of contingent consideration on a per share basis."  (*See* EITF No. 95-8, at 3). Another criterion concerns continuing employment:  "The terms of continuing employment by selling shareholders who become key employees may be an indicator of the substance of a contingent consideration arrangement . . . . A contingent consideration arrangement in which the payments are automatically forfeited if employment terminates is a <u>strong</u> indicator that the arrangement is compensation for postcombination services." (*Id.* at 2).  Consistent with Huron's admission that its accounting violated GAAP, these EITF criteria indicate that the acquisition-related payments were required to be accounted for as compensation expenses.

41.     As an example, take the situation where Company A pays $100 million to acquire Company B, the fair value of the net assets of Company B is $60 million, and Company B has four shareholders, each of whom owns a 25% share.  In order for the $40 million difference between purchase price and the fair value of the net assets to be recorded as goodwill, each selling shareholder must receive $25 million (or 25% of $100 million).  If, however, two of those shareholders receive $30 million, and the other two receive $20 million, then the purchase

---

[5]     FAS 141 specifically states that Paragraph 34 is to be interpreted with EITF No. 95-8.  (*See* FAS 141 at 3).

price of Company B, for purposes of calculating goodwill, would be only $80 million (reflecting the fact that each 25% share is worth $20 million).  In the latter example, the additional $20 million that is paid to two of the shareholders:  (1) does not qualify as part of the purchase price under the accounting rules; (2) cannot be accounted for as goodwill as a result; and (3) must be accounted for separately, as compensation expense.[6]

42.     As set forth below, the acquisition-related payments made by Huron and accounted for as goodwill during the Class Period were not made in accordance with the selling shareholders' proportionate interests in the businesses and were not made exclusively to the selling shareholders.   To the contrary, the payments were (1) received by the selling shareholders in amounts disproportionate with their respective interests; (2) made to ordinary Huron employees, including administrative staff, who held no ownership interest in the entity being acquired; and (3) even to employees Huron hired after the acquisition.  In fact, Huron has admitted to violating GAAP in each of these respects.

43.     Moreover, in Huron's case, these payments were used, with Defendants' knowledge, to retain and reward key personnel and, as such, were required to be accounted for by Huron as compensation expenses reducing reported income and earnings performance.  As discussed below, Huron's accounting for the earn-out arrangements improperly transformed these compensation expenses into goodwill and created the illusion that Huron's financial performance was better than that of its competitors.

---

[6] Furthermore, using the latter example, if each selling shareholder of Company B received $20 million, and thereafter the remaining $20 million was paid to a senior manager at Company B as a retention or incentive bonus, GAAP requires that $20 million be recorded separately as a compensation expense.

### C.    Defendants Fraudulently Accounted For Huron's Acquisitions Throughout The Class Period

44.    As Huron has acknowledged, the Company violated GAAP in connection with the accounting for its acquisition-related payments in at least four different ways.

45.    <u>First</u>, Huron incorrectly recorded as goodwill payments that it made to selling shareholders in amounts that were <u>not</u> consistent with the selling shareholders' ownership percentages as of the date of the acquisitions.  <u>Second</u>, Huron incorrectly recorded as goodwill payments it made to employees who were not even selling shareholders of the acquired companies, but rather rank-and-file employees whom Huron wanted to retain – including "client-serving and administrative employees" of the acquired businesses.  <u>Third</u>, and perhaps most egregiously, Huron even recorded as goodwill payments it made to employees hired by the Company <u>after the acquisitions</u>.  As the Company ultimately disclosed in its Form 10-K/A, employees who received these payments included client-serving and administrative "employees hired by or <u>assigned to the respective Acquired Businesses after the date of such acquisitions</u>."

46.    <u>Fourth</u>, as the Company ultimately acknowledged, these payments were in reality contingent payments that depended upon continuing employment with Huron, or on the achievement of personal performance measures.  In essence, these payments were salaries and bonuses that Huron committed to pay to employees at the acquired businesses.  Rather than record these payments as compensation expense, as the accounting rules clearly required, Huron accounted for them as goodwill.  Further, Huron hired employees after acquisitions occurred, assigned those employees to the acquired businesses, paid them salaries and bonuses, and then pretended that such payments were not compensation, but goodwill.

47.     Thus, Huron hid the truth and engaged in sham accounting to minimize its compensation expense by redirecting those sums to retain its key personnel.  As the *Wall Street Journal* explained on August 5, 2009 – a few days after the fraud was revealed to investors – "[t]he method the company used to book its payments served to increase its profit."  Each of Huron's deceptive accounting practices were flagrant violations of GAAP and, as set forth in Section V below, were done with the knowledge and/or recklessness of the Individual Defendants.

48.     As the Company ultimately admitted, the fraud came to light when Huron's Audit Committee uncovered a side agreement that contradicted Huron's accounting for acquisition-related payments.  Specifically, Huron publicly stated that:

Selling shareholders of four different firms had redistributed <u>no less than $57 million</u>:

(i)     in amounts that were not consistent with their ownership interests on the date we acquired the business ("Shareholder Payments").  These Shareholder Payments were dependent, in part, on continuing employment with the Company or on the achievement of personal performance measures; and

(ii)    to certain [Company] employees who were not selling shareholders of the Acquired Businesses ("Employee Payments").  These Employee Payments were dependent on continuing employment with the Company or on the achievement of personal performance measures. The Company employees who received the Employee Payments were client-serving and administrative employees of the respective Acquired Businesses at the date such businesses were acquired by us as well as <u>similar employees hired by or assigned to the respective Acquired Businesses after the date of such acquisitions</u>.

49.     In addition, following the Audit Committee Investigation, the Company acknowledged that Huron's <u>senior management knew of these agreements, but misapplied the accounting rules</u>.  Specifically, in its Form 10-K/A, Huron stated:

Based on its inquiry into the facts and circumstances underlying the

restatement, which is now substantially complete, the Audit Committee determined that the Shareholder Payments and Employee Payments were not properly recorded in the financial statements because <u>senior management did not properly take into account the impact of the selling shareholders' redistribution of the acquisition-related payments when determining the appropriate accounting treatment.</u>  In some cases, senior management was unaware of the redistributions.  In other cases, <u>senior management was aware of the redistributions but</u> either misunderstood or <u>misapplied the appropriate accounting guidance</u>.

50.     Indeed, in connection with the restatement, Huron was forced to amend "certain agreements" related to Huron's acquisition-related payments to provide that "future earn-outs will be distributed only to the applicable selling shareholders and only in accordance with their equity interests on the date [Huron] acquired the business, with no required continuing employment…."  In these amended agreements, Huron again made clear that its most senior management knew that these earn-out payments were being used to compensate Huron employees.  For example, according to an amended agreement relating to the Wellspring acquisition, which was dated July 30, 2009 (one day before the restatement was announced):

[T]he direct payment of amounts to certain Huron employees from funds which would otherwise have constituted earn-out payments <u>were discussed with Huron's management</u>.

That amended agreement further acknowledged that, by no later than March 31, 2009 – or four months before the restatement was announced – Huron's senior management knew the specific details of the distribution methodology used to compensate these employees.  In other words, the Defendants even knew who got how much, and when.

51.     The Company also admitted that its senior management withheld critical information about the earn-out payments from Huron's outside auditor, PriceWaterhouseCoopers LLP ("PWC").  Indeed, in connection with PWC's audits and quarterly reviews, Huron's management was, among other things, required to disclose in

representation letters to PWC (i) management's belief as to whether Huron's financial statements were fairly presented in conformity with GAAP; (ii) the completeness or incompleteness of all financial records and related data that were made available to PWC; and (iii) the presence or absence of unrecorded transactions.  *See*, *e.g.*, Generally Accepted Auditing Standards AU §333.  Significantly, however, Huron's senior management failed to accurately describe the acquisition-related payment agreements in these representation letters.  As Huron explained in its Form 10-K/A: "the facts and circumstances surrounding the Shareholders Payments and Employee Payments were not fully described in representation letters previously provided to our independent auditors."

52.     As a result, the Company immediately terminated the Individual Defendants, forcing them to resign without any severance.  The Company further acknowledged that, as a result of the accounting improprieties, it would be forced to restate its financial statements for more than three full years, from 2006 through the first quarter of 2009.  The size of the restatement was massive.  As Huron revealed on July 31, 2009 (the "Restatement 8-K"), Huron had overstated its net income, earnings per share ("EPS") and earnings before interest taxes depreciation and amortization ("EBITDA") in violation of GAAP throughout the Class Period to a staggering degree:

### NET INCOME

| Reporting Period | Reported Net Income (in millions) | Restated Net Income (in millions) | Net Income Overstatement |
|---|---|---|---|
| 2006 | $26.7 | $22.9 | **17 %** |
| 2007 | $41.9 | $24.3 | **72 %** |
| 2008 | $40.7 | $10.1 | **303 %** |
| Q1/09 | $10.3 | $7.1 | **45 %** |

**EARNINGS PER SHARE**

| Reporting Period | Reported Basic EPS | Restated Basic EPS | EPS Overstatement |
|---|---|---|---|
| 2006 | $1.63 | $1.40 | **16 %** |
| 2007 | $2.47 | $1.43 | **73 %** |
| 2008 | $2.23 | $0.55 | **305 %** |
| Q1/09 | $0.52 | $0.36 | **44 %** |

**EBITDA**

| Reporting Period | Reported EBITDA (in millions) | Restated EBITDA (in millions) | EBITDA Overstatement |
|---|---|---|---|
| 2006 | $59 | $55 | **7 %** |
| 2007 | $109 | $91 | **20 %** |
| 2008 | $122 | $91 | **34 %** |
| Q1/09 | $29 | $25 | **16 %** |

## V.    THE DEFENDANTS ACTED WITH SCIENTER

53.    Numerous facts alleged herein establish that Defendants' misstatements were intentional and/or reckless, including the facts that: (1) the Individual Defendants are all financial and accounting experts with many years of experience in assisting clients to comply with technical and complicated accounting rules, and Huron, for which the Individual Defendants served as chief executives, employed hundreds of other experts and highly qualified personnel in accounting and finance whose knowledge and experience they could readily draw upon; (2) the relevant accounting rules violated were simple, clear-cut and long-standing; (3) the fraud was both massive and lengthy, taking place over three and one quarter years, and resulting in the Company reducing its net income by almost 50% for that time period; (4) the Company has admitted its senior management were <u>aware</u> of the redistributions of earn-out payments and that its senior management "misapplied" the governing accounting rules – facts which alone are

sufficient to establish a strong inference of scienter; (5) numerous confidential witnesses have confirmed that the Individual Defendants were well aware of the improper accounting; (6) side agreements existed that contradicted the Company's accounting treatment for the earn-out payments and the terms of the purchase agreements; (7) the Defendants misrepresented facts to Huron's auditors relating to these payments; (8) the Company terminated the Individual Defendants immediately and without severance upon the Board's discovery of the fraud; and, (9) Defendant Holdren benefited handsomely from the fraud by selling Huron stock at artificially inflated prices during the Class Period, deriving proceeds of more than $16 million. Certain of these facts are discussed in more detail below.

### A.   Each Individual Defendant Had Extensive Accounting Knowledge And The Applicable Accounting Rules That Defendants Violated Are Straightforward And Have Been In Place For Decades

54.     As explained in detail above, the fundamental accounting principle at issue in this case is straightforward: any company acquiring another company <u>must</u> record payments related to post-acquisition services of employees as a "compensation expense" that reduces the company's income and earnings per share.  This principle has been part of GAAP for decades.

55.     Given their decades of professional experience in accounting and finance, it is not plausible that these Defendants "misunderstood" this plain and longstanding accounting rule. Indeed, the Individual Defendants are all former senior executives of large accounting firms with many years of CPA experience.  Before co-founding Huron, Defendant Holdren, a CPA, worked for more than 25 years at Andersen, rising to become its worldwide director of financial and economic consulting.  Defendant Burge became a CPA in 1976 and, after starting his career at the accounting firm Haskins & Sells (now Deloitte LLP), held a number of senior financial positions at publicly held companies, including as Chief Financial Officer at Morningstar, Inc.,

before becoming Huron's CFO.  Defendant Lipski became a CPA in 1979 and worked as a senior auditor at Andersen and other senior accounting and finance positions before becoming Huron's Controller and Chief Accounting Officer.  As Confidential Witness ("CW") 1, a legal financial consultant with Huron from July 2007 until May 2009, explained: any accountant "with half a brain" would have been able to perform the accounting correctly, and Huron's own consultants were employed to "advise companies how to avoid situations like this."  In sum, the notion that the Individual Defendants failed to understand the accounting rules is not plausible.

56.     As Gregory Zuckerman of *The Wall Street Journal* remarked in an August 5, 2009, article entitled *Huron Takes Big Hit As Accounting Falls Short*:  "A dose of irony is that Huron makes its money providing financial and legal consulting services, including forensic-style investigative work…."  The article quoted analyst Sean Jackson of Avondale Partners expressing his disbelief that the Defendants did not know about the Company's accounting improprieties, stating:

> One of their businesses is forensic accounting – they're experts in this...investors are saying <u>"These guys had to know what happened with the accounting or they should have known."</u>

57.     Indeed, if any of the Defendants truly had any doubt about the applicable accounting rules, they could have sought the advice from any of the dozens of other accounting experts that Huron has said it employs to assist clients with "complex accounting and financial reporting matters" and with "their accounting and finance needs in the areas of … mergers, acquisitions and divestitures."

58.     Witnesses who worked at the Company – and who knew the Individual Defendants and were fully familiar with their expertise in accounting issues and their managerial styles – were even more direct in their assessment that the Individual Defendants

knew how to properly account for the earn-out payments, but failed to do so.  CW 2, a Director

of Business Development at Huron in Atlanta from 2006 through 2007, stated:  "The real crime

was in Chicago.  All the guilt lies in the Chicago office; they screwed up the accounting."  CW 2

further stated that, "The real tragedy in this whole thing is that Huron held itself out as the

restatement shop for the top 1500 companies in the country, the Fortune 1500.  And here they

can't even do their own acquisitions right."  CW 2 ridiculed the notion that Huron's accounting

irregularities could be chalked up to error:  "It's not an error when it happens 4 times; it was a

trend.  The fact is, they were more aggressive than they needed to be."

> **B.** **Numerous Confidential Witnesses Have Confirmed That The Individual Defendants Were Aware Of Or Recklessly Disregarded The Improper Earn-Out Payment Arrangements**

59.     Multiple percipient witnesses affiliated with Huron during the Class Period have

not only corroborated the findings of Huron's Board of Directors, but have amplified the

Board's findings and have directly attributed knowledge of the accounting fraud to the

Individual Defendants.  For example, CW 3, a Director of Restructuring at Huron during the

Class Period until December 2007 who reported to CW 4 (who, in turn, reported directly to

Defendant Holdren), explained that Huron's acquisitions of other firms were handled personally

by Holdren and a small group of people in Chicago.  As CW 3 stated:  "Nothing got approved

without Holdren's say so – including the final deals for the acquisitions."  CW 3 specifically

explained that Holdren and his colleagues were "cutting deals with selling shareholders and

employees – including stay bonuses," which meant, for example, that an employee of an

acquired firm would be notified that "[Huron] will give you a million bucks if you stick around

for three years."  According to CW 3, these "incentive bonuses and lucrative deals" caused a lot

of talk among Huron employees, and many Huron employees were upset because newly-

arriving employees received these deals.  CW 3 further explained that, in his experience, Defendant Holdren had a "managing to meet earnings target mentality" with a "get it done at whatever cost" managerial style.

60.     Likewise, CW 5, a Director at Huron/S&W from May 2006 until January 2007, stated that Holdren negotiated the sale of S&W with S&W's co-founders, including "sign on" and retention bonuses for former S&W employees.  CW 5, along with other S&W employees, attended a dinner around the time that S&W was acquired by Huron that took place at the W Hotel in New York City.  <u>CW 5 recalled that Holdren specifically stated that "if you stayed on for at least twelve months after the acquisition, you would be given a retention bonus."</u>  CW 5 also stated that S&W's founders provided "money they got paid from Huron" to former S&W employees, based on the tenure of the former S&W employees, to thank those people for "staying on."  CW 6, a Director in Huron's Florida offices from 2005 through 2008, stated that Huron's acquisition of S&W "set the model for subsequent acquisitions."

61.     Similarly, CW 7, an accounting director at Huron from December 2003 until November 2009, stated that Lipski and Burge would have been involved in the improper accounting for the payments, and specifically stated that "Holdren would get involved in the communication of [earn-out payments]."  CW 8, a Huron director in Boston from May 2007 until February 2008, explained in this regard that within Huron there was a "bonus pool" and he understood that some of the earn-out payments were used to fund this pool.  CW 8 added that Holdren, especially because of his professional background at Andersen, would have known if earn-out money was coming into the bonus pool and was being paid out and incorrectly booked as an adjustment to goodwill.  Moreover, according to CW 8, Huron's senior management was adept at "using accounting issues to inflate their earnings and exploit some of the accounting

rules under FAS."   Similarly, CW 4, a Managing Director at Huron from 2002-2006 who reported directly to Defendant Holdren, stated that he had advised Holdren against giving "retention bonuses."   CW 4 also remarked that Defendants Burge and Lipski were "very involved" and "very hands-on" at Huron.   CW 4 further stated that Holdren, Burge and Huron executive Lisa Robison would participate in monthly accounting meetings, which included meetings with every Huron department to go over the financials and status of each department.

62.     In a related vein, numerous confidential witnesses independently stated that the Individual Defendants were closely involved in every aspect of Huron's operations and acquisitions.   For example, CW 7 stated that Holdren was "involved in every facet of the business, including Investor Relations, M&A, etc."   CW 8 described Defendants Holdren, Burge and Lipski as "very hands-on" in their management style, adding that "Gary [Holdren] was in the trenches."   CW 9, a managing director in Huron's office in Washington D.C. from February 2005 until August 2007, corroborated these accounts, stating that with respect to Huron's business operations, Holdren was "very hands on – very involved is probably an understatement."

63.     In addition, numerous confidential witnesses confirmed that the Individual Defendants formed a "tight club" that directly controlled Huron's payments and expenses, including Huron's earn out payments.   For example, CW 10, a manager in Huron's healthcare group from April 2008 until January 2009, stated that Huron's senior management tightly controlled Huron's payments and expenses – to the point where even a reimbursement check for expenses could not be cut without approval from senior management in headquarters – and it was "almost impossible for this to have been carried out without the knowledge of Holdren, Burge and other executives."   CW 11, a Huron director in Chicago from May 2005 until April

2009, described Huron's senior management as a "tight club" which was not prone to disseminate company information outside of their control group.  CW 12, a managing director in Huron's litigation and consulting group in Chicago from December 2005 until early 2007, independently confirmed the understanding of CW 10 and CW 11, stating that Huron had a relatively small management team and that the Individual Defendants tightly controlled Huron's payments.

### C.   "Resignation" Of The Individual Defendants Without Severance

64.   The Individual Defendants' role in Huron's accounting fraud is further confirmed by the circumstances of their "resignations" from Huron immediately upon the Company's disclosure of Huron's restatement and the findings of Huron's Board concerning the role of senior management concerning Huron's materially false financial reporting.  Indeed, Defendant Holdren "resigned" his position as CEO <u>without severance</u> on the very same day that the Audit Committee and the Board concluded that Huron's financial statements were materially inaccurate and needed to be restated.  As explained below, the <u>only</u> plausible inference raised by Holdren's resignation is that he engaged in misconduct that resulted in material financial detriment to Huron.

65.   Specifically, as of March 23, 2009, according to Huron's SEC filings, Holdren was entitled to more than $22 million in severance if his employment was terminated without cause or if he resigned for strictly defined "good reasons."  By contrast, <u>Holdren was not entitled to any severance if his employment was terminated for cause, which could only be established by an affirmative vote of at least 75% of the disinterested members of the Board</u>.  Accordingly, the <u>only</u> plausible inference that can be drawn from the fact that Holdren "resigned" without any severance is that he was terminated for cause.  Termination for cause is

defined in §1.5(b)(i)(3) of a publicly disclosed Amended and Restated Senior Management Agreement dated January 29, 2007, as follows: "the Executive's misconduct that results in material financial detriment to the Company or its affiliates or a material detrimental effect on the business or the reputation of the Company or its affiliates."

66.     Defendant Burge similarly resigned his position as CFO without severance, on July 31, 2009.   As with Defendant Holdren, this "resignation" was a result of Burge's misconduct.  Specifically, on November 22, 2002, Defendant Burge had entered into a "Senior Management Agreement" with Huron which automatically renewed for one year periods on an annual basis.   Under the terms of Burge's employment agreement, Burge was entitled to severance equal to six months' base salary and earned but unpaid annual bonus if his employment was terminated by Huron without cause.  As of March 23, 2009, the total value of Burge's severance was more than $200,000.   Thus, as with Holdren, the most plausible inference to be drawn from Burge's "resignation" without any severance is that he was terminated for cause.

67.     Defendant Lipski resigned his position as Chief Accounting Officer without severance, on July 31, 2009.  Because Lipski by his own admission oversaw all accounting-related areas at Huron, including internal controls, accounting policies, acquisition accounting and employee expense, was actively involved in the Company's acquisitions, and oversaw the work provided to the external auditors, the most plausible inference to be drawn from the fact that Lipski "resigned" without any severance is that he was terminated for cause.

## D.     Defendants Misrepresented Facts To Huron's Independent Auditors

68.     As a publicly-held company, Huron is required to retain an external auditor to audit its financial statements in accordance with generally accepted auditing standards

("GAAS").  During the Class Period, Huron retained PWC to serve as its external auditor.  As part of its audits and reviews of Huron's financial statements, PWC asked for written representations from Huron's senior management to complement other auditing procedures.  Representations requested by PWC from Defendants during the Class Period included: (i) management's belief that the financial statements were fairly presented in conformity with GAAP; (ii) completeness of all financial records and related data that were made available by Defendants to PWC; and (iii) a complete and accurate description of the acquisition-related payments that Huron made when it acquired businesses.  Although PWC could not simply rely on Defendants' representations, PWC could use Defendants' representations to complement its other auditing procedures, and PWC did so.

69.     During the Class Period, Defendants represented to PWC in connection with the Company's audited financial statements that they had provided PWC with complete and accurate information, including with respect to the earn-out payments, and that there were no undisclosed agreements relating to those payments of which they were aware.  Those representations were false.  In the Form 10-K/A, Huron expressly admitted that "the facts and circumstances surrounding the Shareholder Payments and Employee Payments were not fully described in representation letters previously provided to our independent auditors."

70.     According to PWC, Defendants' false representations contributed to its erroneous audit opinion assuring investors that Huron's financial statements during the Class Period fairly presented Huron's financial condition.  In this regard, CW 12, a managing director in Huron's litigation and consulting group in Chicago from December 2005 until early 2007, explained that "if someone could design something to dupe their auditors, who better than auditors?"  CW 12

added that Defendants "knew the kind of paper documentation that was required" and that "if they wanted to defraud PWC, they could get it by."

71.     In addition, while reporting Huron's false financial figures over the course of more than three years, Defendants Holdren and Burge falsely certified that Huron's financial statements were accurate and complete, and that there were no material weaknesses in Huron's internal controls over financial reporting.   These statements assured investors that they could safely rely on Huron's reported results.   However, Defendants Holdren, Burge and Lipski were in fact responsible for a material weakness in Huron's internal controls over financial reporting (which Defendant Lipski also exercised control over as Huron's Controller and Chief Accounting Officer) that rendered the Company's financial statements materially false.   As the Company disclosed in connection with the restatement, it "reevaluated management's conclusion as to the Company's internal controls," and determined that:

> we have identified a material weakness in our internal control over financial reporting related to our accounting for certain acquisition-related payments received by selling shareholders of specific businesses we acquired that were subsequently redistributed by the selling shareholders among themselves and to other select Huron employees.

## E.     Defendant Holdren Profited Enormously From The Artificially Inflated Performance

72.     A strong inference of scienter is further supported by the financial gains that the Individual Defendants reaped during the Class Period based on Huron's artificially inflated performance.   Those profits include Defendant Holdren's insider stock sales and the Individual Defendants' bonuses.   The Individual Defendants were, as a result, highly motivated to conceal the truth so that they could maintain Huron's falsely reported performance in order to sell their

shares at the highest possible prices, and obtain as large a bonus as possible before the truth about the Company's accounting improprieties emerged.

73.     Defendant Holdren took full advantage of the artificial inflation in the Company's stock price caused by Defendants' material misrepresentations detailed herein by making stock sales that were unusual and suspicious in timing and the amount of stock sold.  The chart below shows Holdren's sales of Huron's stock during the Class Period:

| Defendant Holdren's Insider Sales During the Class Period | | | | |
|---|---|---|---|---|
| **Date** | **Shares** | **% Of Holdings** | **Share Price (⊗)** | **Proceeds** |
| 2/27/2007 | 10,000 | 1.50% | $63.50 | $635,000.00 |
| 2/28/2007 | 10,000 | 1.52% | $63.05 | $630,500.00 |
| 3/1/2007 | 10,000 | 1.54% | $62.79 | $627,900.00 |
| 3/2/2007 | 10,000 | 1.57% | $62.88 | $628,800.00 |
| 3/5/2007 | 10,000 | 1.59% | $63.82 | $638,200.00 |
| 3/6/2007 | 10,000 | 1.62% | $64.44 | $644,400.00 |
| 5/9/2007 | 15,000 | 2.70% | $65.81 | $987,150.00 |
| 5/11/2007 | 25,000 | 4.63% | $65.07 | $1,626,750.00 |
| 5/14/2007 | 20,000 | 3.89% | $65.64 | $1,312,800.00 |
| 7/2/2008 | 7,226 | 1.28% | $46.47 | $335,792.22 |
| 7/15/2008 | 10,000 | 1.65% | $50.00 | $500,000.00 |
| 8/1/2008 | 10,000 | 1.68% | $52.50 | $525,000.00 |
| 8/8/2008 | 5,000 | 0.90% | $59.84 | $299,200.00 |
| 8/11/2008 | 5,000 | 0.91% | $62.19 | $310,950.00 |
| 8/12/2008 | 10,000 | 1.83% | $62.21 | $622,100.00 |
| 9/2/2008 | 10,000 | 1.70% | $65.68 | $656,800.00 |
| 10/1/2008 | 10,000 | 1.73% | $56.01 | $560,100.00 |
| 10/13/2008 | 16,194 | 3.03% | $50.37 | $815,691.78 |
| 11/3/2008 | 10,000 | 1.76% | $54.11 | $541,100.00 |
| 12/1/2008 | 10,000 | 1.80% | $50.00 | $500,000.00 |
| 1/2/2009 | 10,000 | 1.86% | $57.79 | $577,900.00 |
| 2/3/2009 | 10,000 | 1.90% | $50.00 | $500,000.00 |
| 2/27/2009 | 4,750 | 0.90% | $41.59 | $197,552.50 |
| 6/11/2009 | 10,000 | 1.94% | $50.00 | $500,000.00 |
| 6/11/2009 | 10,000 | 1.84% | $50.00 | $500,000.00 |
| 7/1/09 | 7,330 | 1.37% | $46.73 | $342,530.90 |
| **TOTALS:** | **275,500** | | | **$16,016,217.40** |

74.     These stock sales are suspicious in amount and in timing, and help raise a strong inference of Holdren's scienter.  Indeed, prior to the Class Period, Holdren did not sell <u>any</u> Huron shares he owned or controlled.  In contrast, during the Class Period and as reflected in the chart above, Holdren sold 275,500 shares that he owned or controlled, or approximately 21% of his total holdings of Huron stock.

## VI.     THE DEFENDANTS' FALSE AND MISLEADING STATEMENTS

75.     Throughout the Class Period, Defendants made materially false and misleading statements regarding Huron's financial performance and condition.  Specifically, in Huron's Restatement 8-K and its Form 10-K/A, Huron admitted that it issued materially false and misleading financial statements for each of the 13 reporting periods from 2006 through the first quarter of 2009.  Moreover, because Huron's false financial statements violated GAAP, including by violating clear accounting rules promulgated by the FASB, Huron's false accounting statements filed with the SEC during the Class Period are presumed to have been misleading.  SEC Regulation S-X, 17 C.F.R. §240.4-01(a)(1).

76.     Defendants' misleading statements are set forth below.

### A.     Defendants' False And Misleading Statements In 2006

77.     As alleged above, Huron acquired S&W on May 9, 2005 for $17.2 million plus additional payments in the future.  In addition, on April 3, 2006, Huron acquired Galt for $20.4 million plus future payments.  With respect to these acquisitions, part of the purchase price was: (i) not shared by the selling shareholders proportionate to their equity interest in the acquired firm; and/or (ii) paid to Huron employees who were not selling shareholders; and/or (iii) paid to Huron employees who were hired after acquisition.  In each case, Huron nevertheless booked those payments as goodwill in direct violation of GAAP.

35

78.   <u>First Quarter 2006:</u>   On April 27, 2006, the first day of the Class Period, Defendants announced Huron's financial results for the first quarter of 2006 in a press release and also filed a Form 10-Q reporting Huron's financial statements for the first fiscal quarter of 2006 ("2006 10-Q/1").   Quoting Defendant Holdren as stating that "Huron Consulting Group performed well in the first quarter," the press release reported Huron's net income for the three months ending March 31, 2006 to be $5.6 million.   The 2006 10-Q/1 – signed by Defendant Burge – reiterated those financial results and represented that Huron's financial statements were prepared in accordance with GAAP.

79.   Analysts relied on these statements to inform investors about Huron's financial condition.   For example, based on the 2006 10-Q/1, a May 1, 2006 WB analyst report concluded that Huron had reported better results than expected and had outperformed its competitors during the first quarter of 2006, and recommended that investors buy Huron stock.   The WB report specifically noted that Huron's reported profits were particularly impressive:

> Last week, Huron Consulting Group (HURN) reported stronger than expected first quarter results and meaningfully increased its annual guidance.  Pro forma earnings per share were $0.36, versus $0.29 during the year-ago period, up 25% year-over-year.  This result exceeded our EPS estimate by $0.05 and the consensus estimate by $0.06.  <u>The outperformance was driven by revenue and by profit margins.</u>

80.   The statements set forth above at ¶78 were materially false and misleading.   In the Form 10-K/A restating Huron's financial statements from 2006 through the first quarter of 2009, Huron admitted that its net income for the quarter was overstated by at least $1,113,000, or 25%, and that its 2006 10-Q/1 was not prepared in accordance with GAAP, because Huron and its senior management had improperly accounted for certain acquisition-related payments as goodwill rather than as compensation expense.

81.    <u>Second Quarter 2006:</u>   On August 8, 2006, Defendants announced Huron's financial results for the second quarter of 2006 in a press release and also filed a Form 10-Q reporting Huron's financial statements for the second fiscal quarter of 2006 ("2006 10-Q/2"). The press release quoted Defendant Holdren as stating that "Huron Consulting Group generated very solid results during the second quarter," and reported that the Company's net income in the second quarter was $6.3 million.  The 2006 10-Q/2 – signed by Defendant Burge – reiterated those financial results and represented that Huron's financial statements were prepared in accordance with GAAP.

82.    Analysts again noted that the results exceeded expectations.  For example, based on the 2006 10-Q/2, WB analysts concluded in an August 8, 2006 report that Huron had "reported stronger-than-expected second quarter results."  Analysts at Deutsche Bank similarly concluded in an August 9, 2006 report that Huron had reported a "strong Q2."  Furthermore, SunTrust initiated analyst coverage of Huron on October 17, 2006, stating that Huron had experienced remarkable growth from its beginning in 2002 and concluding that the Company "operates at superior margin at every level of the income statement despite its relatively smaller size."

83.    The statements set forth above at ¶81 were materially false and misleading.   In the Form 10-K/A, restating Huron's financial statements from 2006 through the first quarter of 2009, Huron admitted that its net income for the quarter was overstated by at least $808,000, or 15%, and for the first six months by at least $1,919,000, or more than 19%.  In the Form 10-K/A Huron also admitted that its 2006 10-Q/2 was not prepared in accordance with GAAP, because Huron and its senior management had improperly accounted for certain acquisition-related payments as goodwill rather than as compensation expense.

84.  <u>Third Quarter 2006:</u>  On November 2, 2006, Defendants announced Huron's financial results for the third quarter of 2006 in a press release and also filed a Form 10-Q reporting Huron's financial statements for the third fiscal quarter of 2006 ("2006 10-Q/3").  The press release reported that Huron's net income was $6.8 million for the quarter and $33.1 million for the first nine months of 2006.  The 2006 10-Q/3 – signed by Defendant Burge – reiterated those financial results and represented that Huron's financial statements were prepared in accordance with GAAP.

85.  The statements set forth above at ¶84 were materially false and misleading.  In the Form 10-K/A restating Huron's financial statements from 2006 through the first quarter of 2009, Huron admitted that its net income for the quarter was overstated by $989,000, or 17%, and for the nine months ending September 30, 2006 by $2,908,000, or more than 18%, and that its 2006 10-Q/3 was not prepared in accordance with GAAP, because Huron and its senior management had improperly accounted for certain acquisition-related payments as goodwill rather than as compensation expense.

86.  <u>Fourth Quarter and Year End 2006:</u>  On February 21, 2007, Defendants announced Huron's financial results for the third quarter of 2006 and for the year ending December 31, 2006 in a press release.  The press release reported that Huron's net income for 2006 was $26.7 million.  On February 21, Defendants also filed a Form 10-K reporting Huron's financial statements for the fourth quarter and full year that ended December 31, 2006 (the "2006 10-K").  The 2006 10-K – signed by Defendants Holdren and Burge – reiterated those financial results, incorporated the financial statements that were reported in the 2006 10-Qs, and represented that Huron's financial statements were prepared in accordance with GAAP.

87.     The statements set forth above at ¶86 were materially false and misleading.  In the
Form 10-K/A restating Huron's financial statements from 2006 through the first quarter of 2009,
Huron admitted that its net income for 2006 was overstated by at least $3,830,000, or almost
17%, and that its 2006 10-K was not prepared in accordance with GAAP, because Huron and its
senior management had improperly accounted for certain acquisition-related payments as
goodwill rather than as compensation expense.

88.     <u>False Certifications Of The 2006 10-Qs and 10-K</u>:  With respect to each of the
financial statements filed by Huron in 2006, Defendants Holdren and Burge certified that (i) the
financial statements fairly represented Huron's financial condition; and (ii) that Holdren and
Burge had disclosed any fraud involving management as well as "all significant deficiencies and
material weaknesses in the design or operation of internal control over financial reporting" to
Huron's auditor and to the Company's Audit Committee.  These certifications were material to
investors because they indicated that Huron's most senior management – the Company's CEO
and CFO – were taking a direct role in ensuring that Huron's reported financial statements were
accurate and that they would quickly detect and correct any inaccuracies that could have a
material impact on Huron's financial condition by maintaining effective internal control
mechanisms.

89.     Holdren's and Burge's certifications that Huron's 2006 10-Qs and 10-K fairly
represented Huron's financial condition, and that Holdren and Burge had disclosed any fraud
involving management, as well as all significant deficiencies and material weaknesses in the
design or operation of Huron's internal control mechanisms, to Huron's auditor and to the Audit
Committee were false.  In its Form 10-K/A, Huron admitted that it did have a material weakness
concerning the financial reporting of earn-out payments to selling shareholders, that senior

management was aware of these payments, and that senior management did not describe the true facts and circumstances of Huron's earn-out payment arrangements to PWC or the Audit Committee.

### B.    Defendants' False And Misleading Statements In 2007

90.    As alleged above, on January 2, 2007, Huron acquired Wellspring for $68 million plus additional payments in the future.  In addition, on July 29, 2007, Huron acquired Callaway for $64.9 million plus future payments.  With respect to these acquisitions, part of the purchase price was: (i) not shared by the selling shareholders proportionate to their equity interest in the acquired firm; and/or (ii) paid to Huron employees who were not selling shareholders; and/or (iii) paid to Huron employees who were hired after acquisition.   In each case, Huron nevertheless booked those payments as goodwill in direct violation of GAAP.

91.    Throughout 2007, Defendants stated that Huron's net income was increasing significantly when compared to 2006.  Indeed, according to Defendants, Huron's net profit increased by $15.2 million or more than 57% year-over-year from the end of 2006 until the end of 2007.   These statements were false because Defendants failed to properly account for acquisition related compensation expenses in the financial statements.  As a result, as set forth in greater detail below, Defendants artificially overstated Huron's aggregate net income for 2007 by more than 72%.

92.    First Quarter 2007:  On May 3, 2007, Defendants announced Huron's financial results for the first quarter of 2007 in a press release and also filed a Form 10-Q reporting Huron's financial statements for the first fiscal quarter of 2007 ("2007 10-Q/1").  According to the press release, Huron's net income during the first quarter of 2007 was $9.8 million.  The

2007 10-Q/1 – signed by Defendant Burge – reiterated those financial results and represented that Huron's financial statements were prepared in accordance with GAAP.

93.     The statements set forth above at ¶92 were materially false and misleading.   In the Form 10-K/A restating Huron's financial statements from 2006 through the first quarter of 2009, Huron admitted that its net income for the quarter was overstated by at least $3,750,000, or 62%, and that its 2007 10-Q/1 was not prepared in accordance with GAAP, because Huron and its senior management had improperly accounted for certain acquisition-related payments as goodwill rather than as compensation expense.

94.     <u>Second Quarter 2007:</u>   On August 7, 2007, Defendants announced Huron's financial results for the second quarter of 2007 in a press release and also filed a Form 10-Q reporting Huron's financial statements for the second fiscal quarter of 2007 ("2007 10-Q/2"). The press release quoted Defendant Holdren as stating that he was "very pleased with the strong revenue and earnings growth posted by Huron in the quarter," and reported Huron's net income for the quarter to be $10.1 million compared to $6.3 million for the comparable quarter in 2006. The 2007 10-Q/2 – signed by Defendant Burge – reiterated those financial results and represented that Huron's financial statements were prepared in accordance with GAAP.

95.     Analysts relied on these statements to inform investors about Huron's financial condition.  For example, based on the 2007 10-Q/2, analysts at Deutsche Bank issued a report on August 7, 2007, remarking on Huron's "solid" results for the second quarter of 2007 and recommending that investors buy Huron stock.  Deutsche Bank raised its price target for Huron stock to $90 per share.  On August 7, SunTrust raised its price target for Huron stock to a "conservative" $80 per share, and similarly continued to encourage its clients to buy Huron shares.  The following day, on August 8, WB published a report stating that Huron's results

exceeded its estimate, "primarily due to a better-than expected gross margin." Under the heading "Profit Margins Better Than Expected," WB explained:

> Building on what were already industry-high EBITDA margins, Huron Consulting reported solid EBITDA margin expansion during the second quarter. … This was the primary driver of the company's [earnings per share] outperformance relative to our estimate.

96.     The statements set forth above at ¶94 were materially false and misleading. In the Form 10-K/A restating Huron's financial statements from 2006 through the first quarter of 2009, Huron admitted that its net income for the quarter was overstated by at least $3,844,000, or 64%, and for the first six months of 2007 by $7,954,000, or more than 66%. In the Form 10-K/A, Huron also admitted that its 2007 10-Q/2 was not prepared in accordance with GAAP because Huron and its senior management had improperly accounted for certain acquisition-related payments as goodwill rather than as compensation expense.

97.     <u>Third Quarter 2007:</u>  On October 31, 2007, Defendants announced Huron's financial results for the third quarter of 2007 in a press release and also filed a Form 10-Q reporting Huron's financial statements for the third fiscal quarter of 2007 ("2007 10-Q/3"). The 2007 10-Q/3 – signed by Defendant Burge – reiterated those financial results and represented that Huron's financial statements were prepared in accordance with GAAP. Defendants Holdren and Burge joined analysts on a conference call to discuss Huron's results the same day. During the call, Holdren emphasized that Huron's revenues and operating income had grown substantially, stating "Huron's nine months revenues have increased by nearly 80% over last year, with an 83% increase in operating income."

98.     The statements set forth above in ¶97 were false and misleading. In the Form 10-K/A restating Huron's financial statements from 2006 through the first quarter of 2009, Huron

admitted that its net income for the first nine months of 2007 was overstated by $12,366,000, or more than 68%, and that its 2007 10-Q/3 was not prepared in accordance with GAAP, because Huron and its senior management had improperly accounted for certain acquisition-related payments as goodwill rather than as compensation expense.  Moreover, Huron's Form 10-K/A also showed that Holdren's statements during the conference call were false: Huron admitted that it had understated its direct costs in the third quarter of 2007 by $4.7 million, thereby materially overstating its operating income.

99.     <u>Fourth Quarter and Year End 2007:</u>  On February 20, 2008, Huron issued a press release announcing its financial results for the fourth quarter of 2007 and the full year that ended December 31, 2007.  The press release stated that Huron's net income in 2007 was $41.9 million and that "[f]ull year 2007 EBITDA(5) increased 84.9% to $108.9 million."  On February 21, 2008, Defendants filed a Form 10-K reporting Huron's financial statements for the fourth quarter and full year that ended December 31, 2007 (the "2007 10-K").  The 2007 10-K – signed by Defendants Holdren and Burge – reiterated those financial results, incorporated the financial statements that were reported in the 2007 10-Qs, and represented the financial statements were prepared in accordance with GAAP.

100.    The statements set forth in ¶99 were false and misleading.  In the Form 10K/A restating Huron's financial statements from 2006 through the first quarter of 2009, Huron admitted that it overstated Huron's net income for 2007 by at least $17,621,000, or more than 72%, and that its 2007 financial statements were not prepared in accordance with GAAP, because Huron and its senior management had improperly accounted for certain acquisition-related payments as goodwill rather than as compensation expense.

101.     <u>False Certifications Of The 2007 10-Qs and 10-K:</u>  With respect to each of the financial statements that were filed in 2007, Defendants Holdren and Burge certified that (i) the financial statements fairly represented Huron's financial condition; and (ii) that Holdren and Burge had disclosed any fraud involving management as well as "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting" to Huron's auditor and to the Audit Committee.  These certifications indicated to investors that Huron's CEO and CFO had a direct role in ensuring that Huron's reported financial statements were accurate, and they were material to investors.

102.     Defendants Holdren and Burge falsely certified that Huron's 2007 10-Qs and 10-K fairly represented Huron's financial condition, and that Holdren and Burge had disclosed any fraud involving management as well as all significant deficiencies and material weaknesses in the design or operation of Huron's internal control mechanisms.  In its Form 10-K/A, Huron admitted that it did have a material weakness concerning the financial reporting of earn-out payments to selling shareholders, that senior management was aware of these payments, and that senior management did not describe the true facts and circumstances of Huron's earn-out payment arrangements to PWC or the Audit Committee.

**C.     Defendants' False And Misleading Statements In 2008**

103.     Throughout 2008, Defendants stated that Huron's net income was increasing significantly in comparison to Huron's 2007 results.  These statements were false because Defendants failed to include acquisition-related compensation expenses in the financial statements.  As a result, as set forth in greater detail below, <u>Defendants artificially overstated Huron's aggregate net income for 2008 by an astonishing more than 300%.</u>

104.   <u>First Quarter 2008:</u>   On May 6, 2008, Defendants announced Huron's financial results for the first quarter of 2008 in a press release and also filed a Form 10-Q reporting Huron's financial statements for the first fiscal quarter of 2008 ("2008 10-Q/1").   The press release stated that Huron's net income for the first quarter of 2008 was $10.2 million.   The 2008 10-Q/1 – signed by Defendant Burge – reiterated those financial results and represented that Huron's financial statements were prepared in accordance with GAAP.

105.   The statements set forth in ¶104 were materially false and misleading.   In the Form 10-K/A restating Huron's financial statements from 2006 through the first quarter of 2009, Huron admitted that its net income for the quarter was overstated by at least $7,164,000, or more than 234%, and that its 2008 10-Q/1 was not prepared in accordance with GAAP, because Huron and its senior management had improperly accounted for certain acquisition-related payments as goodwill rather than as compensation expense.

106.   <u>Second Quarter 2008:</u>   On August 5, 2008, Defendants announced Huron's financial results for the second quarter of 2008 and filed a Form 10-Q reporting Huron's financial statements for the second fiscal quarter of 2008 ("2008 10-Q/2").   The following day, Huron issued a press release stating that Huron's net income for the quarter was $9.8 million. The 2008 10-Q/2 – signed by Defendant Burge – reiterated those financial results and represented that Huron's financial statements were prepared in accordance with GAAP.

107.   Analysts responded favorably to the financial results announced in the 2008 10-Q/2.   Deutsche Bank stated in an August 5, 2008 report that Huron had reported a "Solid Quarter" and reiterated its recommendation to clients to buy Huron's stock.   On August 6, SunTrust published a report stating that the earnings per share reported by Huron in the 2008 10-Q/2 exceeded SunTrust's expectation before the results were announced and, additionally,

that "[g]ross profit increased 10.7% year over year from $51.8 million to $57.4 million in 2Q08."   SunTrust continued to rate Huron stock as "buy."

108.    The statements set forth in ¶106 were materially false and misleading.   In the Form 10-K/A restating Huron's financial statements from 2006 through the first quarter of 2009, Huron admitted that that its net income for the quarter was overstated by at least $8.6 million, or 764%, and for the first six months of 2008 by at least $15,838,000, or more than 378%, and that its 2008 10-Q/2 was not prepared in accordance with GAAP, because Huron and its senior management had improperly accounted for certain acquisition-related payments as goodwill rather than as compensation expense.

109.    <u>Third Quarter 2008:</u> On October 30, 2008, Defendants announced Huron's financial results for the third quarter of 2008 in a press release and also filed a Form 10-Q reporting Huron's financial statements for the third fiscal quarter of 2008 ("2008 10-Q/3").   The press release quoted Defendant Holdren commenting on "the Company's strong results" and reported that Huron's net income in the third quarter was $8.8 million.   The 2008 10-Q/3 – signed by Defendant Burge – reiterated those financial results and represented that Huron's financial statements were prepared in accordance with GAAP.

110.    Analysts relied on these statements to inform investors about Huron's financial condition and, following the announcement of the 2008 10-Q/3 results, Deutsche Bank, SunTrust and WB maintained their recommendation that clients buy Huron stock.   WB stated in an October 30, 2008 report that Huron's results "exceeded our estimate and the consensus" and that this "outperformance was driven by better-than-expected revenue growth and profit margins."

111.   The statements set forth in ¶109 were materially false and misleading.   In the Form 10-K/A restating Huron's financial statements from 2006 through the first quarter of 2009, Huron admitted that its net income for the third quarter was overstated by $6,392,000, or 262%, and for the first nine months of 2008 by at least $22,230,000, or more than 335%, and that its 2008 10-Q/3 was not prepared in accordance with GAAP, because Huron and its senior management had improperly accounted for certain acquisition-related payments as goodwill rather than as compensation expense.

112.   <u>Fourth Quarter and Year End 2008:</u> On February 24, 2009, Defendants announced Huron's financial results for the fourth fiscal quarter of 2008 and for 2008.   The press release stated that Huron's net income in the fourth quarter was $11.8 million and that Huron's net income in 2008 was $40.7 million.   Defendants also filed a Form 10-K reporting Huron's financial statements for the fourth quarter and full year that ended December 31, 2008 ("2008 10-K").   The 2008 10-K – signed by Defendants Holdren and Burge – reiterated those financial results, incorporated the financial statements that were reported in the 2008 10-Qs, and represented that Huron's financial statements were prepared in accordance with GAAP.

113.   The statements set forth in ¶112 were materially false and misleading.   In the Form 10-K/A restating Huron's financial statements from 2006 through the first quarter of 2009, Huron admitted that its net income for the quarter was overstated by at least $8,340,000, or 241%, and that its income for 2008 was overstated by at least $30,570,000, or more than 303%, and that its 2008 financial statements were not prepared in accordance with GAAP, because Huron and its senior management had improperly accounted for certain acquisition-related payments as goodwill rather than as compensation expense.

114.   <u>False Certifications Of The 2008 10-Qs and 10-K</u>:  With respect to each of the financial statements that were filed in 2008, Defendants Holdren and Burge certified that (i) the financial statements fairly represented Huron's financial condition; and (ii) that Holdren and Burge had disclosed any fraud involving management as well as "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting" to Huron's auditor and to the Audit Committee.  These certifications indicated to investors that Huron's CEO and CFO had a direct role in ensuring that Huron's reported financial statements were accurate, and they were material to investors.

115.   Holdren's and Burge's certifications that Huron's 2008 10-Qs and 10-K fairly represented Huron's financial condition, and that Holdren and Burge had disclosed any fraud involving management, as well as all significant deficiencies and material weaknesses in the design or operation of Huron's internal control mechanisms, to Huron's auditor and to the Audit Committee were false.  In its Form 10-K/A, Huron admitted that it did have a material weakness concerning the financial reporting of earn-out payments to selling shareholders, that senior management was aware of the related payments, and that senior management did not describe the true facts and circumstances of Huron's earn-out payment arrangements to PWC or the Audit Committee.

**D.   Defendants' False And Misleading Statements In 2009**

116.   <u>First Quarter 2009</u>:  On April 30, 2009, Defendants announced Huron's financial results for the first quarter of 2009.  The press release stated that in the first quarter of 2009, Huron generated net income of $10.3 million.  Defendants also filed a Form 10-Q reporting Huron's financial statements for the first fiscal quarter of 2009 ("2009 10-Q/1").  The 2009 10-

Q/1 – signed by Defendant Burge – reiterated those financial results and represented that Huron's financial statements were prepared in accordance with GAAP.

117.    Analysts relied on these statements to inform investors about Huron's financial condition and, as a result of the announced figures, Huron met analyst expectations.   For example, an April 30, 2009 WB report stated that "[e]arlier this morning, Huron Consulting reported first quarter results that were relatively in line with both our estimate and the consensus estimate."

118.    The statements set forth in ¶116 were false and misleading.   In the Form 10-K/A restating Huron's financial statements from 2006 through the first quarter of 2009, Huron admitted that its net income for the quarter was overstated by at least $3,175,000, or almost 45%, and that its 2009 10-Q/1 was not prepared in accordance with GAAP, because Huron and its senior management had improperly accounted for certain acquisition-related payments as goodwill rather than as compensation expense.

119.    <u>False Certifications Of The 2009 10-Q/1:</u>   Defendants Holdren and Burge certified that the 2009 10-Q/1 financial statements fairly represented Huron's financial condition, and that they had disclosed any fraud involving management as well as "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting" to Huron's auditor and to the Audit Committee.   These certifications of Holdren and Burge indicated to investors that Huron's senior management had expressly undertaken direct responsibilities in ensuring that Huron's reported financial statements were accurate.   As such, the certifications were material to investors.

120.    Holdren's and Burge's certifications that Huron's 2009 10-Q/1 fairly represented Huron's financial condition, and that Holdren and Burge had disclosed any fraud involving

management, as well as all significant deficiencies and material weaknesses in the design or operation of Huron's internal control mechanisms, to Huron's auditor and to the Audit Committee were false.  In its Form 10-K/A, Huron admitted that it did have a material weakness concerning the financial reporting of earn-out payments to selling shareholders, that senior management was aware of the related payments, and that senior management did not describe the true facts and circumstances of Huron's earn-out payment arrangements to PWC or the Audit Committee.

## VII.    THE TRUTH BEGINS TO EMERGE

121.    On Friday, July 31, 2009, after the markets closed, Huron shocked investors when it revealed that the Company's financial statements for the fiscal years 2006, 2007, 2008, and the fiscal first quarter of 2009, were materially misstated, should no longer be relied upon, and would have to be restated as a result of the Company's improper accounting for certain payments related to Huron's acquisition of four companies acquired between 2005 and 2007. The Company further disclosed that, as a result of the improper accounting, Huron's aggregate reported net profit for that period would be cut nearly in half, by $57 million, from $120 million to just $63 million.   Huron also revealed that the Company's Chairman and CEO, Chief Financial Officer and Chief Accounting Officer – Defendants Holdren, Burge and Lipski, respectively – had immediately resigned their positions at the Company without severance.

122.    These shocking announcements caused the price of Huron stock to drop massively – 70% in one day – from a closing price of $44.35 per share on Friday, July 31, 2009 to a closing price of $13.69 per share on Monday, August 3, 2009 (the first trading day after the July 31, 2009 announcement), a decline of $30.66 per share, on extraordinary volume of over 32.4 million shares, or over 121 times the average trading volume for Huron Stock during the

Class Period.  The market's strong reaction corresponded with the significance of the disclosure of the previously-concealed facts about Huron.  For example, as the Company admitted in connection with its restatement, Huron's previously reported "growth" in income after 2006 was almost entirely the result of phony accounting, and Huron's reported income in 2008 was 410% greater than the corrected amount reported in its restated financial statement for 2008.

123.    Analysts were also shocked.  In response to Huron's announcements, on August 3, 2009, Deutsche Bank published a report lowering the price target for Huron's stock by *60%* to $20 per share while noting Huron's "[t]riple whammy: Guidance retraction, Restatement and Mgmt changes."  On August 3, WB also published a report discussing the "very disappointing" announcements, noting that "to complicate matters further, management is not responding to questions from shareholders or analysts."

124.    The financial press noted the irony that Huron, a company with hundreds of accounting experts, had violated GAAP and was required to restate its financial statements for more than three years.  On August 6, 2009, *Bloomberg* published an article entitled "Blowing Up Your Company Gets Raised To Art Form" stating that "Huron had built a reputation as a Mr. Fix-It for companies embroiled in accounting messes" and quoting Huron's website as saying that Huron had "the skills and experience to help you resolve your accounting question, the ability to explain the literature in a clear and concise manner, and the ability to help you apply the literature in practice."  The article concluded that, instead, "[t]oday, Huron is better known as the forensic accounting shop that couldn't keep its books straight, and blew up its business model in the process."

125.    Even in its restatement, Huron continued to incorrectly account for the acquisition-related payment redistributions.  Rather than immediately reduce Huron's goodwill,

as the Company should have done, Huron recorded the monies redistributed by selling shareholders as contributions to the Company's capital by the selling shareholders. This was incorrect because it assumed that the selling shareholders had independently decided to take tens of millions of dollars that they were entitled to out of their own pockets and give these monies to current and future Huron employees. As admitted by the Company, that is <u>not</u> what happened.

126.   In fact, as set forth above, Huron's senior executives were well aware of the redistributions of the purchase price to current and future employees, and the redistributions were fundamental parts of those acquisitions (as evidenced by, among other things, the written agreements that the Company was later forced to amend). In other words, these redistributions were tied to Huron's acquisition-related payments with Defendants' knowledge, and <u>did not</u> somehow reflect repeated instances of independent and unusually altruistic actions by the selling shareholders in at least four separate Huron acquisitions.

127.   Tellingly, concurrently with the reduction of net income and corresponding increase in capital supposedly paid in by the selling shareholders that was recorded in its restatement, Huron reevaluated its goodwill for impairment and ultimately reduced its goodwill by $106 million, or nearly twice the $57 million of net income that the Company admitted had been improperly recorded. In reality, the goodwill reduction was necessitated by the improper accounting related to Huron's acquisitions, and goodwill should have been reduced at the time of the restatement since the redistributed payments to the current and future employees should never have been recorded as goodwill in the first place, but as expenses.

## VIII.   LOSS CAUSATION

128.   Defendants' wrongful conduct directly caused the economic losses suffered by Lead Plaintiffs and the Class.   During the Class Period, the market price of Huron stock was artificially inflated as a result of the false and misleading statements made by Defendants, discussed above in Section VI, reaching $44.35 per share immediately before disclosure of Huron's fraud after the close of the market on July 31, 2009.   Consequently, the Lead Plaintiffs' and Class members' purchases of Huron stock during the Class Period were made at artificially inflated prices.   When Defendants' false and misleading statements were revealed to investors, the stock price of Huron's shares declined precipitously, causing substantial losses to investors.

129.   Defendants' scheme to overstate Huron's earnings was revealed when Huron announced after the market closed on July 31, 2009 that it was required to restate its financial results for 2006, 2007, 2008 and the first quarter of 2009.   As this adverse information became known to investors, the prior artificial inflation was eliminated from Huron's stock price, and Lead Plaintiffs and the Class were damaged because of the resulting stock price decline.   As a direct result of investors learning of Defendants' scheme, Huron's stock price collapsed from $44.35 per share at the close of trading on July 31, 2009 to $13.69 per share at the close of trading on August 3, 2009 (the first business day following the announcement).

130.   The decline in Huron's stock price at the end of the Class Period, on extremely high trading volume, was a direct result of the Defendants' scheme being revealed to investors and to the market.   Indeed, the Company itself has acknowledged that the announcement of the restatement caused the "significant decline in the price of our common stock."   As the Company's Form 10-K/A states:

> On July 31, 2009, immediately prior to our announcement of our intention

to restate our financial statements, the price of our common stock was $44.35 per share. As of the close of business on August 3, 2009, <u>the business day following such announcement</u>, the price of our common stock was $13.69 per share.

Thus, the Company itself has admitted that the stock price decline was attributable to the disclosure of the restatement, and not to any other factors.

131.    The timing and magnitude of Huron's stock price decline negates any inference that the losses suffered by Lead Plaintiffs and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to Defendants' fraudulent conduct.

132.    As the following chart shows, during the same period in which the price of Huron stock (ticker "HURN") fell dramatically as a result of Defendants' fraud being revealed, the NASDAQ (ticker "ICIX") and the S&P 500 (ticker "GSPC"), as well as the stock price of three of Huron's peers, Navigant Consulting (ticker "NCI") FTI Consulting (ticker "FCN") and CRA (ticker "CRAI"), were relatively unchanged:[7]

---

[7] *See Yahoo! Finance* available online at:
http://finance.yahoo.com/echarts?s=HURN#chart9symbol=hurn;range=20081229,20091228;compare=crai+fcn+nci+^ixic+^gspc;indicator=volume;charttype=line;crosshair=on;ohlcvalues=0;logscale=on.



## IX.   PRESUMPTION OF RELIANCE

133.   At all relevant times, the market for Huron's common stock was efficient for the following reasons, among others:

(a)   Huron's stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

(b)   As a regulated issuer, Huron filed periodic reports with the SEC and NASDAQ;

(c)   Huron regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   Huron was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers.   Each of these reports was publicly available and entered the public market place.

134.     As a result of the foregoing, the market for Huron stock promptly digested current information regarding Huron from all publicly available sources and reflected such information in Huron's stock price.   Under these circumstances, all purchasers of Huron common stock during the Class Period suffered similar injury through their purchase of Huron common stock at artificially inflated prices, and a presumption of reliance applies.

## X.     NO SAFE HARBOR

135.     The statutory safe harbor and/or bespeaks caution doctrine applicable to forward looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded in this Complaint.

136.     None of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Huron's financial results, its reported net income, earnings per share, and EBITDA, among others.

137.     Further, the statutory safe harbor does not apply to statements included in financial statements that purportedly were made in accordance with GAAP, such as Huron's Forms 10-K and 10-Q issued throughout the Class Period.

138.     To the extent that any of the false and misleading statements alleged herein can be construed as forward looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.   As set forth above in detail, then existing facts contradicted Defendants' statements regarding Huron's financial results, its reported net income, earnings per share, and EBITDA, among others.   Given the then-existing facts contradicting Defendants' statements, the

generalized risk disclosures made by Huron were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

139.    To the extent that the statutory safe harbor does apply to any forward looking statements pleaded herein, Defendants are liable for those false forward looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward looking statement was false, and/or the false forward looking statement was authorized and/or approved by an executive officer of Huron who knew that the statement was false when made.

## XI.    LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS

140.    Lead Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the common stock of Huron between April 27, 2006 and July 31, 2009, inclusive (the "Class"), and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of Huron at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

141.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Huron common shares were actively traded on NASDAQ.  As of April 23, 2009, Huron had approximately 21,522,506 million shares of common stock issued and outstanding.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members of the proposed Class.  Class members who purchased Huron common shares may be identified from records maintained by

Huron or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

142.   Lead Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

143.   Lead Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

144.   Common questions of law and fact exist to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of fact and law common to the Class are:

> (a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;
>
> (b)   whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and internal controls of Huron;
>
> (c)   whether Defendants acted with scienter; and
>
> (d)   to what extent the members of the Class have suffered damages, as well as the proper measure of damages.

145.   A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable.  Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation makes it impossible for such members to individually redress the wrong done to them.  There will be no difficulty in the management of this action as a class action.

## XII.   CAUSES OF ACTION

### COUNT I

### FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5 PROMULGATED THEREUNDER
### (Against Defendants Huron, Holdren and Burge)

146.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

147.    This Count is asserted on behalf of all members of the Class against Defendants Huron, Holdren and Burge for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

148.    During the Class Period, Defendants Huron, Holdren and Burge disseminated or approved the false statements specified below, among others, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

149.    These Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Huron common stock during the Class Period.  As detailed herein, the misrepresentations contained in, or the material facts omitted from, those statements included, but were not limited to, the Company's publicly reported net income, earnings per share and EBIDTA at each reporting period from

2006 through the first quarter of 2009, statements of compliance with GAAP in preparing Huron's financial statements, and statements of the adequacy of Huron's internal controls over financial reporting.

150.     These Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Huron common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and the Class, regarding, among other things, Huron's artificially inflated statements of net income, earnings per share, and EBITDA, and the Company's failure to comply with GAAP and failure to maintain adequate internal controls over financial reporting; (b) artificially inflate and maintain the market price of Huron common stock; and (c) cause Lead Plaintiffs and other members of the Class to purchase Huron common stock at artificially inflated prices and suffer losses when the true facts became known.

151.     Defendant Huron is liable for all materially false and misleading statements made during the Class Period, as alleged above, including the false and misleading statements in:

      a.        Huron's 2006 10-Q/1;

      b.        Huron's 2006 10-Q/2;

      c.        Huron's 2006 10-Q/3;

    d.        Huron's 2006 10-K;

    e.        Huron's 2007 10-Q/1;

    f.        Huron's 2007 10-Q/2;

    g.        Huron's 2007 10-Q/3;

    h.        Huron's 2007 10-K;

    i.        Huron's 2008 10-Q/1;

    j.        Huron's 2008 10-Q/2;

    k.        Huron's 2008 10-Q/3;

    l.        Huron's 2008 10-K; and

    m.        Huron's 2009 10-Q/1.

152.    Huron is further liable for the false and misleading statements made in press releases, website postings, newspaper articles and during conference calls with investors and analysts, as alleged above, as the maker of such statements and under the principle of *respondeat superior*.

153.    Defendants Holdren and Burge are liable for the false and misleading statements they made, as set forth above, including:

    a.    Defendant Holdren's false statements during the October 31, 2007 conference call, and the other statements for which he was responsible, including those made in the Company's Forms 10-K and 10-Q, press releases, website postings, newspaper articles, and during and in connection with conference calls and meetings with investors and/or analysts from April 27, 2006 through July 31, 2009; and

    b.    Defendant Burge's false statements for which he was directly responsible, including those made in the Company's Forms 10-K and 10-Q, press releases, website postings, newspaper articles, and during and in connection with conference calls and meetings with investors and/or analysts from April 27, 2006 through July 31, 2009.

154.    Defendants Holdren and Burge benefited from making these false and misleading statements.    Holdren and Burge benefited from insider stock sales of personally held or controlled Huron stock at artificially inflated stock prices – Holdren's proceeds during the Class Period were $16,016,217.40; Burge's proceeds were $444,380.81.    In addition, Holdren and Burge received substantial cash bonuses and stock awards during the Class Period as a result of Huron's artificially inflated performance, as reflected in the following tables:

| Defendants Holdren's Salary and Incentive Awards | | | | |
|---|---|---|---|---|
| | Salary | Cash Bonus | Stock Award | Stock Option Award |
| 2006 | $800,000 | $775,000 | $1,215,529 | $74,531 |
| 2007 | $1,100,000 | - | $4,161,593 | $72,243 |
| 2008 | $1,150,000 | - | $5,285,806 | $17,652 |
| Total | $3,050,000 | $775,000 | $10,662,928 | $164,426 |
| Defendants Burge's Salary and Incentive Awards | | | | |
| | Salary | Cash Bonus | Stock Award | Stock Option Award |
| 2006 | $325,000 | $215,000 | $273,939 | $10,788 |
| 2007 | $400,000 | - | $581,644 | $10,674 |
| 2008 | $400,000 | - | $793,077 | $2,648 |
| Total | $1,125,000 | $215,000 | $1,648,660 | $24,110 |

155.    As described above, the Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. Specifically, these Defendants knew or recklessly disregarded that, in violation of GAAP, during the Class Period, Huron was engaging in a scheme to conceal its employee compensation

expenses and artificially boost its reported net income, earnings per share and EBITDA, as described more fully above.

156.    The above allegations, as well as the allegations pertaining to the overall scope and breadth of the fraud at Huron, which resulted in continuous and material overstatements of the Company's most important financial metrics, establish a strong inference that Defendants Huron, Holdren, and Burge acted with scienter in making the materially false and misleading statements set forth above during the Class Period.

157.    Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Huron common stock, which inflation was removed from the stock when the true facts became known.  Lead Plaintiffs and the Class would not have purchased Huron common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

158.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the fraud alleged herein in connection with their purchases of Huron common stock during the Class Period.

## COUNT II

### FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
### (Against Defendants Holdren, Burge and Lipski)

159.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

160.    This Count is asserted on behalf of all members of the Class against each of the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

161.     During their tenures as officers and/or directors of Huron, each of these Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of Huron, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the public statements made by Huron during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

162.     In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Holdren, Burge and Lipski had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions.  Defendants Holdren and Burge signed the Company's SEC filings during the Class Period, and were directly involved in providing false information and certifying and/or approving the false statements disseminated by Huron during the Class Period.  Defendant Lipski, as Controller and Chief Accounting Officer, was also directly responsible for controlling, and did control, the Company's violations of GAAP and other relevant accounting rules, and was directly involved in providing false information and certifying and/or approving the false statements disseminated by Huron during the Class Period. In addition to the facts showing control alleged above, Defendant Lipski has acknowledged in his *curriculum vitae*, which is available online, that at Huron he oversaw "40 employees" and that he was "[r]esponsible for all accounting related areas including external reporting, GAAP accounting, revenue recognition . . . internal controls, accounting policies, internal financial

statements, [and] acquisition accounting. . . ." and that he was "[a]ctively involved in the company's acquisitions – due diligence, transition process, etc."  As a result of the foregoing, Defendants Holdren, Burge and Lipski, as a group and individually, were controlling persons of Huron within the meaning of Section 20(a) of the Exchange Act.

163.    As set forth above, Huron violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of Huron and as a result of their own aforementioned conduct, Defendants Holdren, Burge and Lipski are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired Huron common stock.  Moreover, as detailed above, during the respective times these Defendants served as officers and/or directors of Huron, each of these Defendants was culpable for the material misstatements and omissions made by Huron, including such misstatements as the Company's false financial statements, including false statements concerning Huron's net income, earnings per share, and EBIDTA, as set forth above.

164.    As a direct and proximate result of these Defendants' conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of Huron common stock.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

(a)    Declaring the action to be a proper class action pursuant to Fed. R. Civ. P. 23;

(b)      Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)      Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

(d)      Awarding such equitable, injunctive and other relief as the Court may deem just and proper.

## XIV.   **JURY DEMAND**

Lead Plaintiffs hereby demand a trial by jury.

Dated:  January 29, 2010

**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**

By: /s/   Avi Josefson
Steven B. Singer
Jerald D. Bien-Willner (*pro hac vice* pending)
Jeroen van Kwawegen
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel: (212) 554-1400
Fax: (212) 554-1444

-and-

Avi Josefson
2835 N. Sheffield Avenue, Suite 409
Chicago, Illinois 60657
Tel: 773-883-5382
avi@blbglaw.com
Illinois Bar No. 6272453

**LABATON SUCHAROW LLP**

By: /s/   Christopher J. Keller
Christopher J. Keller
Javier Bleichmar
140 Broadway
New York, NY 10005
Tel:  (212) 907-0700
Fax:  (212) 818-0477

**COHEN MILSTEIN SELLERS
   & TOLL PLLC**

By: /s/   Carol V. Gilden
Carol V. Gilden
190 South LaSalle Street, Suite 1705
Chicago, Illinois 60603
Tel.: (312) 357-0370
Fax:  (312) 357-0369
cgilden@cohenmilstein.com
Attorney ID: 06185530

-and-

Steven J. Toll
Daniel S. Sommers
Matthew K. Handley
1100 New York Avenue N.W.
West Tower, Suite 500
Washington, DC 20005-3964
Tel: (202) 408-4600

*Co-Lead Counsel for the Court-appointed Lead
Plaintiffs and the Class*

Exhibit A



**Chicago Teachers' Pension Fund**

203 N LaSalle, Suite 2600
Chicago, IL 60601-1210

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Kevin Huber, on behalf of the Public School Teachers' Pension & Retirement Fund of Chicago ("Chicago Teachers"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.    I am the Executive Director of Chicago Teachers.  I have reviewed a complaint filed in this matter.  Chicago Teachers has authorized Bernstein Litowitz Berger & Grossmann LLP and Cohen Milstein Sellers & Toll PLLC to file a motion for appointment as lead plaintiff on its behalf.

2.    Chicago Teachers did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3.    Chicago Teachers is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.  Chicago Teachers fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4.    Chicago Teachers' transactions in the Huron Consulting Group Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5.    Chicago Teachers has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

*Eastwood Enterprises LLC, v. Farha et al.,* No. 07-cv-1940 (M.D. Fla.)
*In re Ambac Financial Group, Inc. Securities Litigation,* No. 08-cv-411 (S.D.N.Y.)

6.    Chicago Teachers will not accept any payment for serving as a representative party on behalf of the Class beyond Chicago Teachers' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this __ day of October 2009.

Kevin Huber
Executive Director
*Public School Teachers' Pension &
Retirement Fund of Chicago*

**Public School Teachers' Pension & Retirement Fund of Chicago**
**Transactions in Huron Consulting Group Inc. (HURN)**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 6/21/2006 | 16,240 | 30.4700 |
| Purchase | 9/22/2006 | 3,300 | 39.8115 |
| Purchase | 9/25/2006 | 100 | 39.7300 |
| Purchase | 2/14/2007 | 5,000 | 54.8658 |
| Purchase | 2/15/2007 | 1,400 | 54.9638 |
| Purchase | 2/16/2007 | 800 | 54.9176 |
| Purchase | 2/22/2007 | 2,300 | 60.2128 |
| Purchase | 2/23/2007 | 300 | 61.9985 |
| Purchase | 3/28/2007 | 900 | 61.2627 |
| Purchase | 4/3/2007 | 700 | 61.7186 |
| Purchase | 4/4/2007 | 800 | 61.9614 |
| Purchase | 4/9/2007 | 200 | 62.0000 |
| Purchase | 4/11/2007 | 500 | 61.7717 |
| Purchase | 4/26/2007 | 900 | 61.6933 |
| Purchase | 4/30/2007 | 200 | 60.4938 |
| Purchase | 5/3/2007 | 1,200 | 67.4451 |
| Purchase | 5/10/2007 | 500 | 65.4418 |
| Purchase | 5/17/2007 | 5,300 | 61.7900 |
| Purchase | 5/17/2007 | 400 | 61.8373 |
| Purchase | 5/18/2007 | 725 | 62.6536 |
| Purchase | 5/18/2007 | 1,400 | 61.7685 |
| Purchase | 5/21/2007 | 75 | 63.2700 |
| Purchase | 5/21/2007 | 300 | 62.3715 |
| Purchase | 5/22/2007 | 1,900 | 65.0627 |
| Purchase | 5/23/2007 | 800 | 65.7855 |
| Purchase | 5/24/2007 | 1,200 | 65.5938 |
| Purchase | 7/26/2007 | 2,700 | 69.6252 |
| Purchase | 8/7/2007 | 1,200 | 65.2311 |
| Purchase | 8/8/2007 | 250 | 71.6075 |
| Purchase | 8/8/2007 | 275 | 71.6075 |
| Purchase | 9/18/2007 | 6,000 | 63.8905 |
| Purchase | 10/24/2007 | 430 | 76.1292 |
| Purchase | 10/31/2007 | 405 | 69.6529 |
| Purchase | 10/31/2007 | 12,300 | 60.6050 |
| Purchase | 10/31/2007 | 7,500 | 63.7770 |
| Purchase | 10/31/2007 | 2,100 | 64.8266 |
| Purchase | 11/2/2007 | 30 | 69.2899 |
| Purchase | 11/9/2007 | 170 | 64.3000 |
| Purchase | 12/10/2007 | 670 | 75.3662 |
| Purchase | 12/10/2007 | 200 | 76.2200 |
| Purchase | 12/11/2007 | 300 | 73.2000 |
| Purchase | 12/12/2007 | 4,900 | 72.4978 |
| Purchase | 12/12/2007 | 100 | 72.5400 |
| Purchase | 1/10/2008 | 2,000 | 68.7878 |
| Purchase | 1/16/2008 | 100 | 64.1023 |
| Purchase | 2/12/2008 | 30 | 66.9194 |
| Purchase | 2/19/2008 | 600 | 60.8377 |

**Public School Teachers' Pension & Retirement Fund of Chicago
Transactions in Huron Consulting Group Inc. (HURN)**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 2/21/2008 | 2,000 | 55.1735 |
| Purchase | 2/22/2008 | 7,000 | 53.2364 |
| Purchase | 2/27/2008 | 1,300 | 51.3688 |
| Purchase | 2/28/2008 | 900 | 49.9999 |
| Purchase | 2/28/2008 | 135 | 49.9559 |
| Purchase | 3/13/2008 | 3,500 | 55.2100 |
| Purchase | 3/13/2008 | 1,700 | 55.5073 |
| Purchase | 3/17/2008 | 5,300 | 54.5600 |
| Purchase | 4/18/2008 | 3,500 | 44.1474 |
| Purchase | 5/6/2008 | 7,000 | 44.0775 |
| Purchase | 6/27/2008 | 200 | 44.4500 |
| Purchase | 6/30/2008 | 100 | 44.6800 |
| Purchase | 7/9/2008 | 9,100 | 49.9610 |
| Purchase | 7/10/2008 | 1,800 | 49.5884 |
| Purchase | 7/15/2008 | 11,000 | 49.9849 |
| Purchase | 8/5/2008 | 400 | 56.9986 |
| Purchase | 11/10/2008 | 200 | 52.9150 |
| Purchase | 1/2/2009 | 1,050 | 57.2700 |
| Purchase | 1/2/2009 | 100 | 57.2700 |
| Purchase | 1/2/2009 | 100 | 57.2700 |
| Purchase | 1/2/2009 | 475 | 57.2700 |
| Purchase | 2/20/2009 | 8,900 | 43.9439 |
| Purchase | 2/24/2009 | 3,000 | 39.3683 |
| Purchase | 2/24/2009 | 17,200 | 39.0824 |
| Purchase | 4/24/2009 | 40 | 41.9318 |
| Purchase | 6/3/2009 | 500 | 46.4703 |
| Purchase | 6/22/2009 | 1,200 | 49.2316 |
| Purchase | 6/23/2009 | 1,530 | 48.4463 |
| Purchase | 6/26/2009 | 3,520 | 46.6219 |
| Purchase | 6/26/2009 | 200 | 47.0800 |
| Purchase | 6/29/2009 | 3,120 | 46.9954 |
| Sale | 4/27/2006 | (5,700) | 33.2679 |
| Sale | 8/16/2006 | (4,900) | 35.3479 |
| Sale | 9/13/2006 | (21,700) | 38.5663 |
| Sale | 11/22/2006 | (2,200) | 42.6000 |
| Sale | 2/23/2007 | (5,700) | 63.6623 |
| Sale | 2/28/2007 | (18,718) | 63.2603 |
| Sale | 3/13/2007 | (1,267) | 67.3458 |
| Sale | 4/20/2007 | (150) | 63.8018 |
| Sale | 4/20/2007 | (250) | 63.8018 |
| Sale | 5/3/2007 | (6,952) | 66.9050 |
| Sale | 7/6/2007 | (200) | 75.0400 |
| Sale | 7/17/2007 | (1,900) | 76.7354 |
| Sale | 10/2/2007 | (3,000) | 73.8603 |
| Sale | 10/3/2007 | (800) | 73.1700 |
| Sale | 10/30/2007 | (900) | 80.9283 |
| Sale | 12/18/2007 | (1,200) | 77.3069 |
| Sale | 12/19/2007 | (1,600) | 77.9425 |

**Public School Teachers' Pension & Retirement Fund of Chicago**
**Transactions in Huron Consulting Group Inc. (HURN)**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Sale | 1/14/2008 | (200) | 69.0480 |
| Sale | 2/15/2008 | (4,300) | 64.0105 |
| Sale | 2/19/2008 | (900) | 64.1812 |
| Sale | 3/27/2008 | (950) | 41.9967 |
| Sale | 3/27/2008 | (750) | 41.9967 |
| Sale | 6/23/2008 | (7,700) | 46.2808 |
| Sale | 6/24/2008 | (9,300) | 45.1879 |
| Sale | 6/24/2008 | (2,300) | 45.5027 |
| Sale | 7/9/2008 | (900) | 49.6546 |
| Sale | 7/17/2008 | (3,800) | 55.7977 |
| Sale | 7/18/2008 | (700) | 55.1181 |
| Sale | 7/30/2008 | (1,700) | 52.4399 |
| Sale | 7/31/2008 | (1,600) | 52.1234 |
| Sale | 8/1/2008 | (1,800) | 52.8027 |
| Sale | 8/19/2008 | (2,500) | 62.1359 |
| Sale | 8/20/2008 | (3,800) | 61.0776 |
| Sale | 8/21/2008 | (400) | 60.2823 |
| Sale | 8/29/2008 | (2,000) | 64.1770 |
| Sale | 9/4/2008 | (300) | 63.5900 |
| Sale | 9/5/2008 | (700) | 63.1194 |
| Sale | 9/8/2008 | (500) | 64.1380 |
| Sale | 9/9/2008 | (200) | 65.3530 |
| Sale | 9/9/2008 | (2,200) | 63.7980 |
| Sale | 9/9/2008 | (2,500) | 63.6849 |
| Sale | 9/25/2008 | (600) | 57.2167 |
| Sale | 10/13/2008 | (310) | 49.9974 |
| Sale | 10/16/2008 | (5,000) | 42.3146 |
| Sale | 10/23/2008 | (1,200) | 47.7333 |
| Sale | 10/31/2008 | (1,300) | 52.9162 |
| Sale | 10/31/2008 | (40) | 54.2200 |
| Sale | 11/19/2008 | (260) | 49.8529 |
| Sale | 11/20/2008 | (8,900) | 50.3325 |
| Sale | 11/28/2008 | (900) | 52.0300 |
| Sale | 12/10/2008 | (5,900) | 52.9007 |
| Sale | 12/17/2008 | (1,800) | 60.3317 |
| Sale | 12/18/2008 | (3,000) | 59.5333 |
| Sale | 1/5/2009 | (14,000) | 59.1649 |
| Sale | 1/12/2009 | (150) | 54.5000 |
| Sale | 2/24/2009 | (825) | 39.1802 |
| Sale | 2/25/2009 | (2,300) | 43.0000 |
| Sale | 2/26/2009 | (100) | 43.0000 |
| Sale | 7/31/2009 | (900) | 20.0251 |
| Sale | 6/1/2009 | (700) | 46.7528 |
| Sale | 7/31/2009 | (2,400) | 44.6477 |

Case 1:09-cv-04734   Document 25-2   Filed 10/05/09   Page 23 of 29

Public School Teachers Pension & Retirement Fund of Chicago
FIFO Losses in Huron Consulting Group Inc. (HURN)
Class Period: 4/27/06 - 7/31/09
Retained Share Price (8/3/09 - 10/2/09): $19.1377

| Transaction | Date | Shares | Price | Cost | Price | Shares | Date | Transaction | Price | Proceeds |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 128,474 | | Opening Balance: | | |
| | | | | | | (5,700) | 4/27/2006 | Sale | $33.2679 | ($189,627.03) |
| | | | | | | (4,900) | 8/16/2006 | Sale | $35.3479 | ($173,204.71) |
| | | | | | | (21,700) | 9/13/2006 | Sale | $38.5663 | ($836,888.71) |
| | | | | | | (2,200) | 11/22/2006 | Sale | $42.6000 | ($93,720.00) |
| | | | | | | (5,700) | 2/23/2007 | Sale | $63.6623 | ($362,875.11) |
| | | | | | | (18,718) | 2/28/2007 | Sale | $63.2603 | ($1,184,106.30) |
| | | | | | | (1,267) | 3/13/2007 | Sale | $67.3458 | ($85,327.13) |
| | | | | | | (150) | 4/20/2007 | Sale | $63.8018 | ($9,570.27) |
| | | | | | | (250) | 4/20/2007 | Sale | $63.8018 | ($15,950.45) |
| | | | | | | (6,952) | 5/3/2007 | Sale | $66.9050 | ($465,123.56) |
| | | | | | | (200) | 7/6/2007 | Sale | $75.0400 | ($15,008.00) |
| | | | | | | (1,900) | 7/17/2007 | Sale | $76.7354 | ($145,797.26) |
| | | | | | | (3,000) | 10/2/2007 | Sale | $73.8603 | ($221,580.90) |
| | | | | | | (800) | 10/3/2007 | Sale | $73.1700 | ($58,536.00) |
| | | | | | | (900) | 10/30/2007 | Sale | $80.9283 | ($72,835.47) |
| | | | | | | (1,200) | 12/18/2007 | Sale | $77.3069 | ($92,768.28) |
| | | | | | | (1,600) | 12/19/2007 | Sale | $77.9425 | ($124,708.00) |
| | | | | | | (200) | 1/14/2008 | Sale | $69.0480 | ($13,809.60) |
| | | | | | | (4,300) | 2/15/2008 | Sale | $64.0105 | ($275,245.15) |
| | | | | | | (900) | 2/19/2008 | Sale | $64.1812 | ($57,763.08) |
| | | | | | | (950) | 3/27/2008 | Sale | $41.9967 | ($39,896.87) |
| | | | | | | (750) | 3/27/2008 | Sale | $41.9967 | ($31,497.53) |
| | | | | | | (7,700) | 6/23/2008 | Sale | $46.2808 | ($356,362.16) |
| | | | | | | (9,300) | 6/24/2008 | Sale | $45.1879 | ($420,247.47) |
| | | | | | | (2,300) | 6/24/2008 | Sale | $45.5027 | ($104,656.21) |
| | | | | | | (900) | 7/9/2008 | Sale | $49.6546 | ($44,689.14) |
| | | | | | | (3,800) | 7/17/2008 | Sale | $55.7977 | ($212,031.26) |
| | | | | | | (700) | 7/18/2008 | Sale | $55.1181 | ($38,582.67) |
| | | | | | | (1,700) | 7/30/2008 | Sale | $52.4399 | ($89,147.83) |
| | | | | | | (1,600) | 7/31/2008 | Sale | $52.1234 | ($83,397.44) |
| | | | | | | (1,800) | 8/1/2008 | Sale | $52.8027 | ($95,044.86) |
| | | | | | | (2,500) | 8/19/2008 | Sale | $62.1359 | ($155,339.75) |
| | | | | | | (3,800) | 8/20/2008 | Sale | $61.0776 | ($232,094.88) |
| | | | | | | (400) | 8/21/2008 | Sale | $60.2823 | ($24,112.92) |
| | | | | | | (2,000) | 8/29/2008 | Sale | $64.1770 | ($128,354.00) |
| | | | | | | (300) | 9/4/2008 | Sale | $63.5900 | ($19,077.00) |
| | | | | | | (700) | 9/5/2008 | Sale | $63.1194 | ($44,183.58) |

Page 1 of 4

**Public School Teachers Pension & Retirement Fund of Chicago**
**FIFO Losses in Huron Consulting Group Inc. (HURN)**
Class Period: 4/27/06 - 7/31/09
Retained Share Price (8/3/09 - 10/2/09): $19.1377

| Transaction | Date | Shares | Price | Cost |
|---|---|---|---|---|
| Purchase | 6/21/2006 | 16,240 | $30.4700 | $494,832.80 |
| Purchase | 9/22/2006 | 3,300 | $39.8115 | $131,377.95 |
| Purchase | 9/25/2006 | 100 | $39.7300 | $3,973.00 |
| Purchase | 2/14/2007 | 5,000 | $54.8658 | $274,329.00 |
| Purchase | 2/15/2007 | 1,400 | $54.9638 | $76,949.32 |
| Purchase | 2/16/2007 | 800 | $54.9176 | $43,934.08 |
| Purchase | 2/22/2007 | 2,300 | $60.2128 | $138,489.44 |
| Purchase | 2/23/2007 | 300 | $61.9985 | $18,599.55 |
| Purchase | 3/28/2007 | 900 | $61.2627 | $55,136.43 |
| Purchase | 4/3/2007 | 700 | $61.7186 | $43,203.02 |
| Purchase | 4/4/2007 | 800 | $61.9614 | $49,569.12 |
| Purchase | 4/9/2007 | 200 | $62.0000 | $12,400.00 |
| Purchase | 4/11/2007 | 500 | $61.7717 | $30,885.85 |
| Purchase | 4/26/2007 | 900 | $61.6933 | $55,523.97 |
| Purchase | 4/30/2007 | 200 | $60.4938 | $12,098.76 |
| Purchase | 5/3/2007 | 1,200 | $67.4451 | $80,934.12 |
| Purchase | 5/10/2007 | 500 | $65.4418 | $32,720.90 |
| Purchase | 5/17/2007 | 5,300 | $61.7900 | $327,487.00 |
| Purchase | 5/17/2007 | 400 | $61.8373 | $24,734.92 |
| Purchase | 5/18/2007 | 725 | $62.6536 | $45,423.86 |
| Purchase | 5/18/2007 | 1,400 | $61.7685 | $86,475.90 |
| Purchase | 5/21/2007 | 75 | $63.2700 | $4,745.25 |
| Purchase | 5/21/2007 | 300 | $62.3715 | $18,711.45 |
| Purchase | 5/22/2007 | 1,900 | $65.0627 | $123,619.13 |
| Purchase | 5/23/2007 | 800 | $65.7855 | $52,628.40 |
| Purchase | 5/24/2007 | 1,200 | $65.5938 | $78,712.56 |
| Purchase | 7/26/2007 | 2,700 | $69.6252 | $187,988.04 |
| Purchase | 8/7/2007 | 1,200 | $65.2311 | $78,277.32 |
| Purchase | 8/8/2007 | 250 | $71.6075 | $17,901.88 |
| Purchase | 8/8/2007 | 275 | $71.6075 | $19,692.06 |
| Purchase | 9/18/2007 | 6,000 | $63.8905 | $383,343.00 |

| Transaction | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| Sale | 9/8/2008 | (500) | $64.1380 | ($32,069.00) |
| Sale | 9/9/2008 | (200) | $65.3530 | ($13,070.60) |
| Sale | 9/9/2008 | (2,200) | $63.7980 | ($140,355.60) |
| Sale | 9/9/2008 | (1,837) | $63.6849 | ($116,989.16) |
| *Sales Offset by Opening Balance:* | | (128,474) | | ($6,915,644.93) |

**Public School Teachers Pension & Retirement Fund of Chicago**
**FIFO Losses in Huron Consulting Group Inc. (HURN)**
Class Period: 4/27/06 - 7/31/09
Retained Share Price (8/3/09 - 10/2/09): $19.1377

| Transaction | Date | Shares | Price | Cost | Transaction | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|---|---|---|---|
| Purchase | 10/24/2007 | 430 | $76.1292 | $32,735.56 | | | | | |
| Purchase | 10/31/2007 | 405 | $69.6529 | $28,209.42 | | | | | |
| Purchase | 10/31/2007 | 12,300 | $60.6050 | $745,441.50 | | | | | |
| Purchase | 10/31/2007 | 7,500 | $63.7770 | $478,327.50 | | | | | |
| Purchases | 10/31/2007 | 2,100 | $64.8266 | $136,135.86 | | | | | |
| Purchases | 11/2/2007 | 30 | $69.2899 | $2,078.70 | | | | | |
| Purchases | 11/9/2007 | 170 | $64.3000 | $10,931.00 | | | | | |
| Purchases | 12/10/2007 | 670 | $75.3662 | $50,495.35 | | | | | |
| Purchases | 12/10/2007 | 200 | $76.2200 | $15,244.00 | | | | | |
| Purchases | 12/11/2007 | 300 | $73.2000 | $21,960.00 | | | | | |
| Purchases | 12/12/2007 | 4,900 | $72.4978 | $355,239.22 | | | | | |
| Purchases | 12/12/2007 | 100 | $72.5400 | $7,254.00 | | | | | |
| Purchases | 1/10/2008 | 2,000 | $68.7878 | $137,575.60 | | | | | |
| Purchases | 1/16/2008 | 100 | $64.1023 | $6,410.23 | | | | | |
| Purchases | 2/12/2008 | 30 | $66.9194 | $2,007.58 | | | | | |
| Purchases | 2/19/2008 | 600 | $60.8377 | $36,502.62 | | | | | |
| Purchases | 2/21/2008 | 2,000 | $55.1735 | $110,347.00 | | | | | |
| Purchases | 2/22/2008 | 7,000 | $53.2364 | $372,654.80 | | | | | |
| Purchases | 2/27/2008 | 1,300 | $51.3688 | $66,779.44 | | | | | |
| Purchases | 2/28/2008 | 900 | $49.9999 | $44,999.91 | Sale | 9/9/2008 | (663) | $63.6849 | ($42,223.09) |
| Purchases | 2/28/2008 | 135 | $49.9559 | $6,744.05 | Sale | 9/25/2008 | (600) | $57.2167 | ($34,330.02) |
| Purchases | 3/13/2008 | 3,500 | $55.2100 | $193,235.00 | Sale | 10/13/2008 | (310) | $49.9974 | ($15,499.19) |
| Purchases | 3/13/2008 | 1,700 | $55.5073 | $94,362.41 | Sale | 10/16/2008 | (5,000) | $42.3146 | ($211,573.00) |
| Purchases | 3/17/2008 | 5,300 | $54.5600 | $289,168.00 | Sale | 10/23/2008 | (1,200) | $47.7333 | ($57,279.96) |
| Purchases | 4/18/2008 | 3,500 | $44.1474 | $154,515.90 | Sale | 10/31/2008 | (1,300) | $52.9162 | ($68,791.06) |
| Purchases | 5/6/2008 | 7,000 | $44.0775 | $308,542.50 | Sale | 10/31/2008 | (40) | $54.2200 | ($2,168.80) |
| Purchases | 6/27/2008 | 200 | $44.4500 | $8,890.00 | Sale | 11/19/2008 | (260) | $49.8529 | ($12,961.75) |
| Purchases | 6/30/2008 | 100 | $44.6800 | $4,468.00 | Sale | 11/20/2008 | (8,900) | $50.3325 | ($447,959.25) |
| Purchases | 7/9/2008 | 9,100 | $49.9610 | $454,645.10 | Sale | 11/28/2008 | (900) | $52.0300 | ($46,827.00) |
| Purchases | 7/10/2008 | 1,800 | $49.5884 | $89,259.12 | Sale | 12/10/2008 | (5,900) | $52.9007 | ($312,114.13) |
| Purchases | 7/15/2008 | 11,000 | $49.9849 | $549,833.90 | Sale | 12/17/2008 | (1,800) | $60.3317 | ($108,597.06) |
| Purchases | 8/5/2008 | 400 | $56.9986 | $22,799.44 | Sale | 12/18/2008 | (3,000) | $59.5333 | ($178,599.90) |
| Purchases | 11/10/2008 | 200 | $52.9150 | $10,583.00 | Sale | 1/5/2009 | (14,000) | $59.1649 | ($828,308.60) |
| Purchases | 1/2/2009 | 1,050 | $57.2700 | $60,133.50 | Sale | 1/12/2009 | (150) | $54.5000 | ($8,175.00) |
| Purchases | 1/2/2009 | 100 | $57.2700 | $5,727.00 | Sale | 2/24/2009 | (825) | $39.1802 | ($32,323.67) |
| Purchases | 1/2/2009 | 100 | $57.2700 | $5,727.00 | Sale | 2/25/2009 | (2,300) | $43.0000 | ($98,900.00) |
| Purchases | 1/2/2009 | 475 | $57.2700 | $27,203.25 | Sale | 2/26/2009 | (100) | $43.0000 | ($4,300.00) |

**Public School Teachers Pension & Retirement Fund of Chicago**
**FIFO Losses in Huron Consulting Group Inc. (HURN)**
Class Period: 4/27/06 - 7/31/09
Retained Share Price (8/3/09 - 10/2/09): $19.1377

| Transaction | Date | Shares | Price | Cost |
|---|---|---|---|---|
| Purchases | 2/20/2009 | 8,900 | $43.9439 | $391,100.71 |
| Purchases | 2/24/2009 | 3,000 | $39.3683 | $118,104.90 |
| Purchases | 2/24/2009 | 17,200 | $39.0824 | $672,217.28 |
| Purchases | 4/24/2009 | 40 | $41.9318 | $1,677.27 |
| Purchases | 6/3/2009 | 500 | $46.4703 | $23,235.15 |
| Purchases | 6/22/2009 | 1,200 | $49.2316 | $59,077.92 |
| Purchases | 6/23/2009 | 1,530 | $48.4463 | $74,122.84 |
| Purchases | 6/26/2009 | 3,520 | $46.6219 | $164,109.09 |
| Purchases | 6/26/2009 | 200 | $47.0800 | $9,416.00 |
| Purchases | 6/29/2009 | 3,120 | $46.9954 | $146,625.65 |
| | | 185,770 | | $9,611,551.34 |

| Transaction | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| Sale | 6/1/2009 | (700) | $46.7528 | ($32,726.96) |
| Sale | 7/31/2009 | (2,400) | $44.6477 | ($107,154.48) |
| Sale | 7/31/2009 | (900) | $20.0251 | ($18,022.59) |
| Sale* | 8/3/2009 | (12,200) | $13.6900 | ($167,018.00) |
| Sale* | 8/3/2009 | (875) | $13.6900 | ($11,978.75) |
| Sale* | 8/4/2009 | (5,825) | $14.2897 | ($83,237.50) |
| Sale* | 8/5/2009 | (5,195) | $14.1113 | ($73,308.20) |
| Retained Shares | | (110,427) | $19.1377 | ($2,113,318.80) |
| | | (185,770) | | ($5,117,696.77) |

**TOTAL FIFO LOSS:** ($4,493,854.58)

*Shares sold within 90 days after the end of the class period are calculated at the higher value between the actual sales price and the average closing price from the end of the class period to the date of sale.

Case 1:09-cv-04734   Document 25-2   Filed 10/05/09   Page 27 of 29

**Public School Teachers Pension & Retirement Fund of Chicago**
**LIFO Losses in Huron Consulting Group Inc. (HURN)**
Class Period: 4/27/06 - 7/31/09
Retained Share Price (8/3/09 - 10/2/09): $19.1377

| Transaction | Date | Shares | Price | | Cost |
|---|---|---|---|---|---|
| | *Opening Balance:* | 128,474 | | | |
| Purchase | 6/21/2006 | 16,240 | $30.4700 | $ | 494,832.80 |
| Purchase | 9/22/2006 | 3,300 | $39.8115 | $ | 131,377.95 |
| Purchase | 9/25/2006 | 100 | $39.7300 | $ | 3,973.00 |
| Purchase | 2/14/2007 | 5,000 | $54.8658 | $ | 274,329.00 |
| Purchase | 2/15/2007 | 1,400 | $54.9638 | $ | 76,949.32 |
| Purchase | 2/16/2007 | 800 | $54.9176 | $ | 43,934.08 |
| Purchase | 2/22/2007 | 2,300 | $60.2128 | $ | 138,489.44 |
| Purchase | 2/23/2007 | 300 | $61.9985 | $ | 18,599.55 |
| Purchase | 3/28/2007 | 900 | $61.2627 | $ | 55,136.43 |
| Purchase | 4/3/2007 | 700 | $61.7186 | $ | 43,203.02 |
| Purchase | 4/4/2007 | 800 | $61.9614 | $ | 49,569.12 |
| Purchase | 4/9/2007 | 200 | $62.0000 | $ | 12,400.00 |
| Purchase | 4/11/2007 | 500 | $61.7717 | $ | 30,885.85 |
| Purchase | 4/26/2007 | 900 | $61.6933 | $ | 55,523.97 |
| Purchase | 4/30/2007 | 200 | $60.4938 | $ | 12,098.76 |
| Purchase | 5/3/2007 | 1,200 | $67.4451 | $ | 80,934.12 |
| Purchase | 5/10/2007 | 500 | $65.4418 | $ | 32,720.90 |
| Purchase | 5/17/2007 | 5,300 | $61.7900 | $ | 327,487.00 |
| Purchase | 5/17/2007 | 400 | $61.8373 | $ | 24,734.92 |
| Purchase | 5/18/2007 | 725 | $62.6536 | $ | 45,423.86 |
| Purchase | 5/18/2007 | 1,400 | $61.7685 | $ | 86,475.90 |
| Purchase | 5/21/2007 | 75 | $63.2700 | $ | 4,745.25 |
| Purchase | 5/21/2007 | 300 | $62.3715 | $ | 18,711.45 |
| Purchase | 5/22/2007 | 1,900 | $65.0627 | $ | 123,619.13 |
| Purchase | 5/23/2007 | 800 | $65.7855 | $ | 52,628.40 |
| Purchase | 5/24/2007 | 1,200 | $65.5938 | $ | 78,712.56 |
| Purchase | 7/26/2007 | 2,700 | $69.6252 | $ | 187,988.04 |
| Purchase | 8/7/2007 | 1,108 | $65.2311 | $ | 72,276.06 |
| Purchase | 8/7/2007 | 92 | $65.2311 | $ | 6,001.26 |
| Purchase | 8/8/2007 | 250 | $71.6075 | $ | 17,901.88 |
| Purchase | 8/8/2007 | 275 | $71.6075 | $ | 19,692.06 |

| Transaction | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| Sale | 4/27/2006 | (5,700) | $33.2679 | ($189,627.03) |
| Sale | 9/13/2006 | (10,360) | $38.5663 | ($399,546.87) |
| Sale | 2/28/2007 | (13,418) | $63.2603 | ($848,826.71) |
| Sale | 3/13/2007 | (1,267) | $67.3458 | ($85,327.13) |
| Sale | 5/3/2007 | (1,952) | $66.9050 | ($130,598.56) |
| *Sales Offset by Opening Balance:* | | (32,697) | | ($1,653,926.29) |
| Sale | 8/16/2006 | (4,900) | $35.3479 | ($173,204.71) |
| Sale | 9/13/2006 | (11,340) | $38.5663 | ($437,341.84) |
| Sale | 11/22/2006 | (2,200) | $42.6000 | ($93,720.00) |
| Sale | 2/23/2007 | (5,700) | $63.6623 | ($362,875.11) |
| Sale | 2/28/2007 | (5,300) | $63.2603 | ($335,279.59) |
| Sale | 4/20/2007 | (150) | $63.8018 | ($9,570.27) |
| Sale | 4/20/2007 | (250) | $63.8018 | ($15,950.45) |
| Sale | 5/3/2007 | (5,000) | $66.9050 | ($334,525.00) |
| Sale | 7/6/2007 | (200) | $75.0400 | ($15,008.00) |
| Sale | 7/17/2007 | (1,900) | $76.7354 | ($145,797.26) |
| Sale | 10/2/2007 | (3,000) | $73.8603 | ($221,580.90) |
| Sale | 10/3/2007 | (800) | $73.1700 | ($58,536.00) |
| Sale | 10/30/2007 | (900) | $80.9283 | ($72,835.47) |
| Sale | 12/18/2007 | (1,200) | $77.3069 | ($92,768.28) |
| Sale | 12/19/2007 | (1,600) | $77.9425 | ($124,708.00) |
| Sale | 1/14/2008 | (200) | $69.0480 | ($13,809.60) |
| Sale | 2/15/2008 | (4,300) | $64.0105 | ($275,245.15) |

**Public School Teachers Pension & Retirement Fund of Chicago**
**LIFO Losses in Huron Consulting Group Inc. (HURN)**
Class Period: 4/27/06 - 7/31/09
Retained Share Price (8/3/09 - 10/2/09): $19.1377

| Transaction | Date | Shares | Price | Cost | Transaction | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|---|---|---|---|
| Purchase | 9/18/2007 | 6,000 | $63.8905 | $ 383,343.00 | Sale | 2/19/2008 | (900) | $64.1812 | ($57,763.08) |
| Purchase | 10/24/2007 | 430 | $76.1292 | 32,735.56 | Sale | 3/27/2008 | (950) | $41.9967 | ($39,896.87) |
| Purchase | 10/31/2007 | 405 | $69.6529 | 28,209.42 | Sale | 3/27/2008 | (750) | $41.9967 | ($31,497.53) |
| Purchase | 10/31/2007 | 12,300 | $60.6050 | 745,441.50 | Sale | 6/23/2008 | (7,700) | $46.2808 | ($356,362.16) |
| Purchase | 10/31/2007 | 4,343 | $63.7770 | 276,983.51 | Sale | 6/24/2008 | (9,300) | $45.1879 | ($420,247.47) |
| Purchase | 10/31/2007 | 3,157 | $63.7770 | 201,343.99 | Sale | 6/24/2008 | (2,300) | $45.5027 | ($104,656.21) |
| Purchase | 10/31/2007 | 2,100 | $64.8266 | 136,135.86 | Sale | 7/9/2008 | (900) | $49.6546 | ($44,689.14) |
| Purchase | 11/2/2007 | 30 | $69.2899 | 2,078.70 | Sale | 7/17/2008 | (3,800) | $55.7977 | ($212,031.26) |
| Purchase | 11/9/2007 | 170 | $64.3000 | 10,931.00 | Sale | 7/18/2008 | (700) | $55.1181 | ($38,582.67) |
| Purchase | 12/10/2007 | 670 | $75.3662 | 50,495.35 | Sale | 7/30/2008 | (1,700) | $52.4399 | ($89,147.83) |
| Purchase | 12/10/2007 | 200 | $76.2200 | 15,244.00 | Sale | 7/31/2008 | (1,600) | $52.1234 | ($83,397.44) |
| Purchase | 12/11/2007 | 300 | $73.2000 | 21,960.00 | Sale | 8/1/2008 | (1,800) | $52.8027 | ($95,044.86) |
| Purchase | 12/12/2007 | 4,900 | $72.4978 | 355,239.22 | Sale | 8/19/2008 | (2,500) | $62.1359 | ($155,339.75) |
| Purchase | 12/12/2007 | 100 | $72.5400 | 7,254.00 | Sale | 8/20/2008 | (3,800) | $61.0776 | ($232,094.88) |
| Purchase | 1/10/2008 | 2,000 | $68.7878 | 137,575.60 | Sale | 8/21/2008 | (400) | $60.2823 | ($24,112.92) |
| Purchase | 1/16/2008 | 100 | $64.1023 | 6,410.23 | Sale | 8/29/2008 | (2,000) | $64.1770 | ($128,354.00) |
| Purchase | 2/12/2008 | 30 | $66.9194 | 2,007.58 | Sale | 9/4/2008 | (300) | $63.5900 | ($19,077.00) |
| Purchase | 2/19/2008 | 600 | $60.8377 | 36,502.62 | Sale | 9/5/2008 | (700) | $63.1194 | ($44,183.58) |
| Purchase | 2/21/2008 | 2,000 | $55.1735 | 110,347.00 | Sale | 9/8/2008 | (500) | $64.1380 | ($32,069.00) |
| Purchase | 2/22/2008 | 7,000 | $53.2364 | 372,654.80 | Sale | 9/9/2008 | (200) | $65.3530 | ($13,070.60) |
| Purchase | 2/27/2008 | 1,300 | $51.3688 | 66,779.44 | Sale | 9/9/2008 | (2,200) | $63.7980 | ($140,355.60) |
| Purchase | 2/28/2008 | 900 | $49.9999 | 44,999.91 | Sale | 9/9/2008 | (1,837) | $63.6849 | ($116,989.16) |
| Purchase | 2/28/2008 | 135 | $49.9559 | 6,744.05 | Sale | 9/9/2008 | (663) | $63.6649 | ($42,223.09) |
| Purchase | 3/13/2008 | 3,500 | $55.2100 | 193,235.00 | Sale | 9/25/2008 | (600) | $57.2167 | ($34,330.02) |
| Purchase | 3/13/2008 | 1,700 | $55.5073 | 94,362.41 | Sale | 10/13/2008 | (310) | $49.9974 | ($15,499.19) |
| Purchase | 3/17/2008 | 5,300 | $54.5600 | 289,168.00 | Sale | 10/16/2008 | (5,000) | $42.3146 | ($211,573.00) |
| Purchase | 4/18/2008 | 3,500 | $44.1474 | 154,515.90 | Sale | 10/23/2008 | (1,200) | $47.7333 | ($57,279.96) |
| Purchase | 5/6/2008 | 7,000 | $44.0775 | 308,542.50 | Sale | 10/31/2008 | (1,300) | $52.9162 | ($68,791.06) |
| Purchase | 6/27/2008 | 200 | $44.4500 | 8,890.00 | Sale | 10/31/2008 | (40) | $54.2200 | ($2,168.80) |
| Purchase | 6/30/2008 | 100 | $44.6800 | 4,468.00 | Sale | 11/19/2008 | (260) | $49.8529 | ($12,961.75) |
| Purchase | 7/9/2008 | 9,100 | $49.9610 | 454,645.10 | Sale | 11/20/2008 | (8,900) | $50.3325 | ($447,959.25) |
| Purchase | 7/10/2008 | 1,800 | $49.5884 | 89,259.12 | Sale | 11/28/2008 | (900) | $52.0300 | ($46,827.00) |
| Purchase | 7/15/2008 | 11,000 | $49.9849 | 549,833.90 | Sale | 12/10/2008 | (5,900) | $52.9007 | ($312,114.13) |
| Purchase | 8/5/2008 | 400 | $56.9986 | 22,799.44 | Sale | 12/17/2008 | (1,800) | $60.3317 | ($108,597.06) |
| Purchase | 11/10/2008 | 200 | $52.9150 | 10,583.00 | Sale | 12/18/2008 | (3,000) | $59.5333 | ($178,599.90) |
| Purchase | 1/2/2009 | 1,050 | $57.2700 | 60,133.50 | Sale | 1/5/2009 | (14,000) | $59.1649 | ($828,308.60) |
| Purchase | 1/2/2009 | 100 | $57.2700 | 5,727.00 | Sale | 1/12/2009 | (150) | $54.5000 | ($8,175.00) |
| Purchase | 1/2/2009 | 100 | $57.2700 | 5,727.00 | Sale | 2/24/2009 | (825) | $39.1802 | ($32,323.67) |

Case 1:09-cv-04734   Document 25-2   Filed 10/05/09   Page 29 of 29

**Public School Teachers Pension & Retirement Fund of Chicago**
**LIFO Losses in Huron Consulting Group Inc. (HURN)**
Class Period: 4/27/06 - 7/31/09
Retained Share Price (8/3/09 - 10/2/09): $19.1377

| Transaction | Date | Shares | | Price | Cost | Transaction | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|---|---|---|---|---|
| Purchase | 1/2/2009 | 475 | $ | $57.2700 | 27,203.25 | Sale | 2/25/2009 | (2,300) | $43.0000 | ($98,900.00) |
| Purchase | 2/20/2009 | 8,900 | $ | $43.9439 | 391,100.71 | Sale | 2/26/2009 | (100) | $43.0000 | ($4,300.00) |
| Purchase | 2/24/2009 | 3,000 | $ | $39.3683 | 118,104.90 | Sale | 6/1/2009 | (700) | $46.7528 | ($32,726.96) |
| Purchase | 2/24/2009 | 17,200 | $ | $39.0824 | 672,217.28 | Sale | 7/31/2009 | (2,400) | $44.6477 | ($107,154.48) |
| Purchase | 4/24/2009 | 40 | $ | $41.9318 | 1,677.27 | Sale | 7/31/2009 | (900) | $20.0251 | ($18,022.59) |
| Purchase | 6/3/2009 | 500 | $ | $46.4703 | 23,235.15 | Sale* | 8/3/2009 | (12,200) | $13.6900 | ($167,018.00) |
| Purchase | 6/22/2009 | 1,200 | $ | $49.2316 | 59,077.92 | Sale* | 8/3/2009 | (875) | $13.6900 | ($11,978.75) |
| Purchase | 6/23/2009 | 1,530 | $ | $48.4463 | 74,122.84 | Sale* | 8/4/2009 | (5,825) | $14.2897 | ($83,237.50) |
| Purchase | 6/26/2009 | 3,520 | $ | $46.6219 | 164,109.09 | Sale* | 8/5/2009 | (5,195) | $14.1113 | ($73,308.20) |
| Purchase | 6/26/2009 | 200 | $ | $47.0800 | 9,416.00 | | | | | |
| Purchase | 6/29/2009 | 3,120 | $ | $46.9954 | 146,625.65 | Retained Shares | | (14,650) | $19.1377 | ($280,367.31) |
| | | 185,770 | $ | | 9,611,551.34 | | | (185,770) | | ($8,546,463.91) |

TOTAL LIFO LOSS: ($1,065,087.44)

*Shares sold within 90 days after the end of the class period are calculated at the higher value between the actual sales price and the average
closing price from the end of the class period to the date of sale.

Exhibit B

## CERTIFICATION

Gail H. Stone, Executive Director of Arkansas Public Employee Retirement System ("APERS") declares, as to the claims asserted under the federal securities laws, that:

1.  I am authorized to make this certification on behalf of APERS.

2.  I have reviewed a complaint filed in this matter and APERS wishes to serve as a lead plaintiff.

3.  APERS did not purchase the securities that are the subject of this action at the direction of its counsel or to participate in this action.

4.  APERS is willing to serve as a lead plaintiff and class representative on behalf of the Class, including providing testimony at deposition, and trial, if necessary.

5.  APERS' transactions in the securities of Huron Consulting Group Inc. that are the subject of this action are set forth in the chart attached hereto.

6.  During the three years prior to the date of this Certification, APERS sought to serve as a representative party for a class under the federal securities laws and was not appointed in the following cases:

    *In re Verifone Holdings, Inc. Securities Litig.* (N.D. Cal. 2007).
    *In re UBS AG Securities Litig.* (S.D.N.Y. 2007).

7.  APERS is currently serving as the lead plaintiff in the following cases:

    *In re Brocade Securities Litig.* (N.D. Cal. 2005).
    *In re Harman International Industries, Inc. Securities Litig.* (D.D.C. 2007).
    *In re GT Solar International, Inc. Securities Litig.* (D.N.H. 2008)

8.  APERS will not accept any payment for serving as a class representative on behalf of the class beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 28th day of September, 2009.

*Gail H. Stone*

Gail H. Stone
Executive Director
*Arkansas Public Employee Retirement System*

Arkansas Public Employees Retirement System

Huron Consulting Group Inc. Trades

| Trading Date | Transaction Type | Number of Shares | Price (Dollars) |
|---|---|---|---|
| 12/10/2008 | Buy | 2,900.0000 | 52.023200 |
| 12/11/2008 | Buy | 1,100.0000 | 55.609100 |
| 1/5/2009 | Buy | 700.0000 | 59.685000 |
| 2/12/2009 | Sell | -900.0000 | 47.421000 |
| 2/18/2009 | Sell | -900.0000 | 46.035600 |
| 2/19/2009 | Sell | -800.0000 | 45.684400 |
| 2/23/2009 | Sell | -2,100.0000 | 44.400000 |
| 6/10/2009 | Buy | 5,335.0000 | 48.650100 |
| 6/10/2009 | Buy | 7,965.0000 | 48.639100 |
| 6/11/2009 | Buy | 8,518.0000 | 49.985500 |
| 6/16/2009 | Buy | 2,382.0000 | 49.257900 |
| 6/23/2009 | Buy | 6,200.0000 | 48.590900 |
| 7/10/2009 | Buy | 200.0000 | 42.920000 |

**Arkansas Public Employees Retirement System**

| Trans Type | Trade Date | Shares | Price Per Share | Cost / Proceeds | |
|---|---|---|---|---|---|
| Open | 04/27/06 | 0.00 | | | |
| Purchase | 12/10/08 | 2,900.00 | $52.02 | ($150,867.28) | |
| Purchase | 12/11/08 | 1,100.00 | $55.61 | ($61,170.01) | |
| Purchase | 01/05/09 | 700.00 | $59.69 | ($41,779.50) | |
| Purchase | 06/10/09 | 5,335.00 | $48.65 | ($259,548.28) | |
| Purchase | 06/10/09 | 7,965.00 | $48.64 | ($387,410.43) | |
| Purchase | 06/11/09 | 8,518.00 | $49.99 | ($425,776.49) | |
| Purchase | 06/16/09 | 2,382.00 | $49.26 | ($117,332.32) | |
| Purchase | 06/23/09 | 6,200.00 | $48.59 | ($301,263.58) | |
| Purchase | 07/10/09 | 200.00 | $42.92 | ($8,584.00) | |
| *Class period purchases:* | | *35,300.00* | | *($1,753,731.89)* | |
| Sale | 02/12/09 | -900.00 | $47.42 | $42,678.90 | |
| Sale | 02/18/09 | -900.00 | $46.04 | $41,432.04 | |
| Sale | 02/19/09 | -800.00 | $45.68 | $36,547.52 | |
| Sale | 02/23/09 | -2,100.00 | $44.40 | $93,240.00 | |
| *Class period sales (matched to class period purchases):* | | *-4,700.00* | | *$213,898.46* | |
| Sale | 08/03/09 | -30,600.00 | $19.14 | $585,613.62 | ** |
| *Post-class period sales (matched to class period purchases):* | | *(30,600.00)* | | *$585,613.62* | |
| *Retained purchases:* | | 0.00 | $19.14 | $0.00 | |
| | | | **FIFO & LIFO Gain/(Loss):** | ($954,219.81) | |

*\*Value of retained purchases is the mean trading price from 08/03/2009 to 10/02/2009.*

*\*\*Pursuant to the PSLRA, the value for sales occurring during the 90-day lookback period is either the sale price or the average price up to the date of sale, whichever is higher.*

Exhibit C

*Rubin v. MF Global, Ltd. et al*
*Genovese v. Ashley, et al*
*Iron Workers Local No. 25 Pension Fund v. Oshkosh Corporation, et al*
*Mas v. KV Pharmaceutical Company et al*
*In re Colonial Bancgroup, Inc. Securities Litigation*
*Attias v. Anadigics, Inc. et al (pending)*

7.    Beyond its pro rata share of any recovery, Boston will not accept payment
for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable
costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the
foregoing is true and correct this 26th day of August, 2009.

_____

*Kathleen Kiely-Becchetti*
*Executive Director of Boston Retirement Board*

## TRANSACTIONS IN
## HURON CONSULTING GROUP INC.

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 02/14/07 | 5,600.00 | $54.87 | ($307,248.48) |
| Purchase | 02/15/07 | 1,600.00 | $54.96 | ($87,942.08) |
| Purchase | 02/16/07 | 900.00 | $54.92 | ($49,425.84) |
| Purchase | 02/22/07 | 2,500.00 | $60.21 | ($150,532.00) |
| Purchase | 02/23/07 | 400.00 | $62.00 | ($24,799.40) |
| Purchase | 03/28/07 | 900.00 | $61.26 | ($55,136.43) |
| Purchase | 04/03/07 | 400.00 | $61.73 | ($24,693.80) |
| Purchase | 04/04/07 | 1,300.00 | $61.96 | ($80,549.82) |
| Purchase | 04/09/07 | 300.00 | $62.00 | ($18,600.00) |
| Purchase | 04/11/07 | 500.00 | $61.77 | ($30,885.85) |
| Purchase | 04/26/07 | 1,000.00 | $61.69 | ($61,688.40) |
| Purchase | 04/30/07 | 200.00 | $60.49 | ($12,098.76) |
| Purchase | 05/03/07 | 1,300.00 | $67.45 | ($87,678.63) |
| Purchase | 05/10/07 | 500.00 | $65.44 | ($32,720.90) |
| Purchase | 05/17/07 | 400.00 | $61.84 | ($24,734.92) |
| Purchase | 05/18/07 | 1,600.00 | $61.77 | ($98,829.60) |
| Purchase | 05/21/07 | 400.00 | $62.37 | ($24,948.60) |
| Purchase | 05/22/07 | 2,100.00 | $65.06 | ($136,631.67) |
| Purchase | 05/23/07 | 900.00 | $65.79 | ($59,206.95) |
| Purchase | 05/24/07 | 1,600.00 | $65.59 | ($104,950.08) |
| Sale | 07/06/07 | -500.00 | $75.14 | $37,571.25 |
| Sale | 07/17/07 | -2,100.00 | $76.74 | $161,144.34 |
| Purchase | 08/07/07 | 1,300.00 | $65.23 | ($84,800.43) |
| Sale | 10/30/07 | -1,000.00 | $80.93 | $80,928.30 |
| Purchase | 10/31/07 | 2,400.00 | $64.83 | ($155,583.84) |
| Sale | 12/18/07 | -1,400.00 | $77.31 | $108,229.66 |
| Sale | 12/19/07 | -1,900.00 | $78.47 | $149,101.17 |
| Purchase | 01/11/08 | 1,900.00 | $69.71 | ($132,456.03) |
| Purchase | 01/16/08 | 200.00 | $64.10 | ($12,820.46) |
| Purchase | 02/19/08 | 900.00 | $60.84 | ($54,753.93) |
| Purchase | 02/21/08 | 2,200.00 | $55.22 | ($121,488.40) |
| Purchase | 02/27/08 | 1,400.00 | $51.37 | ($71,916.32) |
| Purchase | 02/28/08 | 1,000.00 | $50.00 | ($49,999.90) |
| Sale | 07/17/08 | -1,300.00 | $55.80 | $72,537.01 |
| Sale | 07/30/08 | -1,700.00 | $52.44 | $89,147.83 |
| Sale | 07/31/08 | -1,700.00 | $52.12 | $88,609.78 |
| Sale | 08/01/08 | -2,000.00 | $52.80 | $105,605.40 |

| Sale | 08/21/08 | -400.00 | $60.28 | $24,112.92 |
| Sale | 08/29/08 | -2,200.00 | $64.18 | $141,189.40 |
| Sale | 09/04/08 | -400.00 | $63.57 | $25,429.84 |
| Sale | 09/05/08 | -700.00 | $63.12 | $44,183.58 |
| Sale | 09/08/08 | -600.00 | $64.14 | $38,482.80 |
| Sale | 09/09/08 | -200.00 | $65.35 | $13,070.60 |
| Sale | 10/23/08 | 1,100.00 | $47.73 | $52,506.63 |
| Sale | 10/31/08 | -1,500.00 | $53.59 | $80,390.85 |
| Sale | 11/28/08 | -200.00 | $52.12 | $10,424.78 |
| Sale | 12/02/08 | -200.00 | $50.11 | $10,022.16 |
| Sale | 12/03/08 | -600.00 | $50.62 | $30,373.14 |
| Purchase | 02/24/09 | 3,300.00 | $39.75 | ($131,162.13) |
| Sale | 07/31/09 | 1,700.00 | $44.71 | $75,998.50 |
| Sale | 07/31/09 | -1,100.00 | $20.03 | $22,027.61 |

Boston Retirement Board

| Trans Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Open | 04/27/06 | 0.00 | | |
| Purchase | 02/14/07 | 5,600.00 | $54.87 | ($307,248.48) |
| Purchase | 02/15/07 | 1,600.00 | $54.96 | ($87,942.08) |
| Purchase | 02/16/07 | 900.00 | $54.92 | ($49,425.84) |
| Purchase | 02/22/07 | 2,500.00 | $60.21 | ($150,532.00) |
| Purchase | 02/23/07 | 400.00 | $62.00 | ($24,799.40) |
| Purchase | 03/28/07 | 900.00 | $61.26 | ($55,136.43) |
| Purchase | 04/03/07 | 400.00 | $61.73 | ($24,693.80) |
| Purchase | 04/04/07 | 1,300.00 | $61.96 | ($80,549.82) |
| Purchase | 04/09/07 | 300.00 | $62.00 | ($18,600.00) |
| Purchase | 04/11/07 | 500.00 | $61.77 | ($30,885.85) |
| Purchase | 04/26/07 | 1,000.00 | $61.69 | ($61,688.40) |
| Purchase | 04/30/07 | 200.00 | $60.49 | ($12,098.76) |
| Purchase | 05/03/07 | 1,300.00 | $67.45 | ($87,678.63) |
| Purchase | 05/10/07 | 500.00 | $65.44 | ($32,720.90) |
| Purchase | 05/17/07 | 400.00 | $61.84 | ($24,734.92) |
| Purchase | 05/18/07 | 1,600.00 | $61.77 | ($98,829.60) |
| Purchase | 05/21/07 | 400.00 | $62.37 | ($24,948.60) |
| Purchase | 05/22/07 | 2,100.00 | $65.06 | ($136,631.67) |
| Purchase | 05/23/07 | 900.00 | $65.79 | ($59,206.95) |
| Purchase | 05/24/07 | 1,600.00 | $65.59 | ($104,950.08) |
| Purchase | 08/07/07 | 1,300.00 | $65.23 | ($84,800.43) |
| Purchase | 10/31/07 | 2,400.00 | $64.83 | ($155,583.84) |
| Purchase | 01/11/08 | 1,900.00 | $69.71 | ($132,456.03) |
| Purchase | 01/16/08 | 200.00 | $64.10 | ($12,820.46) |
| Purchase | 02/19/08 | 900.00 | $60.84 | ($54,753.93) |
| Purchase | 02/21/08 | 2,200.00 | $55.22 | ($121,488.40) |
| Purchase | 02/27/08 | 1,400.00 | $51.37 | ($71,916.32) |
| Purchase | 02/28/08 | 1,000.00 | $50.00 | ($49,999.90) |
| Purchase | 02/24/09 | 3,300.00 | $39.75 | ($131,162.13) |
| *Class period purchases:* | | **39,000.00** | | *($2,288,383.65)* |
| Sale | 07/06/07 | -500.00 | $75.14 | $37,571.25 |
| Sale | 07/17/07 | -2,100.00 | $76.74 | $161,144.34 |
| Sale | 10/30/07 | -1,000.00 | $80.93 | $80,928.30 |
| Sale | 12/18/07 | -1,400.00 | $77.31 | $108,229.66 |
| Sale | 12/19/07 | -1,900.00 | $78.47 | $149,101.17 |
| Sale | 07/17/08 | -1,300.00 | $55.80 | $72,537.01 |
| Sale | 07/30/08 | -1,700.00 | $52.44 | $89,147.83 |
| Sale | 07/31/08 | -1,700.00 | $52.12 | $88,609.78 |
| Sale | 08/01/08 | -2,000.00 | $52.80 | $105,605.40 |
| Sale | 08/21/08 | -400.00 | $60.28 | $24,112.92 |
| Sale | 08/29/08 | -2,200.00 | $64.18 | $141,189.40 |

| | | | | | |
|---|---|---|---|---|---|
| Sale | 09/04/08 | -400.00 | | $63.57 | $25,429.84 |
| Sale | 09/05/08 | -700.00 | | $63.12 | $44,183.58 |
| Sale | 09/08/08 | -600.00 | | $64.14 | $38,482.80 |
| Sale | 09/09/08 | -200.00 | | $65.35 | $13,070.60 |
| Sale | 10/23/08 | -1,100.00 | | $47.73 | $52,506.63 |
| Sale | 10/31/08 | -1,500.00 | | $53.59 | $80,390.85 |
| Sale | 11/28/08 | -200.00 | | $52.12 | $10,424.78 |
| Sale | 12/02/08 | -200.00 | | $50.11 | $10,022.16 |
| Sale | 12/03/08 | -600.00 | | $50.62 | $30,373.14 |
| Sale | 07/31/09 | -1,700.00 | | $44.71 | $75,998.50 |
| Sale | 07/31/09 | -1,100.00 | | $20.03 | $22,027.61 |
| *Class period sales (matched to class period purchases):* | | **-24,500.00** | | | ***$1,461,087.55*** |
| | | | | | |
| Sale | 08/03/09 | -14,500.00 | | $13.69 | $198,505.00 ** |
| *Post-class period sales (matched to class period purchases):* | | **-14,500.00** | | | ***$198,505.00*** |
| | | | | | |
| **Retained purchases:** | | **0.00** | | **$19.1377** | **$0.00** |

**FIFO & LIFO Gain/(Loss):** ($628,691.10)

*\*Value of retained purchases is the mean trading price from 08/03/2009 to 10/02/2009.*

*\*\*Pursuant to the PSLRA, the value for sales occurring during the 90-day look back period is either the sale price or the average price up to the date of sale, whichever is higher.*

Exhibit D

## CERTIFICATION

I, Ellen Philbin, as Executive Director of Cambridge Retirement System, hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of the Cambridge Retirement System ("Cambridge"). I have reviewed a complaint filed against Huron Consulting Group Inc. ("Huron") alleging violations of the federal securities laws;

2.    Cambridge did not purchase securities of Huron at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.    Cambridge is willing to serve as a lead plaintiff in this matter, including providing testimony at deposition and trial, if necessary;

4.    Cambridge's transactions in Huron during the class period are reflected in Exhibit A, are attached hereto;

5.    Cambridge sought to serve as a lead plaintiff in the following class actions under the federal securities laws during the last three years:

*Plumbers & Steamfitters Local 773 Pension Fund v. Elan Corporation, PLC.*
*Attias v. Anadigics, Inc. et al*

6.    Beyond its pro rata share of any recovery, Cambridge will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 8th day of September, 2009.

_Ellen K. Philbin_
_Executive Director of Cambridge Retirement System_

## TRANSACTIONS IN
## HURON CONSULTING GROUP INC.

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 06/30/06 | 800.00 | $34.82 | ($27,859.84) |
| Sale | 07/06/06 | -800.00 | $33.68 | $26,944.00 |
| Purchase | 01/10/07 | 700.00 | $48.00 | ($33,600.00) |
| Purchase | 01/16/07 | 5,000.00 | $48.76 | ($243,794.00) |
| Purchase | 01/16/07 | 4,300.00 | $48.86 | ($210,107.89) |
| Sale | 01/16/07 | -5,000.00 | $48.76 | $243,794.00 |
| Sale | 01/19/07 | -100.00 | $48.98 | $4,898.00 |
| Sale | 02/22/07 | -1,270.00 | $60.40 | $76,714.10 |
| Sale | 03/07/07 | -890.00 | $65.86 | $58,618.96 |
| Purchase | 04/11/07 | 352.00 | $61.72 | ($21,723.68) |
| Purchase | 04/11/07 | 275.00 | $61.86 | ($17,010.32) |
| Purchase | 04/12/07 | 203.00 | $63.50 | ($12,890.72) |
| Purchase | 05/14/07 | 270.00 | $65.39 | ($17,656.00) |
| Purchase | 06/21/07 | 80.00 | $70.46 | ($5,636.66) |
| Purchase | 07/26/07 | 360.00 | $69.92 | ($25,172.89) |
| Purchase | 09/21/07 | 501.00 | $70.23 | ($35,184.48) |
| Purchase | 09/24/07 | 1,124.00 | $70.56 | ($79,303.82) |
| Purchase | 09/25/07 | 185.00 | $70.97 | ($13,128.88) |
| Sale | 11/01/07 | -3,210.00 | $68.43 | $219,658.37 |
| Purchase | 12/05/07 | 1,000.00 | $74.32 | ($74,317.20) |
| Purchase | 12/13/07 | 350.00 | $73.66 | ($25,781.74) |
| Purchase | 12/14/07 | 583.00 | $74.40 | ($43,375.32) |
| Purchase | 12/17/07 | 458.00 | $73.97 | ($33,878.99) |
| Purchase | 12/18/07 | 584.00 | $76.97 | ($44,953.05) |
| Purchase | 12/19/07 | 584.00 | $78.26 | ($45,700.92) |
| Purchase | 12/19/07 | 292.00 | $78.61 | ($22,953.39) |
| Purchase | 12/20/07 | 292.00 | $79.14 | ($23,109.35) |
| Purchase | 12/24/07 | 290.00 | $81.63 | ($23,672.70) |
| Purchase | 12/24/07 | 387.00 | $82.10 | ($31,771.07) |
| Sale | 02/19/08 | -200.00 | $57.55 | $11,509.32 |
| Sale | 02/19/08 | -410.00 | $60.35 | $24,742.31 |
| Sale | 02/20/08 | -1,330.00 | $56.84 | $75,603.72 |
| Sale | 02/21/08 | -200.00 | $55.99 | $11,197.54 |
| Sale | 02/26/08 | -540.00 | $49.20 | $26,568.00 |
| Sale | 02/26/08 | -1,150.00 | $50.33 | $57,880.65 |
| Sale | 02/27/08 | -740.00 | $49.82 | $36,869.39 |
| Sale | 03/27/08 | -3,130.00 | $40.13 | $125,617.54 |
| Purchase | 12/10/08 | 667.00 | $52.65 | ($35,119.15) |
| Purchase | 12/11/08 | 264.00 | $55.75 | ($14,717.63) |

| | | | | |
|---|---|---|---|---|
| Purchase | 06/01/09 | 129.00 | $46.40 | ($5,985.79) |
| | *Class period purchases:* | *24,859.00* | | *($1,411,246.95)* |
| | | | | |
| Sale | 07/06/06 | -800.00 | $33.68 | $26,944.00 |
| Sale | 01/16/07 | -5,000.00 | $48.76 | $243,794.00 |
| Sale | 01/19/07 | -100.00 | $48.98 | $4,898.00 |
| Sale | 02/22/07 | -1,270.00 | $60.40 | $76,714.10 |
| Sale | 03/07/07 | -890.00 | $65.86 | $58,618.96 |
| Sale | 11/01/07 | -3,210.00 | $68.43 | $219,658.37 |
| Sale | 02/19/08 | -200.00 | $57.55 | $11,509.32 |
| Sale | 02/19/08 | -410.00 | $60.35 | $24,742.31 |
| Sale | 02/20/08 | -1,330.00 | $56.84 | $75,603.72 |
| Sale | 02/21/08 | -200.00 | $55.99 | $11,197.54 |
| Sale | 02/26/08 | -540.00 | $49.20 | $26,568.00 |
| Sale | 02/26/08 | -1,150.00 | $50.33 | $57,880.65 |
| Sale | 02/27/08 | -740.00 | $49.82 | $36,869.39 |
| Sale | 03/27/08 | -3,130.00 | $40.13 | $125,617.54 |
| Sale | 07/31/09 | -310.00 | $21.01 | $6,513.47 |
| | *Class period sales (matched to class period purchases):* | *-19,280.00* | | *$1,007,129.37* |
| | | | | |
| Sale | 08/03/09 | -5,579.00 | $13.69 | $76,376.51 ** |
| | *Post-class period sales (matched to class period purchases):* | *-5,579.00* | | *$76,376.51* |
| | | | | |
| | **Retained purchases:** | 0.00 | $19.1377 | $0.00 |

|  |  |
|---|---|
| **FIFO & LIFO Gain/(Loss):** | ($327,741.07) |

*\*Value of retained purchases is the mean trading price from 08/03/2009 to 10/02/2009.*

*\*\*Pursuant to the PSLRA, the value for sales occurring during the 90-day look back period is either the sale price or the average price up to the date of sale, whichever is higher.*

Exhibit E

## CERTIFICATION

I, John Walsh as Director of Operations of Bristol County Retirement System ("Bristol County"), hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of Bristol County.  I have reviewed a complaint filed against Huron Consulting Group Inc. ("Huron") alleging violations of the federal securities laws;

2.    Bristol County did not purchase securities of Huron at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.    Bristol County is willing to serve as a lead plaintiff in this matter, including providing testimony at deposition and trial, if necessary;

4.    Bristol County's transactions in Huron during the class period are reflected in Exhibit A, attached hereto;

5.    Bristol County sought to serve as a lead plaintiff in the following class actions under the federal securities laws during the last three years:

*In re HCC Insurance Holdings, Inc. Sec. Litig.,* No. 4:07-cv-00801 (S.D. Tex.)

*Reese v. Babash,* No.1:07-cv-01530-CKK (D.D.C.)

*In Re European Aeronautic Defense & Space Co. Securities Litigation,* No. 08-cv-05389 (S.D.N.Y.)

*The Eshe Fund v. Fifth Third Bancorp et al,* No. 08-cv-00421 (S.D. Ohio)

6.    Bristol County is currently serving as a lead plaintiff in the following class actions filed under the federal securities laws during the last three years:

*In Re European Aeronautic Defense & Space Co. Securities Litigation,* No. 08-cv-05389 (S.D.N.Y.)

### TRANSACTIONS IN
### HURON CONSULTING GROUP INC.

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 05/19/09 | 165.00 | $45.09 | ($7,440.16) |
| Purchase | 05/20/09 | 109.00 | $45.88 | ($5,000.83) |
| Purchase | 05/21/09 | 176.00 | $45.41 | ($7,991.53) |
| Purchase | 05/27/09 | 3,507.00 | $47.30 | ($165,883.55) |
| Purchase | 07/13/09 | 210.00 | $41.93 | ($8,805.30) |

Bristol County Retirement System

| Trans Type | Trade Date | Shares | Price Per Share | Cost / Proceeds | |
|------------|-----------|--------|-----------------|-----------------|---|
| Open | 04/27/06 | 0.00 | | | |
| Purchase | 05/19/09 | 165.00 | $45.09 | ($7,440.16) | |
| Purchase | 05/20/09 | 109.00 | $45.88 | ($5,000.83) | |
| Purchase | 05/21/09 | 176.00 | $45.41 | ($7,991.53) | |
| Purchase | 05/27/09 | 3,507.00 | $47.30 | ($165,883.55) | |
| Purchase | 07/13/09 | 210.00 | $41.93 | ($8,805.30) | |
| *Class period purchases:* | | *4,167.00* | | *($195,121.38)* | |
| Sale | 08/03/09 | -4,167.00 | $13.69 | $57,046.23 | ** |
| *Post-class period sales (matched to class period purchases):* | | *-4,167.00* | | *$57,046.23* | |
| Retained purchases: | | 0.00 | $19.1377 | $0.00 | |
| | | | FIFO & LIFO Gain/(Loss): | ($146,066.67) | |

*\*Value of retained purchases is the mean trading price from 08/03/2009 to 10/02/2009.*

*\*\*Pursuant to the PSLRA, the value for sales occurring during the 90-day look back period is either the sale price or the average price up to the date of sale, whichever is higher.*

**<u>CERTIFICATE OF SERVICE</u>**

I, Avi Josefson, hereby certify that, in accordance with Federal Rule of Civil Procedure 5(a) and

Northern District of Illinois L.R. 5.5 and 5.9, on January 29, 2010, I caused a copy of Lead Plaintiffs'

Consolidated Class Action Complaint (and related exhibits) to be electronically filed with the Clerk of

Court and served on all counsel of record through the Northern District of Illinois' CM/ECF system.


_____/s/Avi Josefson_____