**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JASON HUGHES, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | |
| Plaintiffs, | |
| vs. | 09-CV-04734 |
| | **Judge Elaine E. Bucklo** |
| HURON CONSULTING GROUP INC., GARY E. HOLDREN, GARY L. BURGE AND WAYNE LIPSKI, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ iii

PRELIMINARY STATEMENT .................................................................... 1

BACKGROUND………………………………………………………………..3

ARGUMENT ................................................................................................ 7

I.     PLAINTIFFS DO NOT PLEAD FACTS GIVING RISE TO A "STRONG
       INFERENCE" OF SCIENTER .............................................................. 7

       A.     Applicable Legal Standards. ...................................................... 7

              1.     The Securities Fraud Standard. ...................................... 7

              2.     Plaintiffs Must Satisfy an "Exacting" Burden to Plead Scienter. .... 7

       B.     Plaintiffs' GAAP Allegations Do Not Support a Strong Inference of
              Scienter. ................................................................................. 10

              1.     Plaintiffs Do Not Adequately Plead That Holdren or Burge
                     Knew the Relevant Details of the Transactions at Issue. ........... 12

              2.     Plaintiffs Do Not Adequately Plead That No Reasonable
                     Accountant Would Have Made the Same Accounting Mistake. ... 15

                     a.     Huron's Peers Made the Same Mistake. ........................... 16

                     b.     The GAAP Provisions at Issue Are Complex and Require
                            Judgment. ......................................................................... 18

                     c.     Holdren's and Burge's Accounting Backgrounds Do Not
                            Salvage Plaintiffs' Inadequate Scienter Allegations. .......... 24

       C.     Plaintiffs' Confidential Witness Statements Do Not Support A Strong
              Inference of Scienter. ................................................................ 25

              1.     Plaintiffs' Confidential Witnesses Lack Firsthand Knowledge. .... 26

              2.     The Alleged Statements Are Not Probative of Scienter. ............... 27

       D.     Plaintiffs' Allegations Concerning Holdren's and Burge's Resignations
              Do Not Support a Strong Inference of Scienter. .......................... 31

       E.     Plaintiffs' Allegations Concerning Representations to Huron's
              Independent Auditor and Sarbanes-Oxley Certifications Do Not Support a
              Strong Inference of Scienter. .................................................... 34

F.    Plaintiffs' Allegations Concerning Holdren's Stock Sales and Holdren's and Burge's Bonuses Do Not Support a Strong Inference of Scienter. ......35

    1.    Holdren's Stock Sales Do Not Give Rise to a Strong Inference of Scienter. .........................................................................................35

    2.    Holdren's and Burge's Bonus Compensation Does Not Give Rise to a Strong Inference of Scienter. ...................................................39

G.    Plaintiffs' Scienter Allegations Also Fail When Considered Collectively. ................................................................................................39

H.    Plaintiffs Do Not Plead Scienter as to Huron. ...........................................40

II.    PLAINTIFFS FAIL TO PLEAD A SECTION 20(a) CLAIM AGAINST HOLDREN, BURGE OR LIPSKI. .......................................................................40

CONCLUSION.............................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrams v. Baker Hughes Inc.*,
  292 F.3d 424 (5th Cir. 2002) ....................................................................11, 30, 31

*Branca v. Paymentech*,
  No. Civ.A.3:97-CV-2507-L, 2000 WL 145083 (N.D. Tex. Feb. 8, 2000) .......................24, 25

*Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004)..................................................................27, 30

*City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*,
  388 F. Supp. 2d 932 (S.D. Ind. 2005) ............................................................27, 37

*Cutsforth v. Renschler*,
  235 F. Supp. 2d 1216 (M.D. Fl. 2002)................................................15, 16, 19, 20

*Davis v. SPSS, Inc.*,
  385 F. Supp. 2d 697 (N.D. Ill. 2005) ......................................................27, 28, 40

*DiLeo v. Ernst & Young*,
  901 F.2d 624 (7th Cir. 1990) .........................................................................9, 10, 13

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*,
  595 F. Supp. 2d 1253 (M.D. Fl. 2009), *aff'd*, 594 F.3d 783 (11th Cir. 2010) ..................18, 24

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*,
  594 F.3d 783 (11th Cir. 2010) .........................................................................12, 15

*Elam v. Neidorff*,
  544 F.3d 921 (8th Cir. 2008) ...............................................................................37

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976)................................................................................ 7-8

*Garfield v. NDC Health Corp.*,
  466 F.3d 1255 (11th Cir. 2006) ...........................................................................34

*Goldberg v. Household Bank, F.S.B.*,
  890 F.2d 965 (7th Cir. 1989) ...............................................................................10

*Greer v. Advanced Equities, Inc.*,
  No. 08 C 4958, 2010 WL 152002 (N.D. Ill. Jan. 15, 2010) .................................9, 39

*Higginbotham v. Baxter Int'l, Inc.*,
No. 04 C 4909, 2005 WL 3542521 (N.D. Ill. Dec. 22, 2005), *aff'd*, 495 F.3d 753 (7th
Cir. 2007) ........................................................................................................................40

*Higginbotham v. Baxter Int'l, Inc.*,
495 F.3d 753 (7th Cir. 2007) .........................................................................................25, 35

*In re Allscripts, Inc. Sec. Litig.*,
No. 00 C 6796, 2001 WL 743411 (N.D. Ill. June 29, 2001) ......................................10, 11, 40

*In re Bally Total Fitness Sec. Litig.*,
No. 04 C 3530, 2006 WL 3714708 (N.D. Ill. July 12, 2006) ............ 8, 9, 10, 24, 30-35, 39, 40

*In re Bally Total Fitness Sec. Litig.*,
No. 04 C 3530, 2007 WL 551574 (N.D. Ill. Feb. 20, 2007)............................................30, 33

*In re Bristol-Myers Squibb Sec. Litig.*,
312 F. Supp. 2d 549 (S.D.N.Y. 2004)..............................................................................12,36

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997)................................................................................................36

*In re Cadence Design Sys. Sec. Litig.*,
654 F. Supp. 2d 1037 (N.D. Cal. 2009) ....................................................................12, 13, 26

*In re Career Educ. Corp.*,
No. 03 C 8884, 2007 WL 1029092 (N.D. Ill. Mar. 29, 2007) ....................................10, 39, 40

*In re Ceridian Corp. Sec. Litig.*,
542 F.3d 240 (8th Cir. 2008) ................................................................................................34

*In re Dell Inc., Sec. Litig.*,
591 F. Supp. 2d 877 (W.D. Tex. 2008)..................................................................................27

*In re Dot Hill Sys. Corp. Sec. Litig.*,
594 F. Supp. 2d 1150 (S.D. Cal. 2008)............................................................................27, 30

*In re Enron Corp. Sec., Deriv. & "ERISA Litig."*,
258 F. Supp. 2d 576, (S.D. Tex. 2003) .................................................................................36

*In re Guidant Corp. Sec. Litig.*,
536 F. Supp. 2d 913 (S.D. Ind. 2008) ...............................................................................3, 37

*In re Harley-Davidson, Inc. Sec. Litig.*,
660 F. Supp. 2d 969 (E.D. Wis. 2009)...................................................................................37

*In re Int'l Rectifier Corp. Sec. Litig.*, No. CV 07-02544 – JFN (VBK), 2008 WL 4555794
(C.D. Cal. May 23, 2008) ....................................................................................27, 31, 37, 38

iv

*In re Medecis Pharm. Corp. Sec. Litig.*,
  CV-08-1821-PHX-GMS, 2009 WL 4755406 (D. Az. Dec. 2, 2009) .............11, 16, 18, 20, 23

*In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152 (N.D. Ill. 2004) .............................11

*In re Neopharm, Inc. Sec. Litig.*,
  No. 02 C 2976, 2007 WL 625533 (N.D. Ill. Feb. 23, 2007)......................................................9

*In re OfficeMax, Inc. Sec. Litig.*,
  No. 1:00-CV-2432, 2002 WL 33959993 (N.D. Oh. Mar. 26, 2002) .....................................11

*In re Radian Sec. Litig.*, 612 F. Supp. 2d 594 (E.D. Pa. 2009) .............................................37, 38

*In re U.S. Aggregates, Inc. Sec. Litig.*,
  235 F. Supp. 2d 1063 (N.D. Cal. 2002) ...............................................................................31

*In re Vantive Corp. Sec. Litig.*, 283 F. 3d 1079 (9th Cir. 2002) ...........................................37-38

*In re Watchguard Sec. Litig.*,
  No. MASTER FILE CO5-678J, 2006 WL 2038656 (W.D. Wash. Apr. 21, 2006)................10

*Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*,
  537 F.3d 527 (5th Cir. 2008) ......................................................................................... 28-29

*Konkol v. Diebold, Inc.*,
  590 F.3d 390 (6th Cir. 2009) ....................................................................................28, 29, 30

*Last Atlantis Capital LLC v. AGS Specialist Partners*,
  533 F. Supp. 2d 828 (N.D. Ill. 2008) ..................................................... 8, 25 27, 39

*Ley v. Visteon Corp.*,
  543 F.3d 801 (6th Cir. 2008) .............................................................................................34

*Makor Issues & Rights, Ltd.  v. Tellabs*, 437 F.3d 588 (7th Cir. 2006), *vacated and
  remanded*, 551 U.S. 308 (2007)..............................................................................8, 9, 36

*Makor Issues & Rights, Ltd.  v. Tellabs*,
  513 F.3d 702 (7th Cir. 2008) ..................................................................... 8, 25, 27

*Malin v. XL Capital Ltd.*,
  499 F. Supp. 2d 117 (D. Conn. 2007), *aff'd*, 312 Fed. Appx. 400 (2d Cir. 2009)..................37

*Malin v. XL Capital, Ltd.*,
  312 Fed. Appx. 400 (2d Cir. 2009)....................................................................................40

*Mortensen v. Americredit Corp*,
  123 F. Supp. 2d 1018 (N.D. Tex. 2000), *aff'd*, 240 F.3d 1073 (5th Cir. 2000) (Table)..........22

*Payne v. DeLuca*,
    433 F. Supp. 2d 547 (W.D. Pa. 2006)...................................................................9, 15, 16, 23

*Pugh v. Tribune Co.*,
    521 F.3d 686 (7th Cir. 2008) .................................................................................3, 35, 36, 38

*Roth v. Officemax, Inc.*,
    527 F. Supp. 2d 791 (N.D. Ill. 2007) ..........................................................................9, 29, 40

*SEC v. Lucent Techs., Inc.*,
    610 F. Supp. 2d 342 (D.N.J. 2009) ......................................................................................34

*Shalala v. Guernsey Mem'l Hosp.*,
    514 U.S. 87 (1995)...............................................................................................................11

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008)...............................................................................................................7

*Svezzese v. Duratek, Inc.*,
    No. Civ. A MJG-01-CV-1830, 2002 WL 1012967 (D. Md. Apr. 30, 2002), *aff'd*, 67
    Fed. Appx. 169 (4th Cir. 2003).............................................................................................13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)......................................................................................................... 3, 7-8

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ...............................................................................26, 28, 31, 34

**Statutes & Rules**

15 U.S.C. § 78u-4(b)(2) ...............................................................................................................8

Federal Rule of Civil Procedure 9(b)......................................................................................7, 30

**Other Authorities**

Accounting Principles Board Opinion No. 16 .............................................................................19

Emerging Issues Task Force Issue 95-8........................................................................... passim

Financial Accounting Statement No. 141 .............................................................................18, 22

Financial Accounting Statement No. 141(R) ..............................................................................22

## EXPLANATION OF CITATION FORMS

The following citation forms are used in this memorandum:

- "Earnhardt Decl." for references to the Declaration of J. Wesley Earnhardt, dated March 30, 2010.

- "Ex." for references to documents attached as exhibits to the Earnhardt Declaration.

- "7/31/09 8-K" for references to the Huron Consulting Group Inc. Current Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 8-K) (July 31, 2009) (Ex. B).

- "10-K/A" for references to the Huron Consulting Group Inc. Amended Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-K/A) (August 17, 2009) (Ex. A).

- "11/5/09 8-K" for references to the Huron Consulting Group Inc. Current Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 8-K) (November 5, 2009) (Ex. C).

- "11/5/09 10-Q" for references to the Huron Consulting Group Inc. Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-Q) (November 5, 2009) (Ex. D).

- "2009 10-K" for references to the Huron Consulting Group Inc. Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-K) (February 23, 2010) (Ex. X).

- "Burge SMA" for references to the Amended and Restated Senior Management Agreement By and Between Huron Consulting Group Inc. and Gary L. Burge, dated February 9, 2009 (Ex. S).

- "Callidus SEC Comment Letter" for references to the November 24, 2008, Letter from Mark Kronforst, SEC Accounting Branch Chief, to Ronald J. Fior, Chief Financial Officer and Senior Vice President of Callidus Software Inc. (Ex. N).

- "Callidus Response Letter" for references to the December 5, 2008, Letter from Ronald J. Fior, Chief Financial Officer and Senior Vice President, Finance and Operations of Callidus Software Inc. to Mark Kronforst, SEC Accounting Branch Chief (Ex. O).

- "Callidus 10-K" for references to the Callidus Software Inc. Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-K) (March 12, 2009) (Ex. P).

- "Compl." for references to the Consolidated Class Action Complaint.

- "CRA 8/13/09 8-K" for references to the CRA International, Inc. Current Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 8-K) (August 13, 2009) (Ex. H).

- "CRA 10/14/09 10-Q" for references to the CRA International, Inc. Current Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-Q) (October 14, 2009) (Ex. I).

- "CRA 2008 10-K" for references to the CRA International, Inc. Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-K) (February 12, 2009) (Ex. E).

- "EITF 95-8" for references to Emerging Issues Task Force Issue 95-8: "Accounting for Contingent Consideration Paid to Shareholders of an Acquired Enterprise in a Purchase Business Combination" (Ex. L).

- "Epic 10-K" for references to the Epic Energy Resources, Inc. Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-K) (March 27, 2009) (Ex. Q).

- "FAS 141(R)" for references to Statement of Financial Accounting Standards No. 141 (R) entitled "Business Combinations" (Ex. R).

- "FTI 8-K" for references to the FTI Consulting, Inc. Current Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 8-K) (August 10, 2009) (Ex. G).

- "FTI 2008 10-K" for references to the FTI Consulting, Inc. Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-K) (March 2, 2009) (Ex. F).

- "Holdren Schedule 13D" for references to the Schedule 13D filed by Gary E. Holdren with the SEC on February 8, 2006 (Ex. V).

- "Holdren SMA" for references to the Amended and Restated Senior Management Agreement By and Between Huron Consulting Group Inc. and Gary E. Holdren, dated December 12, 2008 (Ex. T).

- "Joe's Jeans 4/30/09 10-K" for references to the Joe's Jeans Inc. Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-K) (April 30, 2009) (Ex. J).

- "Kokenge Speech" for references to the December 11, 2003, speech by Chad A. Kokenge, Professional Accounting Fellow in the SEC's Office of the Chief Accountant, at the 2003 Thirty-First AICPA National Conference on Current SEC Developments (Ex. M).

- "Letter Agreement" for references to the July 30, 2009, Letter Agreement between Huron Consulting Group Holdings LLC and the Trustees and Beneficiaries of the Wellspring Partners Trust (Exhibit 2.2 to the 11/5/09 10-K) (Ex. D).

- "MRV 10/8/09 10-K" for references to the Annual Report of MRV Communications Inc. Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-K) (October 8, 2009) (Ex. K).

- "2004 Prospectus' for references to the Huron Prospectus filed with the SEC on October 13, 2004 (Ex. U).

- "2006 Prospectus" for references to the Huron Prospectus filed with the SEC on February 3, 2006 (Ex. U).

Defendants Huron Consulting Group, Inc. ("Huron" or the "Company"), Gary E. Holdren, Gary L. Burge and Wayne E. Lipski (the "Individual Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Consolidated Class Action Complaint (the "Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

Plaintiffs' Complaint is based on the premise that because Huron restated certain of its financial results, the Company and two of its former executives must have engaged in securities fraud. That premise is wrong as a matter of law. The mere fact that a company issues an accounting restatement does not demonstrate securities fraud. Accounting restatements amount to securities fraud only if defendants acted with scienter, something that plaintiffs simply do not plead here.

Plaintiffs' own allegations (and the materials upon which those allegations are based) establish that Huron's restatement resulted from the Company's misapplication of complicated accounting rules that required Huron to treat as compensation expense certain payments that Huron did not itself make. The restated payments were funds redistributed by others after Huron made payments to them. In many instances, Huron and the Individual Defendants did not even know about the subsequent redistributions. At least four other companies – including two of Huron's peers – recently made the same accounting mistake.

What plaintiffs fail to establish is that the accounting mistake here (again, a mistake made by at least four other companies) gives rise to a strong inference of securities fraud. To state a claim for securities fraud under Section 10 and Rule 10b-5 of the Securities Exchange Act of 1934, plaintiffs must plead with particularity that each of Huron, Holdren and

Burge acted with scienter, *i.e.*, with fraudulent intent.[1]  The law is clear that financial restatements or mere errors in applying generally accepted accounting principles ("GAAP") are themselves insufficient to plead scienter.  Plaintiffs can overcome that general rule only by setting forth specific facts demonstrating both (1) that defendants knew the relevant details of the transactions at issue, and (2) that the application of the relevant accounting principles was so obvious that no reasonable accountant could have reached the same conclusions as did Huron with respect to those transactions.  Plaintiffs' Complaint does neither.  (*See infra* § I.B.)

Plaintiffs also attempt to plead scienter through several additional assertions. Each lacks merit.

*First*, none of the alleged statements of plaintiffs' purported "confidential witnesses" supports scienter because plaintiffs fail to plead sufficient facts showing that the witnesses have the requisite firsthand knowledge; most of the witness statements are wholly conclusory; and the witness statements, even if true, simply are not probative of scienter.  (*See infra* § I.C.)

*Second*, plaintiffs argue that the Court should infer scienter based on the assertion that Holdren and Burge were forced to resign "immediately" and without severance.  That assertion is demonstrably false:  Holdren did not leave Huron until a month after the restatement was announced and Burge did not leave Huron until the end of 2009.  Moreover, the very employment contracts upon which plaintiffs rely establish that neither defendant was entitled to severance upon resignation unless they resigned for strictly defined "good reasons", and the Complaint includes no allegations that either resigned for such good reason.  (*See infra* § I.D.)

---

[1] The Section 10 and Rule 10b-5 claim is not asserted against Lipski.  The Section 20(a) claim is the only claim brought against Lipski.

*Third*, the representations made to Huron's independent auditor and in certifications pursuant to the Sarbanes-Oxley Act do not suggest scienter because plaintiffs do not adequately plead that either Holdren or Burge knew the representations or certifications were inaccurate when made. (*See infra* § I.E.)

*Fourth*, Holdren's stock sales are not probative of scienter because plaintiffs do not adequately plead that those sales were "unusual" or "suspicious". (Plaintiffs do not even contend that Burge's stock sales are probative of scienter.) Holdren's and Burge's bonus compensation also does not establish scienter. As numerous courts have recognized, permitting scienter to be pleaded on that basis would permit an end-run around the pleading requirement because the desire to achieve higher compensation is common to virtually all corporate executives. (*See infra* § I.F.)

Because plaintiffs fail to plead the required element of scienter, their claims under Section 10 and Rule 10b-5 must be dismissed as a matter of law. Without claims under Section 10 and Rule 10b-5, plaintiffs' Section 20(a) claim against Holdren, Burge and Lipski also must be dismissed. (*See infra* § II.)

## BACKGROUND

Huron was formed in 2002 and made its initial public offering in October 2004. (*See* Compl. ¶¶ 2, 22; 10-K/A at 5 (Earnhardt Decl. Ex. A).)[2] Huron provides operational and financial consulting services. (*See* 10-K/A at 5 (Earnhardt Decl. Ex. A).) It is not a public accounting firm. (*See id.*) During the putative class period, Holdren was Huron's Chairman and

---

[2] The Court may consider the Complaint and any documents incorporated therein on a motion to dismiss. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The Court also may take judicial notice of documents in the public record, including filings with the Securities and Exchange Commission. *See Pugh v. Tribune Co.*, 521 F.3d 686, 691 n.2 (7th Cir. 2008); *In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 921 (S.D. Ind. 2008).

Chief Executive Officer, Burge was Huron's Chief Financial Officer and Treasurer, and Lipski

was Huron's Controller, and later its Chief Accounting Officer.  (*See* Compl. ¶¶ 23-25.)

On July 31, 2009, Huron announced that it would restate its financial results for

fiscal years 2006, 2007 and 2008 and for the first quarter of 2009.  (*See* 7/31/09 8-K at 2

(Earnhardt Decl. Ex. B).)  Huron also announced the resignations of Holdren, Burge and Lipski.

(*See id.* at 3.)  While Holdren's resignation as CEO took effect immediately, he remained with

the Company until August 31, 2009.  (*See id*.)  Upon his resignation, Huron "recognize[d]"

Holdren "for his extraordinary accomplishment in building Huron," praised him for "work[ing]

tirelessly on behalf of Huron and its shareholders and employees," and stated that it "respect[ed]

his leadership in choosing to pass the reins."  (*Id.*, Exhibit 99.1 at 5.)  Burge resigned as Huron's

Chief Financial Officer following the July 31 announcement, but he continued to serve as the

Company's Treasurer until November 3, 2009, and he remained at Huron until the end of 2009.

(*Id.* at 3; 11/5/09 8-K at 1 (Earnhardt Decl. Ex. C); 2009 10-K at F-16 (Earnhardt Decl. Ex. X).)

On August 17, 2009, Huron filed an amended annual report implementing the

restatement (the "Restatement").  (*See* 10-K/A (Earnhardt Decl. Ex. A).)  The Restatement

concerned four businesses that Huron acquired between 2005 and 2007 (the "Acquired

Businesses").  (*Id.* at 1.)  In addition to paying the selling shareholders of the Acquired

Businesses a fixed sum at closing, Huron also committed to make "earn-out" payments that were

contingent "upon the Acquired Businesses achieving specific financial performance targets over

a number of years" (collectively, the "Acquisition-Related Payments").  (*Id.*)  Huron accounted

for the Acquisition-Related Payments as additional purchase price.  (*See id.*)  Thus, to the extent

the Acquisition-Related Payments exceeded the net fair value of the acquired assets and assumed

liabilities, Huron recorded the excess payments as goodwill.  (*See id.*)

Importantly, Huron's accounting for the Acquisition-Related Payments themselves complied with GAAP and the accounting for those payments has not been restated. (*See id.*)  Rather, Huron's Audit Committee learned shortly before the Restatement that certain selling shareholders of the Acquired Businesses had redistributed a portion of the Acquisition-Related Payments among themselves (the "Shareholder Payments") or to other employees (the "Employee Payments").  (*Id.*)  As described below, Huron restated its financial statements by making additional accounting entries to reflect the Shareholder Payments and Employee Payments as compensation expense of the Company.  (*See id.* at 1-2.)

The Shareholder Payments involved the selling shareholders "redistribut[ing] portions of their acquisition-related payments among themselves in amounts that were not consistent with their ownership interests on the date [Huron] acquired the business."  (*Id.* at 1.)  The Shareholder Payments "were dependent, in part, on continuing employment with the Company or on the achievement of personal performance measures."  (*Id.*)[3]  The Employee Payments involved the selling shareholders "redistribut[ing] portions of their Acquisition-Related Payments to certain [Huron] employees who were not selling shareholders of the Acquired Businesses."  (*Id.*)  The Employee Payments also "were dependent on continuing employment with the Company or on the achievement of personal performance measures."  (*Id.*)

---

[3] With respect to the Shareholder Payments, Huron reflected as non-cash expense all of the payments that were subject to redistribution based on employment or performance, even though "the total amounts of the acquisition-related payments received by the selling shareholders after the redistribution did not differ significantly from the amounts such selling shareholders would have received if the distribution of such portion of the acquisition-related payments had been made in proportion to their respective ownership interests."  (10-K/A at 30-31 (Earnhardt Dec. Ex. A).)  For example, Huron reclassified $38.1 million in connection with the Shareholder Payments for 2006 through 2008, despite the fact that only $5.1 million actually was redistributed.  (*See id.* at 31.)

In July 2009, the Audit Committee determined that, pursuant to GAAP, the Shareholder Payments and Employee Payments should be imputed to Huron, despite the fact that Huron did not make those redistributions, and whether or not Huron management even knew about them. (*See id.* at 1-2.)[4]  After consulting with Huron's independent auditor and third-party accounting experts about the proper interpretation of the relevant GAAP provisions, the Audit Committee determined that the Shareholder Payments and Employee Payments should be "viewed as resulting from services that are assumed to have benefited Huron and must therefore be recorded as non-cash compensation expense of Huron." (*Id.* at 2.)  In the Restatement, Huron recorded the "entries [as] non-cash because the payments were made directly by the selling shareholders from the acquisition proceeds they received from us." (*Id.*)  The Restatement had no impact on Huron's assets, liabilities or revenues. (*See id.*)

Based on its inquiry, the Audit Committee concluded that "senior management did not properly take into account the impact of the selling shareholders' redistribution of the acquisition-related payments when determining the appropriate accounting treatment." (*Id.*)  Specifically, the Audit Committee found "[i]n some cases, senior management was unaware of the redistributions" while "[in] other cases, senior management was aware of the redistributions but either misunderstood or misapplied the appropriate accounting guidance." (*Id.*)

Huron's July 31, 2009, announcement of the necessity for a restatement was greeted by a flurry of purported class actions.  In less than a week, seven such actions were filed

---

[4] As discussed below, the Complaint ignores the fact that the restated payments were not payments made by Huron, but instead were redistribution payments made by the selling shareholders.  In repeated attempts to oversimplify the complexity of the transactions and the accounting principles at issue, plaintiffs mischaracterize the redistributions as payments made by the Company, a contention that is unsupported by any factual allegations (and inconsistent with the public filings upon which the Complaint is based).

in the Northern District of Illinois.  (*See* Docket Nos. 63 and 64.)  On November 16, 2009, the

Court consolidated the actions and appointed Lead Plaintiffs and Lead Counsel.  (*See id.*)

On January 29, 2010, plaintiffs filed the present Complaint on behalf of

themselves and a putative class of similarly situated purchasers of Huron common stock from

April 27, 2006, through July 31, 2009.  (*See* Compl. at 1.)  Plaintiffs allege that certain Huron

filings with the SEC and other statements during the putative class period were fraudulent.  (*See*

*id.* ¶¶ 75-120.)  Plaintiffs assert two causes of action:  (1) a claim against Huron, Holdren and

Burge under Section 10(b) of the Exchange Act and Rule 10b-5; and (2) a claim against Holdren,

Burge and Lipski under Section 20(a) of the Exchange Act.  (*See id.* ¶¶ 146-64.)

## ARGUMENT

## I.     PLAINTIFFS DO NOT PLEAD FACTS GIVING RISE TO A "STRONG INFERENCE" OF SCIENTER.

### A.     Applicable Legal Standards.

#### 1.     The Securities Fraud Standard.

To state a claim under Section 10(b) and Rule 10b-5, plaintiffs must adequately

plead (i) a material misrepresentation or omission by the defendant, (ii) that the

misrepresentation or omission was made with scienter, (iii) reliance upon the misrepresentation

or omission, (iv) economic loss and (v) loss causation.  *See Stoneridge Inv. Partners, LLC v.*

*Scientific-Atlanta,* 552 U.S. 148, 157 (2008).  Plaintiffs also must satisfy the heightened pleading

requirements of Federal Rule of Civil Procedure 9(b) and the even more stringent demands of the

Private Securities Litigation Reform Act ("PSLRA").

#### 2.     Plaintiffs Must Satisfy An "Exacting" Burden to Plead Scienter.

Scienter means the "intention 'to deceive, manipulate, or defraud.'"  *Tellabs, Inc.*

*v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (quoting *Ernst & Ernst v. Hochfelder,*

425 U.S. 185, 194 & n.12 (1976)); *see also Last Atlantis Capital LLC v. AGS Specialist Partners*, 533 F. Supp. 2d 828, 830 (N.D. Ill. 2008).  Only intentional misconduct or recklessness constitutes scienter.  *Makor Issues & Rights v. Tellabs, Inc.*, 513 F.3d 702, 704 (7th Cir. 2008) ("*Makor II*").  Recklessness requires "an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *Makor Issues & Rights v. Tellabs, Inc.*, 437 F.3d 588, 600 (7th Cir. 2006) ("*Makor I*") (quotations omitted), *vacated and remanded*, 551 U.S. 308 (2007).  Mere negligence or even "'inexcusable negligence' does not amount to scienter."  *In re Bally Total Fitness Sec. Litig.*, No. 04 C 3530, 2006 WL 3714708, at *7 (N.D. Ill. July 12, 2006) ("*Bally I*").

The PSLRA imposes "[e]xacting pleading requirements" with respect to scienter.  *Tellabs*, 551 U.S. at 313.  It requires that plaintiffs allege "with particularity facts giving rise to a strong inference that" Holdren or Burge acted with scienter.[5]  *Id.* at 314 (quoting 15 U.S.C. § 78u-4(b)(2)).  A "strong inference" is one that is "more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations."  *Id.* at 324; *see also Last Atlantis*, 533 F. Supp. 2d at 830.  As the Supreme Court explained, "[i]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences."  *Tellabs*, 551 U.S. at 323.  Thus, "[a] plaintiff alleging fraud in a § 10(b) action . . . must plead facts rendering an inference of scienter *at least as likely as* any plausible opposing inference."  *Id.* at 328 (emphasis in original); *see also Makor II*, 513 F.3d at 705 ("[F]irst the inference must be cogent, and second it must be as cogent as the

---

[5] To plead scienter against Huron, plaintiffs must adequately plead scienter against either Holdren or Burge.  (*See infra* § I.H.)

opposing inference, that is, the inference of lack of scienter.").

In addition, to plead scienter against Holdren or Burge, plaintiffs must plead sufficient facts about their individual states of mind – allegations about "defendants" generally or about other members of Huron's management cannot satisfy plaintiffs' burden.  *See, e.g.*, *Makor I*, 437 F.3d at 602-03 (scienter must be pleaded "with respect to each individual defendant in multiple defendant cases"); *Greer v. Advanced Equities, Inc.*, No. 08 C 4958, 2010 WL 152002, at *11 (N.D. Ill. Jan. 15, 2010) (plaintiffs did not satisfy "substantive requirement that the complaint must create a strong inference of scienter *with respect to each individual defendant*") (emphasis in original); *Roth v. Officemax, Inc.*, 527 F. Supp. 2d 791, 797 (N.D. Ill. 2007) ("The Supreme Court did not . . . disturb the Seventh Circuit's requirement [stated in *Makor I*] that plaintiffs must create the strong inference of scienter with respect to each individual defendant in multiple defendant cases.") (quotation omitted).

Moreover, plaintiffs must adequately plead that Holdren and Burge acted with scienter "at the time [of] each allegedly fraudulent statement."  *In re Neopharm, Inc. Sec. Litig.*, No. 02 C 2976, 2007 WL 625533, at *6 (N.D. Ill. Feb. 23, 2007); *see also Bally I*, 2006 WL 3714708, at *7 (plaintiffs must adequately plead defendants' "state of mind behind the misstatements at the time they were made").  Accordingly, they must plead sufficient facts about *what* Holdren and Burge knew and *when* they knew it.  *See DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) (stating that plaintiffs had to plead "the who, what, when, where and how:  the first paragraph of any newspaper story"); *Payne v. DeLuca*, 433 F. Supp. 2d 547, 563 (W.D. Pa. 2006) ("[T]he facts giving rise to a strong inference of scienter must be alleged with particularity, meaning that plaintiffs must plead 'the who, what, where, when, and how:  the first paragraph of any newspaper story.'") (quoting *DiLeo*).

Plaintiffs attempt to plead scienter by reference to (1) the alleged obviousness of the accounting errors that led to the Restatement and the size of the Restatement (*see* Compl. ¶¶ 53-58); (2) the alleged statements of purported "confidential witnesses" (*id.* ¶¶ 59-63); (3) the circumstances of Holdren's and Burge's resignations (*id.* ¶¶ 64-67); (4) certain statements made in representation letters and certifications (*id.* ¶¶ 68-71); and (5) Holdren's sales of Huron stock and Holdren's and Burge's bonuses (*id.* ¶¶ 71-74).  As shown below, plaintiffs' allegations fail, both individually and collectively, to plead a strong inference of scienter.

### B.  Plaintiffs' GAAP Allegations Do Not Support A Strong Inference of Scienter.

It is well-settled that GAAP errors, standing alone, do not establish scienter.  *See, e.g.*, *Bally I*, 2006 WL 3714708, at *8; *In re Allscripts, Inc. Sec. Litig.*, No. 00 C 6796, 2001 WL 743411, at *11 (N.D. Ill. June 29, 2001).  Even GAAP errors that result in significant financial restatements are insufficient to plead scienter.  *See, e.g.*, *In re Career Educ. Corp.*, No. 03 C 8884, 2007 WL 1029092, at *8 (N.D. Ill. Mar. 29, 2007) ("Plaintiffs cite the fact that there was a restatement of financial reports and the magnitude of the alleged GAAP violations as evidence of defendants' state of mind.  These allegations are insufficient by themselves to support a strong inference of scienter."); *Bally I*, 2006 WL 3714708, at *7-8 (rejecting scienter based in part on claim that restatement totaled 438% of company's aggregate pre-restatement net income); *cf. DiLeo*, 901 F.2d at 627 ("Four billion dollars is a big number, but even a large column of big numbers may not add up to a fraud.").

The Seventh Circuit has long recognized that "[r]estatements of earnings are common."  *Goldberg v. Household Bank, F.S.B.*, 890 F.2d 965, 967 (7th Cir. 1989); *see also In re Watchguard Sec. Litig.*, No. MASTER FILE CO5-678J, 2006 WL 2038656, at *12 (W.D. Wash. Apr. 21, 2006) ("[T]he court notes that corporate restatements of earnings are commonplace.").  That is not surprising, as GAAP "standards . . . are far from being a canonical

set of rules that will ensure identical accounting treatment of identical transactions." *In re Medecis Pharm. Corp. Sec. Litig.*, CV-08-1821-PHX-GMS, 2009 WL 4755406, at *5 (D. Ariz. Dec. 2, 2009) (quotation omitted). Rather, "'[t]here are 19 different GAAP sources, any number of which might present conflicting treatments of a particular accounting question.'" *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1168 n.7 (N.D. Ill. 2004) (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101 (1995)).

"Thus, one person's accounting decisions on a given matter, even if open to debate, are not necessarily improper, much less intentionally misleading." *In re OfficeMax, Inc. Sec. Litig.*, No. 1:00-CV-2432, 2002 WL 33959993, at *17 (N.D. Oh. Mar. 26, 2002)*; see also Allscripts*, 2001 WL 743411, at *11 ("[I]t is difficult to build inferences of scienter upon accounting errors because such errors often involve complex calculations about which reasonable people can differ in opinion."); *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 433 (5th Cir. 2002) (GAAP errors "can easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action").

Plaintiffs attempt to avoid these well-settled principles by asserting that the relevant "accounting rule" here was so "plain" that the accounting mistake must have been the result of fraud. (Compl. ¶ 55 (quotation omitted).) But alleging that a "rule" is "plain" in conclusory fashion does not make it so – and is insufficient to support an inference of scienter. Rather, to plead scienter based on the obviousness of an accounting mistake, plaintiffs must plead specific facts (not conclusions) sufficient to establish (1) that Holdren and Burge knew the relevant details of the transactions that were accounted for incorrectly (*see infra* § I.B.1); and (2) that no reasonable accountant could have (properly or mistakenly) interpreted or applied the GAAP provisions at issue in the same manner as Huron (*see infra* § I.B.2). Plaintiffs fail to

plead either of those elements, let alone both, as they must to avoid dismissal.

**1.      Plaintiffs Do Not Adequately Plead That Holdren or Burge Knew the Relevant Details of the Transactions at Issue.**

As explained above, Huron did not restate the accounting entries for its own Acquisition-Related Payments; rather, it restated to record as compensation expense certain payments that were redistributed (or were subject to being redistributed) by the selling shareholders of certain businesses it acquired.  (*See supra* p. 5.)  Plaintiffs do not plead specific facts showing that Holdren or Burge knew any relevant details about those redistributions.

That is a critical failure of plaintiffs' Complaint:  Holdren and Burge could not have misaccounted for the selling shareholders' redistributions with fraudulent intent if they did not know the relevant details of those redistributions.  *See, e.g., Edward J. Goodman Life Income Trust v. Jabil Circuit*, 594 F.3d 783, 792 (11th Cir. 2010) ("*Goodman*"); *In re Cadence Design Sys. Sec. Litig.*, 654 F. Supp. 2d 1037, 1046 (N.D. Cal. 2009); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 569 (S.D.N.Y. 2004) ("*BMS*").  As the *Cadence* court explained, "[p]laintiffs' allegations must, when taken as a whole, give rise to a 'strong inference' that Defendants were aware of these details – otherwise, Defendants would have no way of knowing that the [transactions] were improperly classified."  654 F. Supp. 2d at 1046.

In this regard, plaintiffs' allegations are wholly deficient.  While plaintiffs assert that Holdren and Burge knew there were redistributions, the primary fact that they rely upon to support that assertion is a statement from Huron's own 10-K/A, which plaintiffs contend establishes that "senior management was well 'aware' that the redistributions had taken place." (Compl. ¶ 11.)  That is not what the document says.  To the contrary, the 10-K/A states that "in some cases" senior management *did not know* about the redistributions, while in "other cases" senior management did know about them, but "misunderstood" or "misapplied" the relevant

12

GAAP provisions.  (10-K/A at 2 (emphasis added) (Earnhardt Decl. Ex. A).)  Plaintiffs cannot plead scienter by mischaracterizing, and then selectively quoting only certain portions of, the document upon which they purport to rely.  *See Svezzese v. Duratek*, *Inc.*, No. Civ. A MJG-01-CV-1830, 2002 WL 1012967, at *4 (D. Md. Apr. 30, 2002) ("[F]actual allegations must be true to provide the basis for a cause of action.  A cause of action does not lie when the complaint rests on mischaracterizations of the events at issue.") (quotation omitted), *aff'd*, 67 Fed. Appx. 169 (4th Cir. 2003).

Even with respect to the redistributions the 10-K/A states were known to unnamed "senior management," plaintiffs have not met their burden of pleading the "who, what, when, where, and how" necessary to establish scienter.  *DiLeo,* 901 F.2d at 627.  For instance, the 10-K/A says nothing about what "senior management" knew about the redistributions, and plaintiffs plead no facts about senior management's knowledge of the "relevant details", including any link between the redistributions and continued employment.  Knowing that some redistributions took place is not enough to establish scienter because it is not enough to determine whether to alter the accounting treatment.  *See Cadence,* 654 F. Supp. 2d at 1046.[6]

Instead of pleading particularized facts giving rise to a strong inference that Holdren or Burge knew the relevant details, plaintiffs ask this Court to infer from the 10-K/A that Holdren and Burge not only knew about the redistributions, but also understood all of the pertinent facts, correctly balanced all of the competing accounting judgments and nonetheless launched a fraudulent plan to use "incorrect" accounting.  That inference is nowhere near as plausible as the competing inference that while "senior management" may have known about

---

[6] Plaintiffs also fail to allege – and the 10-K/A does not say – "when" or "how" Holdren or Burge learned of any redistributions.

certain redistributions, it did not know all the relevant details of those redistributions, nor did it

know that the accounting for those redistributions was "incorrect."  In fact, the latter inference is

the only inference that may be drawn from the 10-K/A, because that is exactly what the 10-K/A

says when it states that the accounting treatment was misunderstood or misapplied.  It is not open

to interpretation by the use of an inaccurate characterization.

Not only does the 10-K/A fail to establish that Holdren or Burge knew the

relevant details of the redistributions, plaintiffs' quotation of Huron's July 30, 2009, amended

agreement ("Letter Agreement") relating to Huron's acquisition of Wellspring Partners

("Wellspring") (*see* Compl. ¶ 50) also fails to establish that Holdren or Burge knew the relevant

details of the redistributions.  The cited provision provides:

> "*No Disclosure to Huron*.  Each of the Beneficiaries represents and warrants that,
> prior to March 31, 2009, he/she *did not disclose to Huron's management*
> (excluding any Beneficiaries) the distribution methodology used by the
> Wellspring Trust to determine the amounts of earn-out proceeds to be distributed
> among the Beneficiaries, except that the direct payment of amounts to certain
> Huron employees from funds which would otherwise have constituted earn-out
> amounts were discussed with Huron's management."  (Letter Agreement ¶ 4,
> Exhibit 2.2 to Huron 11/5/09 10-Q (Earnhardt Decl. Ex. D) (emphasis added).)

Quoting only the final clause of that provision, plaintiffs contend that the Letter Agreement

somehow "made clear" that Huron's "most senior management knew that . . . earn-out payments

were being used to compensate Huron employees."  (Compl. ¶ 50.)  The clause's plain language,

however, refers only to funds that "otherwise" would have been earn-out payments.  Thus, the

portion of the Letter Agreement that plaintiffs quote addresses funds that ultimately were not

earn-out payments and that were not restated, making knowledge of those funds irrelevant to

plaintiffs' claims.

Plaintiffs' insistence that the Letter Agreement "acknowledged that, by no later

than March 31, 2009 . . . Huron's senior management knew the specific details of the distribution

methodology used to compensate these employees" (*id.*) is difficult to understand.  The "No

Disclosure to Huron" provision is a representation and warranty by the Wellspring selling

shareholders that, as of the end of the first quarter of 2009 (the last quarter for which Huron had

filed a 10-Q), they had not disclosed details about the redistributions to Huron management.

(*See* Letter Agreement ¶ 4, Exhibit 2.2 to Huron 11/5/09 10-Q (Earnhardt Decl. Ex. D).)  In other

words, the Letter Agreement cuts against any inference of scienter.

       Moreover, contrary to plaintiffs' reading, the Letter Agreement does not say that

the Wellspring sellers advised Huron management of the redistributions on March 31, 2009.

Again, the more plausible inference is that that date was chosen for the certification merely

because it was the last date covered by Huron's most recent 10-Q.  The Letter Agreement does

not establish the knowledge of any member of Huron management, and certainly does not

establish the knowledge of Holdren or Burge.

       In short, plaintiffs' scienter claims must fail because they have pleaded no facts

indicating that Holdren or Burge knew the details about what the selling shareholders did with

the funds Huron paid them.  *See Goodman*, 594 F.3d at 792 (holding it was "not necessary" to

consider the complexity of relevant GAAP provisions where plaintiffs did not "allege any facts

indicating that any individual [defendant] knew that the accounting standard was being

violated").

      **2.**      **Plaintiffs Do Not Adequately Plead That No Reasonable Accountant**
                    **Would Have Made the Same Accounting Mistake.**

       To plead scienter based on the alleged obviousness of the accounting mistake

here, plaintiffs must show not only that Holdren and Burge knew the relevant details of the

redistributions at issue, but also "that the accounting judgments which were made were such that

no reasonable accountant would have made the same decision if confronted with the same facts."

*Payne*, 433 F. Supp. 2d at 580 (quotation omitted); *see also Medicis*, 2009 WL 4755406, at *7

(plaintiff failed to plead that no accountant "would have made the same decisions if confronted

with the same facts") (quotation omitted); *Cutsforth v. Renschler*, 235 F. Supp. 2d 1216, 1260

(M.D. Fl. 2002) (no scienter where "[i]t appears that in some circumstances accountants might

reasonably reach different conclusions about the application" of GAAP).  Plaintiffs have not met

that burden.

### a.        Huron's Peers Made the Same Mistake.

Two of the three companies that plaintiffs describe as Huron's "peers" (Compl. ¶

132) – Charles River Associates International, Inc. ("CRA") and FTI Consulting, Inc. ("FTI")[7] –

recently reported making the same accounting mistake that Huron made, shortly after Huron

announced that it intended to restate its financial statements, and under nearly identical

circumstances.  Put another way, of the four companies in Huron's peer group, only one has not

at this time publicly acknowledged having difficulty with this accounting treatment.  And Huron

was the first to catch – and self-report – the mistake, leaving open the question as to whether

CRA or FTI would have figured out the accounting in the absence of Huron's announcement.

On August 10, 2009, FTI announced that, "[i]n light of recent industry

developments," it had discovered errors in its 2006 through 2008 financial statements.  (FTI 8-K

at 1 (Earnhardt Decl. Ex. G).)  In connection with its acquisition of FD International Holdings

(Limited) ("FD"), FTI made earn-out and other payments to an Employee Benefit Trust

---

[7] CRA describes itself as "a worldwide leading economic, financial and management consulting services firm" that "offer[s] consulting services in . . . financial consulting and business consulting."  (CRA 2008 10-K at 1 (Earnhardt Decl. Ex. E ).)  FTI describes itself as "a leading global business advisory firm" that offers consulting services in such areas as "corporate finance," "forensic and litigation consulting" and "economic consulting" and whose professionals include CPAs.  (FTI 2008 10-K at 2 (capitalization altered) (Earnhardt Decl. Ex. F).)

("EBT"), which was a selling shareholder of FD. (*See id.*) Although FTI's payments to the EBT corresponded with its ownership share of FD, the EBT redistributed those payments such that they "were not in the same proportion as the beneficiaries' ownership of FD shares and/or to beneficiaries who did not own any FD shares." (*Id.*) Accordingly, FTI corrected its 2006 through 2008 "financial statements to record the amount of the payments of acquisition consideration from the EBT as compensation, rather than as purchase consideration." (*Id.*)

On August 13, 2009, also "[i]n light of recent industry developments," CRA announced that it had preliminarily identified an error with its earn-out accounting. (CRA 8/13/09 8-K at 2 (Earnhardt Decl. Ex. H).) On October 1, 2009, CRA confirmed that its 2006 through 2009 financial statements were incorrect because "a $5 million earn-out payment made by the Company to the seller of a business it acquired . . . was subsequently redistributed by the seller to certain continuing employees of the acquired business" in a manner that was not "in accordance with . . . the original ownership percentage interests." (CRA 10/14/09 10-Q at 7 (Earnhardt Decl. Ex. I).) CRA thus determined that the earn-out payment, which it originally "accounted for as additional purchase price and included in goodwill," should be "re-characterized as compensation expense." (*Id.*) CRA further revealed that its May 2009 escrow payment relating to the same selling shareholder should not have been recorded as goodwill. (*See id.*)[8]

The fact that Huron's peers and at least two other companies have recently disclosed similar errors belies any claim "that the accounting judgments which were made were

---

[8] At least two other companies disclosed similar errors in 2009. (*See* Joe's Jeans 4/30/09 10-K at 39 (restatement reclassifying contingent consideration from additional purchase price to compensation expense) (Earnhardt Decl. Ex. J); MRV 10/8/09 10-K at 47, 119-20 (company should have recorded contingent consideration for acquisition as compensation expense) (Earnhardt Decl. Ex. K).)

such that no reasonable accountant would have made the same decision if confronted with the same facts." *Payne*, 433 F. Supp. 2d at 580 (quotation omitted).  SEC filings show that other presumably reasonable accountants made the same accounting mistakes under nearly identical circumstances.

Against this backdrop, plaintiffs' assertion that the accounting principle was so "straightforward" that it is "implausible" that the GAAP errors were unintentional rings hollow. *See Medicis*, 2009 WL 4755406, at *9 ("It also appears that [the company] was not alone in its mistaken interpretation . . . .  Other pharmaceutical companies have attested to the SEC that they too [made similar errors].");  *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 595 F. Supp. 2d 1253, 1277 (M.D. Fl. 2009) (other companies' misapplication of same GAAP provision "belies plaintiffs' characterization of [it] as clear and simple") (quotation omitted), *aff'd*, 594 F.3d 783 (11th Cir. 2010).

### b.     The GAAP Provisions At Issue Are Complex and Require Judgment.

Contrary to plaintiffs' assertions, the GAAP provisions at issue are complex, evolving standards that require substantial judgment and discretion, which explains why so many companies have struggled with this accounting.  This weighs against a finding of scienter.

Plaintiffs' Complaint states that paragraph 34 of Financial Accounting Statement No. 141 ("FAS 141") was "[t]he relevant GAAP provision" during the Class Period.  (Compl. ¶ 37.)  It also states that Emerging Issues Task Force Issue No. 95-8 ("EITF 95-8") set forth the standards for applying FAS 141.  (*See id.* ¶ 39 n.5.)  Even if plaintiffs were correct that FAS 141 and EITF 95-8 were the only relevant accounting literature – and they are not – plaintiffs have failed to meet their burden of pleading that the correct accounting was so obvious that no reasonable accountant could have reached Huron's initial conclusion.

Indeed, plaintiffs do not fully describe those accounting provisions, let alone set forth specific facts showing that all reasonable accountants would apply them exactly the same way in the circumstances presented here.  Plaintiffs simply assert that, because FAS 141 supposedly was "consistent with the prior applicable GAAP Standard, Accounting Principles Board Opinion No. 16" ("APB 16"), the standards allegedly set forth in APB 16 should apply.  (*Id.* ¶ 37.)  Plaintiffs' assertion is irrelevant.  APB 16 was not in effect during the Class Period.  (*See id.*)  And EITF 95-8 expressly rejected the categorical approach that plaintiffs contend APB 16 pronounced.[9]  EITF 95-8 expressly states that whether a contingent payment should be treated as additional purchase price or compensation expense is "a matter of judgment that depends on the relevant facts and circumstances."  (EITF 95-8 at 1 (Earnhardt Decl. ¶ L).)  It then sets forth nine non-exclusive factors to guide that judgment.  (*See id.* at 1-2.)

Plaintiffs make no attempt to show that the correct application of the EITF 95-8 factors was so obvious that Huron's accounting must have been fraudulent.  *See Cutsforth*, 235 F. Supp. 2d at 1260.  Indeed, plaintiffs mention only two of the nine discretionary factors and they allege virtually no facts relevant to the other factors.

For example, EITF 95-8 states that one factor relevant to determining whether contingent payments should be treated as compensation expense rather than additional purchase price is the "[l]evel of compensation" received by the earn-out recipients:  non-contingent compensation that "is at a reasonable level in comparison to that of other key employees in the

---

[9] Plaintiffs quote a January 1995 Arthur Andersen ("Andersen") document that purportedly describes the SEC's interpretation of APB 16:  "the SEC 'will presume that contingent payments are compensatory'" if paid to selling shareholders who "'continue as management, directors, consultants or contractors of the combined entity'" and "'by virtue of their positions, could affect the contingencies' outcome.'"  (Compl. ¶ 38.)  But this analysis, even if correct, was superseded by EITF 95-8, which was issued later in 1995.

combined enterprise may indicate that the contingent payments are additional purchase price rather than compensation."  (EITF 95-8 at 1 (Earnhardt Decl. Ex. L).)  Yet, the Complaint is completely silent about Huron's non-contingent compensation.

EITF 95-8 also states that the reason "why the acquisition agreement includes a provision for contingent payments" is a relevant factor:  "if the initial consideration paid at the acquisition date is based on the low end of a range established in the valuation of the acquired enterprise and the contingent formula relates to that valuation approach, that fact may suggest that the contingent payments are additional purchase price."  (*Id.* at 2.)  Yet, the Complaint is silent about the acquisition valuation ranges and their relationship to the contingent formulas. Plaintiffs similarly ignore the remaining EITF 95-8 factors.

Not only does EITF 95-8 on its face require the exercise of judgment, but Chad A. Kokenge, a Professional Accounting Fellow in the SEC's Office of the Chief Accountant, made clear in a December 11, 2003, speech at the Thirty-First American Institute of Certified Public Accountants ("AICPA")[10] National Conference on Current SEC Developments, that the accounting treatment for earn-outs is "often difficult to determine," that EITF 95-8 "is not a bright line test" and that the SEC had even "in rare situations agreed with registrants who have suggested that a contingency arrangement that is tied to employment should . . . be treated as purchase price."[11]  (Kokenge Speech at 1-2 (Earnhardt Decl. Ex. M); *compare Cutsforth*, 235 F.

---

[10] The AICPA "sets official accounting standards, which are commonly known as GAAP." *Medicis*, 2009 WL 4755406, at *5.

[11] Due to the SEC's "policy . . . disclaim[ing] responsibility for any private publication or statement of any SEC employee or Commissioner" (Kokenge Speech at 1 (Earnhardt Decl. Ex. M), publicly available at www.sec.gov/news/speech/spch121103cak.htm), Mr. Kokenge spoke only on his own behalf.  But his speech to the AICPA certainly defeats any claim that no reasonable accountant could believe that contingent payments tied to continued employment ever could properly be recorded as purchase price.

Supp. 2d at 1260 (finding plaintiffs' argument that underlying simplicity of accounting principles

demonstrated scienter "unpersuasive" because accounting at issue "does not set forth some

bright-line test, but rather states guidelines that call for the exercise of accounting judgment").

   Importantly, as Mr. Kokenge stated, no single factor is dispositive, including any

link to continued employment, contrary to what plaintiffs seem to believe.  (*See* Compl. ¶ 40.)

As late as 2009, the SEC continued to recognize that even contingent payments linked to

ongoing employment could properly constitute additional purchase price in appropriate

circumstances.  In a November 24, 2008, comment letter to Callidus Software Inc. ("Callidus"),

the SEC noted that Callidus's recent 10-Q stated it would record a $1.9 million contingent

payment to selling shareholders as additional purchase price even though it was contingent on

the continued employment of a selling shareholder.  (Callidus SEC Comment Letter at 2

(Earnhardt Decl. Ex. N).)  The SEC asked Callidus to "explain to us how you considered

paragraph 34 of SFAS 141 with respect to this contingent payment."  (*Id.*)  Addressing the nine

EITF 95-8 factors, Callidus explained why it believed the employment-linked contingent

payment qualified as additional purchase price.  (*See* Callidus Response Letter at 3-6 (Earnhardt

Decl. Ex. O).)  In its 10-K dated March 12, 2009, Callidus reiterated that it accounted for the

contingent payment as additional purchase price under EITF 95-8, notwithstanding the fact that it

was contingent on future employment.  (*See* Callidus 10-K at F-19-20 (Earnhardt Decl. Ex. P).)

Apparently satisfied with Callidus's analysis of EITF 95-8, the SEC issued no further comments

to Callidus about its accounting for the contingent payment.[12]

---

[12] Likewise, in its 10-K dated March 27, 2009, Epic Energy Resources, Inc. ("Epic") stated that it acquired a management consulting firm for approximately 4.8 million shares of Epic stock and that the selling shareholders would forfeit up to approximately 1.6 million of those shares if they voluntarily terminated their post-acquisition employment with Epic.  (*See* Epic 10-K at F-13

In 2007, the Financial Accounting Standards Board ("FASB") promulgated FAS 141(R), which superseded FAS 141 and EITF 95-8.[13]  (FAS 141(R) at 1-2, 160 (Earnhardt Decl. Ex. R).)  FASB did so in an effort to "eliminate[] guidance that many have found to be complex, costly, and arbitrary and that has been the source of considerable uncertainties and costs in the marketplace."  (*Id.*, Appendix B, ¶ B442 (p. 127).)  FAS 141(R), unlike EITF 95-8, now explicitly states that "[a] contingent consideration arrangement in which the payments are automatically forfeited if employment terminates is compensation for postcombination services."  (*Id.*, Appendix A, ¶ A87, p. 40.)  That change in language confirms that EITF 95-8 did not clearly mandate compensation-expense treatment for contingent payments tied to continued employment.  *See Mortensen v. Americredit Corp.*, 123 F. Supp. 2d 1018, 1027 (N.D. Tex. 2000) (issuance of clarifying guidance refuted claim that GAAP violations were obvious)*, aff'd*, 240 F.3d 1073 (5th Cir. 2000) (Table).

Finally, plaintiffs fail to address that it was the selling shareholders, not Huron, who made the redistributions that led to the Restatement.[14]  (*See* 10-K/A at 1 (Earnhardt Decl. Ex. A); *see also supra* pp. 4-5.)  That is a critical omission because the Restatement was

---

(Earnhardt Decl. Ex. Q).)  Epic further stated that under EITF 95-8 "this contingent consideration is considered additional purchase price consideration."  (*Id.*)  The SEC did not take any action.

[13] All of the relevant Huron acquisitions occurred before the effective date of FAS 141(R).  (*See* Compl. ¶¶ 29, 31 n.2; FAS 141(R) at 1 (Earnhardt Decl. Ex. R).)

[14] In an attempt to avoid this fundamental point, plaintiffs repeatedly imply that Huron actually made the restated payments.  (Compl. ¶ 45; *see also, e.g., id.* ¶ 7 ("Huron . . . disclosed that . . . Huron recorded as 'goodwill' money *it paid* to employees of the acquired companies hired by Huron after the acquisitions were complete." (emphasis altered); *id.* ¶ 42 (referring to "acquisition-related payments *made by Huron* and accounted for as goodwill") (emphasis added).)  Plaintiffs plead no facts to support those assertions.  Nor could they – the Restatement involved only the payments that were subject to redistributions by the selling shareholders, and not any payments made directly by Huron.

necessary only because Huron's Audit Committee decided that the selling shareholders' actions should be imputed to Huron.  (*See* 10-K/A at 1 (Earnhardt Decl. Ex. A); *see also supra* pp. 4-5.) This was the case (counter-intuitively) even if Huron management did not know about the redistributions.  Plaintiffs do not address this accounting issue.  They certainly do not plead specific facts showing that the Audit Committee's ultimate conclusion that the redistributions should be imputed to Huron was so obvious that no reasonable accountant could have reached the opposite conclusion.  Indeed, plaintiffs do not even mention the accounting provisions that would need to be analyzed to address whether imputation would be proper in this situation.

Plaintiffs have failed to set forth any facts that suggest (let alone support a strong inference) that the accounting mistake at issue here was so obvious that "no reasonable accountant" would have made the same error.  *See Payne*, 433 F. Supp. 2d at 580; *Medicis*, 2009 WL 4755406, at *7.  The more plausible and compelling inference, as confirmed by the statements in Huron's 10-K/A, is that Huron misunderstood or misapplied complex accounting concepts that required the application of judgment involving multiple factors.

\*                    \*                    \*

In sum, the Court must weigh plaintiffs' bare allegations that the correct accounting was plain and unambiguous (with no supporting factual allegations) against public records demonstrating that, among other things, (1) Huron's peers made the same mistake (*see supra* pp. 16-17); (2) the accounting literature plaintiffs cite on its face calls for the application of judgment and use of a multi-factor analysis (*see supra* pp. 18-20); (3) an SEC Professional Accounting Fellow called the accounting "difficult" (*see supra* p. 20); and (4) the accounting literature plaintiffs cite was revised because of its complexity and uncertainty in application (*see supra* p. 22).  No strong inference of scienter can be drawn under these circumstances.

23

### c.    Holdren's and Burge's Accounting Background Does Not Salvage Plaintiffs' Inadequate Scienter Allegations.

Holdren's and Burge's alleged "professional experience in accounting and finance" cannot save plaintiffs' deficient allegations.[15]  Other courts have rejected arguments identical to those plaintiffs make here.  *See Bally I*, 2006 WL 3714708, at *9; *Goodman*, 595 F. Supp. 2d at 1277; *Branca v. Paymentech, Inc.*, No. Civ.A.3:97-CV-2507-L, 2000 WL 145083, at *10 n.20, *11 (N.D. Tex. Feb. 8, 2000).

In *Bally I*, for example, the court refused to "infer scienter from [defendants'] backgrounds in accounting" because doing so would be "an end-run around the requirement that plaintiffs set forth particularized facts to suggest that defendants acted knowingly or recklessly" and would amount to a "'must have known' theory."  2006 WL 3714708, at *9.  Likewise, in *Goodman*, the court rejected plaintiffs' claim that defendants' "sophisticated accounting knowledge" – one defendant formerly practiced tax law, one was a "fellow at the Chartered Institute of Management Accountants" and two were CPAs – supported otherwise deficient scienter allegations.  595 F. Supp. 2d at 1277.  In *Branca*, the court held that defendants' "professional backgrounds in accounting" – one defendant was "a CPA who [formerly] worked for a large public accounting firm" and the other was the company's chief financial officer – did

---

[15] Plaintiffs do not allege that Holdren or Burge had any prior experience or expertise with respect to FAS 141 or EITF 95-8 (or APB 16, for that matter).  Nor do plaintiffs allege when either last worked as an independent auditor.  Instead, plaintiffs broadly allege that "the Individual Defendants are all former senior executives of large accounting firms with many years of CPA experience."  (Compl. ¶ 55.)  With respect to Burge and Lipski, this allegation is contradicted by the more specific allegations about their background; neither served as a senior executive of a large accounting firm.  (*See id.* ¶¶ 24-25.)  As for Holdren, there is no logic to suggest that being in a management role at Andersen would have provided him with any experience with these particular accounting matters; to the contrary, his time spent in management would have been time spent *not* engaging in client service involving the application of accounting principles.

not lessen plaintiffs' pleading burden.  2000 WL 145083, at *10 n.20, *11.

### C.    Plaintiffs' Confidential Witness Statements Do Not Support A Strong Inference of Scienter.

Plaintiffs allege that "[m]ultiple percipient witnesses . . . have directly attributed knowledge of the accounting fraud to the Individual Defendants."  (Compl. ¶ 59.)  As shown below, however, the purported confidential witness statements suffer from numerous defects that provide no basis for an inference of scienter.

The Seventh Circuit has expressed great hesitation about the use of confidential witnesses to meet pleading requirements, reasoning that "[i]t is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences.  Perhaps these confidential sources have axes to grind.  Perhaps they are lying.  Perhaps they don't even exist."  *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007); *see also Last Atlantis*, 533 F. Supp. 2d at 832 (quoting *Higginbotham*). Recognizing that "anonymity conceals information that is essential to the sort of comparative evaluation required by *Tellabs*", the Seventh Circuit concluded that "allegations from 'confidential witnesses' must be 'discounted'" and "[u]sually that discount will be steep." *Higginbotham*, 495 F.3d at 757.  In *Makor II*, the Seventh Circuit reiterated that "allegations based on anonymous informants are very difficult to assess" and it credited confidential sources only because they were "persons who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify," and because the "information that the confidential informants are reported to have obtained is set forth in convincing detail, with some of the information, moreover, corroborated by multiple sources."  513 F.3d at 712.

If the alleged statements of the purported confidential witnesses are to be given any meaningful weight at all, plaintiffs must demonstrate both that (1) the witnesses had

firsthand knowledge of the facts they describe and (2) their proffered testimony would be probative of scienter. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). Here, plaintiffs' confidential witnesses fail this standard.

### 1.     Plaintiffs' Confidential Witnesses Lack Firsthand Knowledge.

Plaintiffs have failed to establish that the confidential witnesses had firsthand knowledge of the facts they purport to describe.

Several of the witness statements are, on their face, not based on firsthand knowledge. For instance, Confidential Witness ("CW") 7 allegedly stated that "Lipski and Burge *would have been* involved in the improper accounting for the payments," and CW 8 allegedly stated that he or she "*understood* that some of the earn-out payments were used to fund th[e] bonus pool" and that Holdren "*would have known*" about that. (Compl. ¶ 61 (emphasis added).) Such allegations – based on what sources "understood" or what they believe anyone "would have known" – are facially deficient. *Zucco*, 552 F.3d at 998 (rejecting "had to have known" allegation from confidential witness); *Cadence*, 654 F. Supp. 2d at 1047 (rejecting "must have known" and "must have approved" allegations from confidential witnesses).

Even with respect to the witnesses who purport to have firsthand knowledge, plaintiffs do not (as they must) set forth facts demonstrating how the witnesses supposedly obtained any such knowledge. For instance, plaintiffs provide no job duty descriptions for any of the confidential witnesses, and the job titles plaintiffs provide rarely show how the sources might have the requisite firsthand knowledge. To give just one example, plaintiffs allege that CW 3, whom they describe as a "Director of Restructuring," stated that "[n]othing got approved without Holdren's say-so – including the final deals for the acquisitions." (Compl. ¶ 59 (emphasis omitted).) They do not, however, plead the duties of a "Director of Restructuring" or how CW 3 knew firsthand Huron's approval process for acquisitions. Nor do these witness

statements show that Holdren was aware that the acquisition payments would be redistributed or the details of such redistributions.  Such witness statements are without substance.[16]  *See Makor II*, 513 F.3d at 712; *City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*, 388 F. Supp. 2d 932, 944 (S.D. Ind. 2004) (rejecting confidential witness where "the allegation contains no specifics as to how a marketing representative would be in a position to obtain personal knowledge regarding . . . inflation" of post-secondary school students' grades); *In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1163 (S.D. Cal. 2008) (rejecting confidential witness where plaintiffs did not plead how engineer would have first hand knowledge about accounting department staffing issues).[17]  In *Last Atlantis*, this Court "discount[ed]" a confidential witness statement where, *inter alia*, plaintiffs' description was similarly "vague about the source's basis for personal knowledge."  533 F. Supp. 2d at 832.[18]

## 2.    The Alleged Statements Are Not Probative of Scienter.

In addition to lacking firsthand knowledge of the events at issue, the confidential witness statements are either conclusory or irrelevant.  Those that are conclusory are facially not

---

[16] Moreover, the witnesses are of limited relevance because only one of them (CW 7) worked for Huron the full putative class period.  *See In re Dell, Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 895 (W.D. Tex. 2008) ("Information from these witnesses could hardly be probative of the Individual Defendants' scienter concerning matters that happened when they were not employed by [the company].").  Four witnesses (CWs 4, 5, 8 and 10) worked for Huron less than one year of the over three-year putative class period.  (*See* Compl. ¶¶ 60, 61, 63.)

[17] Indeed, CWs 2 (Atlanta), 6 (Florida), 8 (Boston) and 9 (Washington, D.C.) did not even work at Huron's Chicago headquarters (*see* Compl. ¶¶ 58, 60-62), yet plaintiffs fail to explain the basis for any firsthand knowledge of the actions of Holdren or Burge, both of whom worked in Chicago.  *See Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 148-153 (3d Cir. 2004) ("*Chubb*") (no scienter based on confidential witnesses who worked in other locations); *In re Rectifier Corp. Sec. Litig.*, No. CV07-02544-JFW (VBK), 2008 WL 4555794, at *18 (C.D. Cal. May 23, 2008).

[18] Some or all of the statements attributed to CWs 1, 2, 6 and 12 fail for similar reasons. (*See* Compl. ¶¶ 55, 58, 60, 63.)

probative of scienter.  *See, e.g.*, *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 716 (N.D. Ill. 2005); *Zucco*, 552 F.3d at 997; *Konkol v. Diebold, Inc.*, 590 F.3d 390, 399 (6th Cir. 2009).  (*See, e.g.*, ¶ 61 (CW 8 asserts that "Huron's senior management was adept at using accounting issues to inflate their earnings and exploit some of the accounting rules under FAS"); ¶ 70 (CW 12 asserts that "Defendants knew the kind of paper documentation that was required and that if they wanted to defraud PwC, they could get it by.") (quotations omitted).)[19]

The remaining few statements that do purport to relay specific facts are not substantively probative of scienter.  *See Zucco*, 552 F.3d at 998-99.  For example, CW 5's claim that at a dinner "around the time" of Huron's acquisition of Speltz & Weis ("S&W"), Holdren told the S&W attendees they "would be given a retention bonus" if they stayed for at least 12 months (Compl. ¶ 60) is irrelevant because CW 5 does not claim that Holdren said anything about using the Acquisition-Related Payments to pay the retention bonuses, and Huron did not restate its accounting for general retention bonuses.  (*See supra* pp. 4-5.)  CW 3's claim that the acquisitions involved "stay bonuses" for employees of the acquired businesses (*see* Compl. ¶ 59) is irrelevant for the same reason.

Likewise, CW 6's statement that "Huron's acquisition of S&W 'set the model for subsequent acquisitions'" (*id.* ¶ 60) says nothing about whether Holdren or Burge knew anything about the propriety of the accounting for the "S&W model" and, moreover, is too vague and susceptible to too many innocent interpretations to be meaningful.[20]  *See Indiana Elec. Workers'*

---

[19] Some or all of the statements attributed to CWs 1, 2, 3, 8 and 10 fail for similar reasons. (*See* Compl. ¶¶ 55, 58, 59, 61, 63.)

[20] For example, CW 6 could have been referring simply to Huron's use of earn-outs in its acquisitions.  Plaintiffs do not allege there is anything improper about the use of earn-outs generally.

*Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 538 (5th Cir. 2008) ("*Shaw*")

(confidential witness allegation "cannot contribute to a strong inference of scienter because it is

susceptible to many interpretations, including innocent ones") (quotation omitted); *Dell*, 591 F.

Supp. 2d at 895 ("If an ambiguous statement is susceptible to many interpretations, including

innocent ones, it will not contribute to an inference of scienter.").  CW 4's claim that he "advised

Holdren against giving retention bonuses" (Compl. ¶ 61 (quotation omitted)) fails for the same

reason.  CW 4 conspicuously does not say why he or she allegedly advised Holdren against

retention bonuses.  CW 3 provides a likely (innocent) possibility:  legacy Huron employees

"were upset because newly arriving employees received these deals."  (*Id.* ¶ 59.)

          CW 4's and CW 8's claims that Holdren and Burge were "hands on" managers

(*id.* ¶¶ 61, 62) and that they attended regular accounting meetings (*see id.* ¶ 61) and CW 7's

assertion that Holdren was "involved in every facet of the business" (*id.* ¶ 62 (quotation

omitted)), cannot establish what, if anything, Holdren or Burge knew about the restated

payments or the relevant GAAP provisions.  *See Roth*, 527 F. Supp. 2d at 798 (allegation that

defendants had "'top-down' management style that was very 'authoritarian' such that [they] were

knowledgeable about and involved in all aspects of the Company's financial performance" was

"not a particularized basis for inferring scienter"); *Konkol*, 590 F.3d at 398-99 ("[A]ttendance at

such meetings, without more, does not support a finding of scienter given that the complaint does

not allege that the . . . scheme was discussed in the meetings"); *Shaw*, 537 F.3d at 535

(defendant's alleged "hands-on management style" did not plead scienter even where he

"boast[ed] that there is nothing in this company that I don't know'").[21]

        Not one of the confidential witnesses states a single fact suggesting that Holdren or Burge actually had knowledge of any incorrect accounting.[22]  Plaintiffs cannot make up in quantity what they lack in quality, as "[t]he sheer volume of confidential sources cited cannot compensate for th[eir] inadequacies."  *Chubb*, 394 F.3d at 155.  "Cobbling together a litany of inadequate [confidential witness] allegations does not render those allegations particularized in accordance with Rule 9(b) or the PSLRA."  *Id.*; *see also In re Bally Total Fitness Sec. Litig.*, No. 04 C 3530, 2007 WL 551574, at *14 (N.D. Ill. Feb. 20, 2007) ("*Bally II*") ("A court cannot aggregate allegations relying on confidential witnesses' testimony that have not been pleaded with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.") (quotation omitted); *Dot Hill Sys.*, 594 F. Supp. 2d at 1163 ("[N]umerosity and verbosity in . . . confidential witness allegations" cannot cure the failure to "provid[e] the specificity and particularity demanded by the PSLRA.").  Where plaintiffs "had confidential witnesses who provided generalized statements . . . one would reasonably expect those witnesses to be able to provide more details about" the relevant issues

---

[21] Similarly, CW 10's assertion that "senior management tightly controlled Huron's payments and expenses – to the point where even a reimbursement check for expenses could not be cut without approval from senior management in headquarters," and CW 12's assertion that "the Individual Defendants tightly controlled Huron's payments" (Compl. ¶ 63), are beside the point.  The Restatement concerned the *selling shareholders'* redistributions of the acquisition consideration, not *Huron's* payments.  (*See supra* pp. 4-5.)  CW 11's assertion that "senior management [was] a 'tight club' which was not prone to disseminate company information outside of their control group" (Compl. ¶ 63) once again misses the point.  Such a statement fails to show that Holdren and Burge knew any relevant details and, thus, has nothing to do with their states of mind.

[22] Indeed, many of the confidential witnesses have nothing to say at all about Holdren or Burge specifically.  Only seven of the confidential witnesses mention Holdren by name (CWs 3, 4, 5, 7, 8, 9 and 10); only four mention Burge (CWs 4, 7, 8 and 10).

"and to be able to specifically connect" defendants to the events that led to the Restatement. *Konkol*, 590 F.3d at 398.  Because they cannot, plaintiffs' confidential witness allegations actually undermine their scienter claims.  *Id.*

> **D.      Plaintiffs' Allegations Concerning Holdren's and Burge's Resignations Do Not Support a Strong Inference of Scienter.**

It is well-settled that the most compelling inference to be drawn from a corporate resignation that occurs after a restatement is that the resignation resulted from the restatement itself and not from any alleged fraud.  "Where a resignation occurs slightly before or after the defendant corporation issues a restatement, a plaintiff must plead facts refuting the reasonable assumption that the resignation occurred as a result of the restatement's issuance itself in order for a resignation to be indicative of scienter."  *Zucco*, 552 F.3d at 1002; s*ee also, e.g.*, *Bally I*, 2006 WL 3714708, at *6-7; *Abrams*, 292 F.3d at 434; *Rectifier*, 2008 WL 4555794, at *16. Moreover, involuntary departures and departures without severance do not establish scienter. *See Bally I*, 2006 WL 3714708 at *6-7; *Rectifier*, 2008 WL 455794, at *16 ("[O]fficers and employees can be terminated for negligence or incompetence as well as fraud.") (quotation omitted); *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1074 (N.D. Cal. 2002) ("Plaintiff can point to no particularized allegation refuting the reasonable assumption that Defendant . . . was fired simply because the errors that led to the restatement occurred on his watch or because he failed to supervise his department.").

Plaintiffs' allegations do not refute the presumption that Holdren and Burge resigned because of the Restatement.  For example, plaintiffs allege that Holdren's employment contract entitled him to severance unless Huron terminated him for cause or he resigned for other than "strictly defined 'good reasons.'"  (Compl. ¶¶ 65, 66.)  Because Holdren did not receive severance, plaintiffs assert that the "only plausible" inference is that Huron must have terminated

him for "misconduct."  (*Id.* ¶ 65 (emphasis omitted).)  Plaintiffs' claim is illogical.  They concede that Holdren was entitled to no severance if he resigned without "strictly defined 'good reasons.'"  (*Id.*)  Thus, the more plausible inference is that that is what happened:  Holdren resigned, but he did not resign for the "strictly defined 'good reasons'" set forth in his employment agreement, so he was not entitled to severance.

In Burge's case, Burge remained with the Company for a full five months after Huron's announcement of the Restatement, continuing to serve as its Treasurer for much of that time – a fact that the Complaint appears deliberately to omit.  (*See supra* p. 4.)  It simply is implausible to suggest that a failure to obtain six months of severance after that five-month period expired is indicative of scienter.  Moreover, Burge's contract had the same "good reason" language as Holdren's contract.  (*See* Burge SMA ¶ 1.5 (Earnhardt Decl. Ex. S).)

The *Bally* court rejected a virtually identical scienter argument under far more compelling circumstances than those presented here.  The plaintiffs in *Bally* alleged scienter based in part on the company's announcement of the findings of an investigation into accounting issues.  Specifically, plaintiffs relied on the company's findings that (1) it committed "numerous accounting errors" and took "aggressively optimistic positions on accounting policies without a reasonable empirical basis"; (2) its former CEO and CFO – who the company initially suspended but who resigned during the investigation – were "responsible for a culture of aggressive accounting"; and (3) the former CFO "made a false and misleading statement to the SEC."  *Bally I*, 2006 WL 3714708, at *4, *6 (quotations omitted).  For all those reasons, the company announced it was "discontinu[ing]" severance payments to the former CEO and CFO.  *Id.* at *6.  The court held, however, that plaintiffs failed to plead a strong inference of scienter and dismissed the complaint but allowed leave to replead.  *See id.* at *7, *14.

32

The *Bally* plaintiffs then filed an amended complaint in which, citing the former CEO's and CFO's employment-related contracts with the company, they added the allegation that the "termination" of "severance pay effectively amounted to termination for cause and that it must be inferred that both [the former CEO's and CFO's] severance were terminated because they had, during the Class Period, engaged in fraud or dishonesty." *Bally II*, 2007 WL 551574, at *4 (quotations omitted).  After reviewing the relevant contracts, the court rejected that scienter theory because, among other things, "[a]s plaintiffs themselves allege, there are two other provisions pursuant to which [the former CFO's] severance payment could be terminated in accord with the" contract.  *Id.* at *5.  So too here.  Because other provisions of Holdren's and Burge's employment agreements establish that they were not entitled to severance for reasons having nothing to do with alleged securities fraud, there is no basis for a strong inference that they acted with scienter.

Other undisputed facts further contradict plaintiffs' theory.  For example, although Burge resigned as Huron's CFO on July 31, 2009, he continued to serve as Huron's Treasurer for three additional months and remained at Huron until the end of 2009 (*see supra* p. 4), which undermines any claim that the Audit Committee believed he acted with scienter. Likewise, although Holdren resigned as Chairman and CEO on July 31, he did not leave Huron until August 31.  (7/31/09 8-K at 3 (Earnhardt Decl. Ex. B).)  Plaintiffs thus are wrong that Huron "immediately terminated the Individual Defendants."  (Compl. ¶ 52.)  Moreover, in *Bally*, the company made disparaging statements about the former CEO and CFO after they were terminated. *See Bally I*, 2006 WL 3714708, at *4.  Here, Huron "recognize[d]" Holdren "for his extraordinary accomplishment in building Huron," praised him for "work[ing] tirelessly on behalf of Huron and its shareholders and employees," and stated that it "respect[ed] his

leadership in choosing to pass the reins." (7/31/09 8-K Ex. 99.1 at 5 (Earnhardt Decl. Ex. B).)

Huron similarly recognized Burge's efforts by retaining him for five additional months.

> ### E.     Plaintiffs' Allegations Concerning Representations to Huron's Independent Auditor and Sarbanes-Oxley Certifications Do Not Support A Strong Inference of Scienter.

Plaintiffs allege that representation letters to Huron's independent auditor and

Holdren's and Burge's certifications pursuant to the Sarbanes-Oxley Act support a strong

inference of scienter. (*See* Compl. ¶¶ 53, 69, 71.) That assertion is without merit.[23]

Representation letters support scienter only where other particularized allegations

sufficiently indicate that the signers knew the representations were false when made. *Cf. SEC v.*

*Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 367 (D.N.J. 2009) ("The signing of this [internal

representation] letter in the absence of other probative facts of [defendant's] contemporaneous

knowledge does not raise a genuine issue of material fact [as to scienter].") The same rule

applies to inaccurate Sarbanes-Oxley certifications. *See, e.g.*, *Bally I*, 2006 WL 3714708, at *8;

*Zucco*, 552 F.3d at 1002-04; *Ley v. Visteon Corp.*, 543 F.3d 801, 812 (6th Cir. 2008); *Garfield v.*

*NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006).

Indeed, if a mere inaccuracy in a Sarbanes-Oxley certification were sufficient to

plead scienter, "scienter would be established in every case where there was an accounting error

or auditing mistake by a publicly traded company, thereby eviscerating the pleading

requirements for scienter set forth in the PSLRA." *In re Ceridian Corp. Sec. Litig.*, 542 F.3d

240, 248 (8th Cir. 2008) (quotation omitted); *see also Zucco*, 552 F.3d at 1004 (declining

plaintiffs' "invitation to undermine the PSLRA's . . . requirements for pleading . . . scienter" by

---

[23] Plaintiffs do not expressly cite the Sarbanes-Oxley Act, but the Complaint's reference to Holdren's and Burge's certifications of Huron's financial statements (*see* Compl. ¶ 71) appears to be an indirect reference to Sarbanes-Oxley.

basing scienter on false Sarbanes-Oxley certifications).  The same rationale applies to scienter claims based on inaccurate representation letters to auditors.

Here, as shown above, plaintiffs do not adequately plead what Holdren or Burge learned about the selling shareholders' redistributions.  (*See supra* § I.B.1.)  Moreover, Huron did not, as plaintiffs contend, state in the 10-K/A that "Defendants had  . . . deliberately misrepresented the facts and circumstances surrounding the acquisition-related payments to the Company's independent auditors."  (Compl. ¶ 11.)  Huron stated only that the "circumstances surrounding [the shareholders' redistributions] were not fully described in [the] representation letters."  (10-K/A at 2 (Earnhardt Decl. Ex. A).)  And it did so immediately following a statement that Huron's management itself was unaware of some of the material facts, making it unsurprising that those letters would not contain full descriptions of the facts.  That the letters turned out to be incorrect or incomplete does not mean they were deliberately inaccurate.  *See, e.g.*, *Bally I*, 2006 WL 3714708, at *7.  Plaintiffs' allegations about the representation letters and the certifications thus are deficient.

  **F.**  **Plaintiffs' Allegations Concerning Holdren's Stock Sales and Holdren's and Burge's Bonuses Do Not Support A Strong Inference of Scienter.**

Plaintiffs allege that Holdren and Burge were motivated to "conceal the truth" because Holdren wanted to sell his stock "at the highest possible prices" and Holdren and Burge wanted to receive large bonuses.  (Compl. ¶ 72.)  Once again, plaintiffs' allegations fail to raise a strong inference of scienter.

  **1.**  **Holdren's Stock Sales Do Not Give Rise to a Strong Inference of Scienter.**

"[B]ecause executives sell stock all the time, stock sales generally must be unusual or suspicious to constitute circumstantial evidence of scienter."  *Pugh v. Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008); *see also Higginbottham*, 495 F.3d at 759 ("[M]anagers sell

stock all the time . . . ."). Transactions are "unusual" or "suspicious" if, for example, they are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Makor I*, 437 F.3d at 604 (quotations omitted).

Plaintiffs, however, do little more than list the dates, amounts, share prices and proceeds of Holdren's alleged sales of Huron stock without pleading the context necessary to evaluate the sales. (*See* Compl. ¶ 73.) Instead, plaintiffs merely rely on their allegation that Holdren did not sell stock before the putative class period. (*See id.* ¶ 74.)

Plaintiffs ignore, however, that Huron did not become a public company until October 2004. (*See supra* p. 3.) Thus, the period in which to evaluate Holdren's pre-class period historical trading practices is less than 18 months – *i.e.*, less than half the length of the putative class period. Plaintiffs do not explain how any meaningful inferences, let alone a strong inference of scienter, can be drawn under these circumstances. *See In re Enron Corp. Sec., Deriv. & "ERISA Litig."*, 258 F. Supp. 2d 576, 614 n.34 (S.D. Tex. 2003).[24]

Plaintiffs do not meet their pleading burden for the following additional reasons:

*First,* Holdren acquired a significant number of his Huron holdings as compensation. (*See* Earnhardt Decl. Ex. W at 2, 5, 17, 47-48.) The sale of stock received as compensation is neither unusual nor suspicious. *See, e.g., Pugh*, 521 F.3d at 695 ("[E]xecutives sell stock all the time . . . ."); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1424 (3d

---

[24] In addition, Holdren and Burge were not permitted to sell their shares during more than half of the pre-class period. On October 13, 2004, Huron undertook an underwritten initial public offering, which subjected Holdren, Burge and other Huron officers to a lock-up period that prohibited them from selling any Huron shares for 180 days (until approximately April 13, 2005). Additionally, on February 3, 2006, Huron undertook a second underwritten public offering, which subjected Holdren, Burge and other Huron officers to a lock-up period of 90 days (lasting until approximately May 3, 2006). (*See* 2004 Prospectus (Earnhardt Decl. Ex. U); 2006 Prospectus (Earnhardt Decl. Ex. U).)

Cir. 1997) ("A large number of today's executives are compensated in terms of stock and stock options. It follows then that these individuals will trade those securities in the normal course of events. We will not infer fraudulent intent from the mere fact that some officers sold stock.").

*Second,* as disclosed by Holdren's SEC filings, approximately 107,000 of the shares were sold pursuant to non-discretionary trading plans. (*See* Earnhardt Decl. Ex. W at 20, 23, 26, 29, 35, 38, 41, 44, 50, 53.) Such sales are not suspicious or unusual. *See*, *e.g., Elam v. Neidorff*, 544 F.3d 921, 928-29 (8th Cir. 2008); *Rectifier*, 2008 WL 4555794, at *19-20; *Guidant*, 536 F. Supp. 2d at 931.

*Third*, Holdren made his October 13, 2008, sale of approximately 16,000 shares (his third largest sale) to pay taxes. (*See* Earnhardt Decl. Ex. W at 32.) Such sales are not unusual or suspicious. *See In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 610-13 (E.D. Pa. 2009); *BMS*, 312 F. Supp. 2d at 561.

*Fourth*, Holdren's sales were "fairly evenly distributed" throughout the putative class period, with sales of approximately 120,000 shares in 2007, approximately 103,000 shares in 2008 and approximately 52,000 shares in the first six months of 2009. (*See* Compl. ¶ 73.) Thus, the sales were not "clustered at its end, when insiders theoretically would have rushed to cash out before the fraud was revealed and stock prices plummeted." *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 151-52 (D. Conn. 2007) (quotation omitted), *aff'd,* 312 Fed. Appx. 400 (2d Cir. 2009).

*Fifth*, other courts have found similar or larger sales (both in terms of ownership percentage and dollars) to be insufficient to establish a strong inference of scienter. *See, e.g., In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 1001-03 (E.D. Wis. 2009) ($66 million in stock sales by individual defendants insufficient without additional allegations); *In re*

*Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092-93 (9th Cir. 2002) (defendants' sale of 38% of

their holdings insufficient); *Rectifier*, 2008 WL 4555794, at *2, *19 (former CEO's sale of 23%

of his holdings for approximately $21 million "is not terribly unusual or suspicious"); *Radian*,

612 F. Supp. 2d at 611-12 (defendant's one-day sale of 68% of his holdings for net proceeds of

$8 million insufficient without additional allegations).[25]   Indeed, even under plaintiffs'

calculation – which includes sales by the Trust and ignores Holdren's acquisitions – Holdren's

retained significant Huron holdings (almost 80% of his holdings by plaintiffs' calculation (*see*

Compl. ¶ 74)), which undermines any inference of scienter.  *See Pugh*, 521 F.3d at 695

(defendants' retention of stock obtained via exercises of options was inconsistent with scienter);

*City of Austin*, 388 F. Supp. 2d at 951 ("The fact that all [defendants] retained significant

holdings weighs against any inference of scienter.").[26]

---

[25] Moreover, more than half (150,000) of Holdren's alleged class-period sales were made by the Holdren Family Trust (the "Trust").  (*See* Earnhardt Decl. Ex. W at 8, 11, 14, 20, 23, 26, 29, 35, 38, 41, 44, 50.)  Plaintiffs seemingly assume that Holdren "controlled" the Trust (Compl. ¶ 74), but they plead no facts to support that conclusion, and it is contradicted by Holdren's SEC filings.  For example, in a February 2006 filing with the SEC, Holdren stated that "Mr. Holdren's spouse is the sole trustee of the Holdren Family Trust and has sole voting and dispositive power with regard to the shares of Common Stock held in the Holdren Family Trust."  (Holdren Schedule 13D at 4 (Earnhardt Decl. Ex. V).)

[26] Plaintiffs do not assert that Burge's stock sales are indicative of scienter, nor could they.  Instead, they merely allege that Burge benefited from stock sales during the class period.  (Compl. ¶ 154).  However, Burge's stock ownership during the class period refutes any inference of scienter.  *Pugh*, 521 F.3d at 695.  Burge made only three sales during the class period:  (1) a sale on July 2, 2008, representing less than 3% of his total holdings; (2) a sale on October 13, 2008, expressly made "to pay withholding taxes" pursuant to an "irrevocable election" made a month earlier, representing 1% of his total holdings; and (3) an "automatic sale pursuant to a 10b5-1 trading plan" on July 1, 2009, representing 5% of his total holdings. (Earnhardt Decl. Ex. Y at 4, 6, 8.)  Such *de minimis* sales not only fail to approach the type of large sales that themselves have been deemed insufficient to give rise to a strong inference of scienter, *see, e.g.*, *Vantive*, 283 F.3d at 1092-93, but also demonstrate that Burge was not taking advantage of the market.  In each year, the absolute volume of his shares *increased*.  Indeed, Burge's ownership of shares more than doubled during the class period, from 39,022 to 97,693.  (*See* Earnhardt Decl. Ex. Y at 2, 8).)

2. **Holdren's and Burge's Bonus Compensation Does Not Give Rise to a Strong Inference of Scienter.**

Plaintiffs' reliance on Holdren's and Burge's bonuses ignores the well-settled rule that the desire to receive higher bonuses or compensation does not establish scienter. *See, e.g., Greer*, 2010 WL 152002, at *12 ("If the court were to accept the plaintiffs' assertion that [defendant's] receipt of sizable commissions satisfies the scienter requirement under the PSLRA, then disgruntled investor suits would multiply exponentially and Congress' intent in passing the stringent pleading requirements of the PSLRA would be significantly undermined."); *Career Educ.*, 2007 WL 1029092, at *9 ("This court agrees with the view of numerous others that allegations that executives were motivated to achieve higher compensation . . . cannot be evidence of scienter because these motivations are common to every executive and every corporation.  Allowing them to be evidence of scienter would eviscerate the requirement."); *Bally I*, 2006 WL 3714708, at *9 ("Regarding the motive to earn bonuses and awards, we agree with the view of numerous courts that these allegations are too common among corporations and their officers to be considered evidence of scienter.") (citing cases).  Moreover, neither Holdren nor Burge received any cash bonus in 2007 or 2008.  (*See* Compl. ¶ 54.)

Because, as this Court held in *Last Atlantis*, "general allegations concerning defendants' financial motive" are not "enough to establish a strong showing of scienter", 553 F. Supp. 2d at 831, plaintiffs' motive theory must fail.

G. **Plaintiffs' Scienter Allegations Also Fail When Considered Collectively.**

Finally, even when their deficient scienter allegations are considered collectively, plaintiffs do not plead a strong inference that either Holdren or Burge acted with scienter.  As the Second Circuit explained:  "[H]aving concluded that none of plaintiffs' allegations showed even a weak inference of scienter, there is no logical way that the District Court could then have

determined that the combined effect of the allegations would form a *strong* inference of scienter." *Malin v. XL Capital Ltd.*, 312 Fed. Appx. 400, 402 (2d Cir. 2009) (emphasis in original). That is because "[f]our cubic zirconias will never add up to one real diamond . . ." *Id.* (quotation omitted); *see also Career Educ.*, 2007 WL 1029092, at *3 ("Plaintiffs again ask the court to view their allegations as a whole, but . . . the court cannot draw any inferences from allegations that are not themselves well pleaded; zero plus zero is zero.") (citation omitted); *Bally I*, 2006 WL 3714798, at *10 (rejecting scienter allegations when considered "in their totality" where "complaint relies largely on conclusory allegations, speculation, and a 'must have known' approach").

### H. Plaintiffs Do Not Plead Scienter as to Huron.

Plaintiffs' failure to plead scienter against either Holdren or Burge (or any other Huron employee) also mandates dismissal of their claim against Huron. *See, e.g.*, *Higginbotham v. Baxter Int'l*, No. 04 C 4909, 2005 WL 3542521, at *3 (N.D. Ill. Dec. 22, 2005), *aff'd*, 495 F.3d 753 (7th Cir. 2007); *Bally I*, 2006 WL 3714708, at *11.

## II. PLAINTIFFS FAIL TO PLEAD A SECTION 20(a) CLAIM AGAINST HOLDREN, BURGE OR LIPSKI.

The Section 20(a) claim against Holdren, Burge and Lipski must be dismissed because plaintiffs failed to plead a Section 10 and Rule 10b-5 claim. *See, e.g.*, *Roth*, 527 F. Supp. 2d at 806; *Davis*, 385 F. Supp. 2d at 717; *Allscripts*, 2001 WL 743411, at *12.

### CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court dismiss the Complaint in its entirety.

March 30, 2010

Respectfully submitted,

RICHARD J. PRENDERGAST, LTD.,

by

_____
/s/  Richard J. Prendergast
Richard J. Prendergast
Michael T. Layden
Members of the Firm

111 West Washington
Suite 1100
Chicago, Illinois 60602
(312) 641-0881
rprendergast@rjpltd.com
*Attorneys for Huron Consulting Group Inc.*

CRAVATH, SWAINE & MOORE LLP,

by

_____
/s/ Francis P. Barron
Francis P. Barron
Rachel G. Skaistis
Members of the Firm

825 Eighth Avenue
New York, New York 10019
(212) 474-1000
fbarron@cravath.com
*Attorneys for Huron Consulting Group Inc.*

VEDDER PRICE P.C.,

by

_____
/s/ Thomas P. Cimino, Jr.
Thomas P. Cimino, Jr.
Jeanah Park.

222 North LaSalle Street
Chicago, Illinois 60601
(312) 609-7500
*Attorneys for Gary E. Holdren*

41

SIDLEY AUSTIN LLP,

by

_____
/s/ Walter C. Carlson
Walter C. Carlson
David A. Gordon
Partners of the Firm

One South Dearborn
Chicago, Illinois 60603
(312) 853-7036
*Attorneys for Gary L. Burge*

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP & AFFILIATES

by

_____
/s/ Charles F. Smith
Charles F. Smith
A member of the Firm

155 N. Wacker Drive
Chicago, Illinois 60606
(312) 407-0700
*Attorney for Wayne Lipski*