**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JASON HUGHES, Individually and on Behalf of all Others Similarly Situated, | Master File No. 09-CV-4734 |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| | **ECF CASE** |
| v. | |
| HURON CONSULTING GROUP, INC., et al. | Honorable Elaine E. Bucklo |
| Defendants | |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page(s)**

I.  PRELIMINARY STATEMENT ..................................................................................... 1

II. STATEMENT OF FACTS .......................................................................................... 4

    A.  Huron Violated GAAP by Accounting for Acquisition Related Payments as Goodwill, Rather Than Compensation Expense ....................................................... 4

    B.  Huron's Improper Accounting Is Revealed to the Public, Causing Massive Losses, and the Individual Defendants Are Forced to Resign ................................. 6

    C.  Huron Admits That Its Senior Management Knew About the Improper Accounting Scheme and Misrepresented Key Facts Regarding the Acquisition-Related Payments to Its Independent Auditor and Investors .............. 7

III. LEGAL STANDARD .................................................................................................. 9

IV. ARGUMENT .............................................................................................................. 11

    A.  Huron's Admissions Concerning Defendants' Accounting Violations Raise a Strong Inference of Scienter .................................................................................. 11

        1.  Plaintiffs Need Not Plead That Defendants Knew the Details of the Redistributions .................................................................................... 13

        2.  Although Not Required, Plaintiffs Actually Do Plead That Defendants Knew the Details of the Redistributions ................................................... 14

        3.  Huron's Admission of Defendants' "Misapplication" of the "Accounting Guidance" Supports a Strong Inference of Scienter ............ 17

            a.  The Comparison with Huron's Supposed Peers Is Inapposite ...... 19

            b.  The GAAP Rules Are Simple and the Violations Blatant ............ 21

    B.  Defendants' Extensive Accounting Experience Further Raises a Strong Inference of Scienter .......................................................................................... 24

    C.  Defendants' False Representation Letters to Huron's Auditor Further Support a Strong Inference of Scienter .......................................................................... 26

    D.  The Magnitude, Scope and Duration of the Restatement Further Support a Strong Inference of Scienter .................................................................................. 28

E.      Holdren's and Burge's Forced Resignations Further Support a Strong Inference of Scienter .............................................................................. 31

F.      Holdren's Massive Insider Trading Further Supports a Strong Inference of His Scienter ............................................................................................ 33

G.      The Detailed Statements from Confidential Sources Also Raise a Strong Inference of Defendants' Scienter ........................................................ 37

        1.      The Statements of the Confidential Witnesses Are Probative of Scienter .................................................................................... 37

        2.      The Witnesses Were in a Position to Know the Information Provided and Are Described with Requisite Particularity ........................................ 39

V.      CONCLUSION ............................................................................................ 40

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Asher v. Baxter Int'l, Inc.*,
No. 02-5608, 2005 WL 331572 (N.D. Ill. Feb. 3, 2005) ....................................... 33

*Batwin v. Occam Networks, Inc.*,
No. 07-2750, 2008 WL 2676364 (C.D. Cal. July 1, 2008) .................................... 33

*Branca v. Paymentech*,
No. Civ. A. 3:97-cv-25072, 2000 WL 145083 (N.D. Tex. Feb. 8, 2000) ............................ 26

*City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*,
388 F. Supp. 2d 932 ........................................................................ 39

*Crowell v. Ionics, Inc.*,
343 F. Supp. 2d 1 (D. Mass. 2004) ........................................................ 34

*Cutsforth v. Renschler*,
235 F. Supp. 2d 1216 (M.D. Fla. 2002 ..................................................... 19

*Dardick v. Zimmerman*,
149 F. Supp. 2d 986 (N.D. Ill. 2001) ..................................................... 16

*Desai v. Gen. Growth Props., Inc.*,
654 F. Supp. 2d 836 (N.D. Ill. 2009) ..................................................... 16

*DiLeo v. Ernst & Young*,
901 F.2d 624 (7th Cir. 1990) ......................................................... 25, 30

*Foss v. Bear Stearns & Co., Inc.*,
394 F.3d 540 (7th Cir. 2005) ............................................................. 40

*Garfield v. NDC Health Corp.*,
466 F.3d 1255 (11th Cir. 2006) .......................................................... 28

*GE Capital Corp. v. Lease Resolution Corp.*,
128 F.3d 1074 (7th Cir. 1997) ....................................................... 11, 19

*Goodman Life Income Trust v. Jabil Circuit, Inc.*,
595 F. Supp. 2d 1253 (M.D. Fla. 2009) ............................................... 21, 26

*Greer v. Advanced Equities, Inc.*,
No. 08 C 4958, 2010 WL 152002 (N.D. Ill. Jan. 15, 2010) ................................ 16

i

*Hennessy v. Penril Datacom Networks, Inc.,*
  69 F.3d 1344, 1354 (7th Cir. 1995)......................................................................... 11

*Higginbotham v. Baxter Int'l, Inc.,*
  495 F.3d 753 (7th Cir. 2007)................................................................................... 37

*In re Able Labs. Sec. Litig.,*
  No. 05-2681, 2008 WL 1967509 (D.N.J. Mar. 24, 2008)........................................ 36

*In re Allscripts, Inc. Sec.Litig.,*
  No. 00c6796, 2001 WL 743411 (N.D. Ill. June 29, 2001)...................................... 30

*In re Bally Total Fitness Secs. Litig.,*
  No. 04C3530, 2007 WL 551574 (N.D. Ill. Feb. 20, 2007) .................................... 32

*In re Cadence Design Sys. Sec. Litig.,*
  654 F. Supp. 2d 1037 (N.D. Cal. 2009) .................................................................. 14

*In re Cardinal Health Inc. Sec. Litig.,*
  426 F. Supp. 2d 688 (S.D. Ohio 2006) ...................................................... 30, 34, 36

*In re Career Educ. Corp.,*
  No. 03-c8884, 2007 WL 1029092 (N.D. Ill. Mar 29, 2007) ................................. 30

*In re Ceridian Corp. Sec. Litig.,*
  542 F.3d 240 (8th Cir. 2008)................................................................................... 28

*In re Dell, Inc. Sec. Litig.,*
  591 F. Supp. 2d 877 (W.D. Tex. 2008) ................................................................... 39

*In re Dot Hill Sys. Corp. Sec. Litig.,*
  594 F. Supp. 2d 1150 (S.D. Cal. 2008) ................................................................... 39

*In re Hi/fn Inc. Sec. Litig.,*
  No. 99-4531, 2000 WL 33775286 (N.D. Cal. Aug. 9, 2000)................................. 35

*In re Infosonics Corp. Derivative Litig.,*
  No. 06-136, 2007 WL 2572276 (S.D. Cal. Sept. 4, 2007) ...................................... 36

*In re Lernout & Hauspie Sec. Litig.,*
  208 F.Supp.2d 74 (D. Mass. 2002) ......................................................................... 28

*In re McKesson, Inc. Sec. Litig.,*
  126 F.Supp.2d 1248 (N.D. Cal. 2000) .................................................................... 13

*In re Medicis Pharm. Corp. Sec. Litig.,*
  No. CV-08-1821-PHJ-GMS, 2009 WL 4755406 (D. Ariz. Dec. 2, 2009)................. 19

ii

*In re Nash Finch Co. Sec. Litig.*,
    502 F. Supp. 2d 861 (D. Minn. 2007) ........................................................ 38

*In re Nature's Sunshine Prods. Sec. Litig.*,
    486 F. Supp. 2d 1301 (D. Utah 2007) ........................................................ 27

*In re Paincare Holdings Sec. Litig.*,
    541 F. Supp. 2d. 1283 (M.D. Fla. 2008) .................................................... 25

*In re Quintel Entm't Inc. Sec. Litig.*,
    72 F. Supp. 2d 283 (S.D.N.Y. 1999) .......................................................... 34

*In re Qwest Communs. Int'l, Inc. Secs. Litig.*,
    396 F. Supp. 2d 1178 (D. Colo. 2004) ....................................................... 33

*In re Rent-Way Sec. Litig.*,
    209 F. Supp. 2d 493 (W.D. Penn. 2002) .................................................... 17

*In re Sadia, S.A. Sec. Litig.*,
    643 F. Supp. 2d 521 (S.D.N.Y. 2009) ........................................................ 31

*In re Sears, Roebuck & Co. Sec. Litig.*,
    291 F. Supp. 2d 722 (N.D. Ill. 2003) ......................................................... 11

*In re Scottish Re Group Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007) ........................................................ 31

*In re Spiegel, Inc. Sec. Litig.*,
    382 F. Supp. 2d 989 (N.D. Ill. 2004) ......................................................... 22

*In re Spyglass*,
    No. 99 C 512, 1999 WL 543197 (N.D. Ill. July 21, 1999) ...................... 33, 34

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006) ....................................................................... 33

*In re Top Tankers, Inc. Sec. Litig.*,
    528 F. Supp. 2d 408 (S.D.N.Y. 2007) ................................................... 10, 17

*In re UTStarcom, Inc. Secs. Litig.*,
    617 F. Supp. 2d 964 (N.D. Cal. 2009) ................................................... 31, 36

*Inst'l Inv's Group v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) ....................................................................... 37

*Jones v. Corus Bankshares, Inc.*,
    No. 09-1538, 2010 WL 1338070 (N.D. Ill. Apr. 6, 2010) ..................... *passim*

iii

*Last Atlantis Capital LLC v. AGS Specialist Partners*,
    533 F. Supp. 2d 828 (N.D. Ill. 2008) ................................................................ 40

*Ley v. Visteon Corp.*,
    543 F.3d 801 (6th Cir. 2008) .......................................................................... 28

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ..................................................................... *passim*

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
    927 F. Supp. 1297 (C.D. Cal. 1996) ................................................................ 34

*McConville v. S.E.C.*,
    465 F.3d 780 (7th Cir. 2006) .......................................................................... 27

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
    No. CV 06-6863, 2008 WL 7084629 (C.D. Cal. July 10, 2008) ..................... 31, 32

*Middlesex Retirement System v. Quest Software Inc.*,
    527 F. Supp. 2d 1164 (C.D. Cal. 2007) ............................................ 29, 33, 34, 36

*Norfolk County Ret. Sys. v. Ustian*,
    No. 07 C 7014, 2009 WL 2386156 (N.D. Ill. July 28, 2009) ........................ passim

*Payne v. Deluca*,
    433 F. Supp. 2d 547 (W.D. Pa. 2006) .............................................................. 18

*Pugh v. Tribune Co.*,
    521 F.3d 686 (7th Cir. 2008) ............................................................ 16, 33, 35

*Rehm v. Eagle Finance Corp.*,
    954 F. Supp. 1246 (N.D. Ill. 1997) ................................................................. 13

*Ross v. Abercrombie & Fitch Co.*,
    501 F. Supp. 2d 1102 (S.D. Ohio 2007) .......................................................... 34

*Roth v. Officemax, Inc.*,
    527 F. Supp. 2d 791 (N.D. Ill. 2007) .............................................................. 16

*Rubenstein v. Collins*,
    20 F.3d 160 (5th Cir. 1994) ........................................................................... 35

*Schleicher v. Wendt*,
    529 F. Supp. 2d 959 (S.D. Ind. Sept. 12, 2007) ........................................... 30, 39

*SEC v. Lucent Techs., Inc.*,
    610 F. Supp. 2d 342 (D.N.J. 2009) ................................................................. 28

*Silverman v. Motorola, Inc.*,
    No. 07C4507, 2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) ..................................................... 39

*Stocke v. Shuffle Master, Inc.*,
    615 F. Supp. 2d 1180 (D. Nev. 2009) ....................................................................................... 35

*Sundstrand Corp. v. Sun Chem. Corp.*,
    553 F.2d 1033 (7th Cir. 1977) ................................................................................................. 12

*Sw. Carpenters Pension Trust v. Merge Techs., Inc.*,
    Case No. 06-c-349, 2008 U.S. Dist. LEXIS 108223 (E.D. Wis. Mar. 31, 2008) ...................... 31

*Takara Trust v. Molex Inc.*,
    429 F. Supp. 2d 960 (N.D. Ill. 2006) ................................................................................. passim

*Tatz v. Nanophase Techs. Corp.*,
    No. 01-8440, 2002 WL 31269485 (N.D. Ill. Oct. 9, 2002) ..................................................... 33

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ........................................................................................... 10, 17, 25, 33

*United States v. Shanahan*,
    No. 4:07-CR175, 2008 WL 2225731 (E.D. Mo. May 28, 2008) ............................................. 20

*Zucco Partners*, *LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) .................................................................................................. 28

## STATUTES AND RULES

15 U.S.C. §78u-4(b)(2) ...................................................................................................................... 9

Securities Exchange Act of 1934, § 20(a) ................................................................................... 11, 40

17 C.F.R. § 240.13d-1(a) ................................................................................................................. 37

Fed. R. Civ. P. 9(b) ..................................................................................................................... 9, 10

Fed. R. Civ. P. 12(b)(6) .............................................................................................................. 9, 10

Fed. R. Civ. P. 15(a) ....................................................................................................................... 40

SEC Rule 10b-5 ............................................................................................................................... 40

Lead Plaintiffs[1] respectfully submit this Memorandum of Law in opposition to Defendants' motion to dismiss the Consolidated Class Action Complaint (the "Complaint").[2] For the reasons set forth herein, the Court should deny Defendants' motion in its entirety.

## I.    __PRELIMINARY STATEMENT__

This is an extraordinary case of accounting fraud, perpetrated by some of the foremost accounting experts in the country. As set forth in detail in the Complaint, <u>for thirteen consecutive quarters</u>, Defendants fraudulently inflated Huron's publicly reported net income by improperly accounting for $57 million worth of employee compensation expenses as if those payments were goodwill – an asset – rather than expenses. ¶¶1, 32-33, 52.[3] Defendants' machinations had a dramatic impact on Huron's bottom line, as these accounting improprieties overstated Huron's publicly reported income for nearly three and one-half years by <u>almost 50%</u>. Fueled by these purportedly strong results, which consistently met or exceeded analysts' earnings expectations only as a result of Defendants' fraudulent accounting, Huron's stock price experienced a meteoric rise, increasing from $33 per share at the start of the Class Period[4] to more than $83 per share in December 2007. ¶6. In turn, Defendant Holdren, the Company's CEO, took advantage of Huron's artificially inflated stock price, selling 275,500 shares of Huron stock during the Class Period for proceeds of more than $16 million. ¶73.

Defendants' fraud was only revealed to investors after the markets closed on July 31, 2009,

---

[1] Lead Plaintiffs are the Public School Teachers' Pension & Retirement Fund of Chicago, Arkansas Public Employees Retirement System, the City of Boston Retirement Board, the Cambridge Retirement System, and the Bristol County Retirement System, collectively "Lead Plaintiffs" or "Plaintiffs."

[2] Defendants are Huron Consulting Group, Inc. ("Huron" or the "Company"), Gary E. Holdren ("Holdren," Huron's former CEO and Chairman), Gary L. Burge ("Burge," Huron's former CFO) and Wayne E. Lipski ("Lipski," Huron's former Chief Accounting Officer). Holdren, Burge and Lipski are collectively referred to as the "Individual Defendants."

[3] Citations to "¶_" refer to the particular paragraph of the Complaint being cited.

[4] The "Class Period" is April 27, 2006 through July 31, 2009, inclusive.

when Huron disclosed that the purportedly strong financial results it had reported for the previous three and one-half years were a sham. ¶7. On that day, Huron announced that its financial statements for 2006, 2007, 2008 and the first quarter of 2009 were materially misstated, should no longer be relied upon, and would have to be restated because the Company had improperly accounted for tens of millions of dollars of compensation expenses. *Id.* Huron further announced that, because of the results of its investigation leading to its restatement, Defendants Holdren, Burge and Lipski had all "resigned" their positions and been forced to forfeit millions of dollars in severance payments. ¶8. In response to these stunning disclosures, Huron's stock collapsed, falling 70% in a single day, from $44.35 to $13.69 – a decline of more than $30 per share. ¶9. The revelation of the fraud wiped out more than $650 million in Huron's market capitalization in one day.

The fraud itself involved a simple scheme. During the Class Period, Huron acquired several consulting firms. ¶29. In acquiring those companies, Huron made payments to the selling shareholders of those firms that were, under the accounting rules, required to be allocated among those shareholders in amounts directly proportionate to their ownership interests. ¶36. However, Huron wanted to retain the employees who worked at the acquired companies, but did not want to pay those employees directly because the Company would then have had to record such payments as compensation expenses, thereby reducing its reported income. Accordingly, Huron's senior management devised a scheme whereby the money paid to the selling shareholders would be "redistributed" to other employees. Thus, with Defendants' knowledge, the selling shareholders entered into secret side agreements which required them to "reallocate" substantial amounts of acquisition-related payments to: (1) Huron employees who were not eligible to receive such payments because they were not selling shareholders; (2) other selling shareholders in amounts disproportionate to their ownership interests; and (3) Huron employees that were only hired <u>after</u> the acquisitions occurred. ¶4. Underscoring the fact that these payments were really merely ordinary compensation

2

and bonuses which should have been treated as expenses, the Company has also admitted that receipt of the payments was tied to continuing employment with Huron, and the achievement of "personal performance measures."  ¶7.

Under unambiguous accounting rules that had been in place for decades, Huron was required to account for these payments for what they were:  employee compensation expenses.  ¶5.  However, because accurately accounting for these substantial payments would have dramatically reduced Huron's publicly reported earnings, Defendants violated Generally Accepted Accounting Principles ("GAAP") by improperly accounting for these employee compensation expenses as goodwill, an asset that, unlike expenses, does not reduce earnings.  *Id.*

Defendants' motion to dismiss is groundless.  Defendants do not dispute that Huron issued materially false and misleading financial statements for more than three years, and that the Class suffered massive losses when the truth was revealed.  Rather, relying heavily on impermissible factual inferences that they ask the Court to draw, and citing to a litany of irrelevant materials not cited anywhere in the Complaint, Defendants argue that the Complaint fails to adequately allege any Defendants' scienter.  However, the manipulation of Huron's earnings for this substantial time period was no accident.  This is not a case where the Defendants can credibly claim that they did not know the underlying facts which led to the restatement, or that they were not the ones responsible for the accounting decisions.  As the Company admitted in its restatement, in many cases the Individual Defendants were "aware" that money paid to the selling shareholders had been "redistributed" by the selling shareholders to other employees, and that the Individual Defendants "misapplied" the relevant accounting rules.  Such admissions at the pleading stage are exceedingly rare in securities litigation, and are easily sufficient to establish scienter.

Moreover, while Defendants ask the Court to conclude at the pleading stage that they were supposedly "confused" about the accounting rules, such arguments are belied by the Complaint, and

3

better decided by the trier of fact. There is nothing in the record to support Defendants' contention that they did not understand the applicable accounting rules, which have been in existence for decades. Each of the Individual Defendants was a highly accomplished Certified Public Accountant ("CPA") with decades of experience, and Defendant Holdren served on the Executive and Management Committees at Arthur Andersen ("Andersen") for years before founding Huron, a company specializing in providing expert accounting services to corporations. ¶¶54-58. Significantly, Huron has admitted that the Individual Defendants repeatedly misrepresented key facts and circumstances regarding the acquisition-related payments in management letters provided to the auditors – in the Company's own words, the facts and circumstances surrounding the redistributions "were not fully described in representation letters previously provided to our independent auditors." ¶¶68-71.

In sum, the notion that these Defendants did not understand the accounting is not a plausible inference that can be drawn from these facts, and there can be no serious dispute that these allegations are sufficient to state claims against Defendants for violations of the federal securities laws.

## II.    STATEMENT OF FACTS

### A.    Huron Violated GAAP by Accounting for Acquisition Related Payments as Goodwill, Rather Than Compensation Expense

Defendant Holdren and approximately twenty former Andersen partners and professionals founded Huron in 2002, after Andersen collapsed in the wake of the Enron accounting scandal. ¶2. Huron provides accounting, finance and corporate transaction consulting services. *Id.* As part of its Accounting and Financial Consulting segment, Huron "assists corporations with complex accounting and financial reporting matters." ¶27. Between 2005 and 2007, Huron spent over $200 million to acquire seven other consulting firms. ¶29. When Huron acquired a number of these firms, Defendants took measures to ensure that the owners, or "selling shareholders" of the companies which

4

Huron purchased, incentivized their key personnel over a number of years to remain with Huron after the acquisition.  ¶3.

In Huron's purchase agreements with the acquired companies, the Company typically agreed to pay the selling shareholders (1) an agreed-upon purchase price at the time of the acquisition's closing and (2) future "earn-out payments," which were supposedly tied to the acquired companies' achievement of specific financial performance targets over a period of time. ¶34.  Throughout the Class Period, Huron accounted for the earn-out payments as goodwill, which is the difference between the purchase price of an acquired company and the fair value of the acquired company's assets, and is recorded as a balance sheet <u>asset</u> (not as an expense).  ¶35.

Basic accounting rules in place for years determine whether acquisition-related payments are booked as expenses or as goodwill.  ¶¶34-42.  These rules are unequivocal and absolute.  First, only payments to shareholders of the acquired company may be booked as goodwill.  ¶¶35-36.  Second, payments to shareholders of the acquired company must be made in direct proportion to the selling shareholders' ownership interest in the company they sold.  *Id.*  Third, even when payments are made only to selling shareholders and only in direct proportion to their ownership interests (which was not the case here), certain strings may not be attached to the receipt of those payments (for example, requiring the continuing employment of the selling shareholders with the acquirer and tying payments to "personal performance measures").  *Id.*  Unless these conditions are met, GAAP plainly and unambiguously requires that the payments be booked as expenses, because the payments have been offered for something other than the excess value of the acquired company (here, to compensate Huron employees).  ¶36.

However, in violation of GAAP, Huron booked these payments as goodwill despite the fact that material amounts of these payments were reallocated to:  (1) employees at the acquired companies who were not eligible to receive such payments because they were not selling

shareholders; (2) selling shareholders in amounts disproportionate to their ownership interests; and (3) Huron's own "client-serving and administrative employees" hired by Huron <u>after the acquisitions occurred</u>.  ¶¶42-45.  Moreover, the improper accounting was not limited to reallocated payments, but also involved direct payments by Huron to Huron employees.  ¶50.  Huron has admitted that the direct and reallocated acquisition-related payments were also, in reality, contingent payments that depended on the employee continuing employment with the Company and/or on the achievement of personal performance measures. ¶46. As the Company has acknowledged, these payments were unequivocally employee compensation expenses, not goodwill.  ¶¶43, 46.

### B. Huron's Improper Accounting Is Revealed to the Public, Causing Massive Losses, and the Individual Defendants Are Forced to Resign

On Friday, July 31, 2009, Huron stunned investors by revealing that the Company's financial statements for the fiscal years 2006, 2007, 2008, and the fiscal first quarter of 2009, would have to be restated as a result of the accounting irregularities, that Huron's aggregate reported net profit for that period would be cut <u>nearly in half</u>, by $57 million, and that Huron's entire senior management team – the Chairman/CEO, CFO and Chief Accountant – had immediately resigned their positions at the Company without severance.  ¶121.   The announcement caused the price of Huron stock to <u>drop by 70% in a single day</u>, from a closing price of $44.35 per share on Friday, July 31, 2009 to a closing price of $13.69 per share on Monday, August 3, 2009 (the first trading day after the July 31, 2009 announcement).  The $30.66 per share decline occurred on extraordinary volume of over 32.4 million shares, or over 121 times the average trading volume for Huron Stock during the Class Period.  ¶122. The Company's announcement further caused the United States Securities and Exchange Commission ("SEC") and the United States Attorneys' Office for the Northern District of Illinois to inquire into the facts and circumstances surrounding Huron's restatement.  ¶10.

As the Wall Street Journal explained a few days after the fraud was revealed to investors, "[t]he method the company used to book its payments served to increase its profit."  ¶47.  Moreover, as detailed in the Complaint, Huron's improper accounting scheme dramatically distorted Huron's reported financial condition, creating the illusion that Huron's financial performance was materially better than that of its competitors and allowing the Company to report results that met or exceeded analysts' expectations virtually every quarter during the Class Period – when in reality the Company materially underperformed throughout the Class Period.  ¶¶32-33, 43.

### C.   Huron Admits That Its Senior Management Knew About the Improper Accounting Scheme and Misrepresented Key Facts Regarding the Acquisition-Related Payments to Its Independent Auditor and Investors

Huron's restatement came about because of an investigation launched by the Company's Audit Committee after it uncovered a side agreement that contradicted Huron's accounting for acquisition-related payments.  ¶49.  Upon completing this investigation, the Audit Committee concluded that Huron's senior management knew of the improperly accounted for payments to Huron employees.  ¶49.  As Huron admitted in its August 17, 2009 Form 10-K/A (the "Restatement"): "senior management was aware of the redistributions but either misunderstood or misapplied the appropriate accounting guidance."  ¶49.[5]  Although the Company has tried to suggest that the Individual Defendants may have "misunderstood" the accounting rules governing compensation expenses, that assertion is not credible.  Defendants Holdren, Burge and Lipski all had decades of accounting experience, and before running Huron held senior leadership and accounting positions at Andersen and other publicly held companies.  ¶¶12, 55, 56.  Moreover, the record is devoid of any facts which show that the Defendants took any steps to clear up their supposed "confusion."  If these Defendants truly had any doubt about the applicable accounting rules, they undoubtedly would have

---

[5] Throughout this memorandum, emphasis is added unless otherwise indicated.

sought advice from either Huron's independent auditor, or any of the dozens of other accounting experts that Huron employed to assist clients with "complex accounting and financial reporting matters" and with "their accounting and finance needs in the areas of . . . mergers, acquisitions and divestitures." ¶57. That they did not do so is highly compelling evidence of scienter.

Indeed, rather than consult with Huron's outside auditor, PriceWaterhouseCoopers LLP ("PWC"), as to the appropriate accounting treatment for these redistributions, Huron has admitted that the Individual Defendants actively misled them, by repeatedly withholding critical information about these payments. ¶¶51, 68-71. As Huron revealed in its Restatement, "the facts and circumstances surrounding the Shareholders Payments and Employee Payments were not fully described in representation letters previously provided to our independent auditors." ¶¶51, 69.

Moreover, senior management also knew about direct payments to Huron employees that were improperly accounted for as goodwill. ¶50. For example, on July 30, 2009 (one day before the Restatement was announced), Huron was forced to amend its agreement concerning one acquisition, Wellspring, which made clear that those payments were discussed with Huron's management:

> [T]he direct payment of amounts to certain Huron employees from funds which would otherwise have constituted earn-out payments were discussed with Huron's management.

¶50. The Wellspring amendment further acknowledged that, as of March 31, 2009 – or four months before the Restatement was announced – Huron's senior management knew the specific details of the distribution methodology used to compensate these employees. In other words, the Defendants knew who got how much and when. ¶50.

Based on the discovery of these facts, the Company and its auditors plainly concluded that this massive accounting fraud, which involved at least four different acquisitions and wiped out nearly 50% of the Company's net profits for a period spanning more than three years, was not an isolated incident or the result of an innocent mistake. ¶¶12, 32, 71. The Company's own filings

8

have made clear that there was a finding of accounting improprieties.   Significantly, in the restatement Huron announced that its entire senior management team – CEO, CFO and Chief Accounting Officer – had been forced to "resign" without severance.  ¶64.  Absent a termination for cause or resignation for "good reasons," Holdren would have been entitled to more than $22 million in severance.  ¶65.  Thus, Defendants' claim that Holdren voluntarily resigned without insisting on payment of $22 million is utterly implausible, unsubstantiated and should be rejected.

## III.   LEGAL STANDARD

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the complaint, not its merits.  *Jones v. Corus Bankshares, Inc.*, No. 09-1538, 2010 WL 1338070, at *1 (N.D. Ill. Apr. 6, 2010).  In resolving a Rule 12(b)(6) motion, all well-pleaded allegations in the complaint must be accepted as true and all reasonable inferences drawn in favor of the nonmoving party.  *Id.* at *2-3.  Thus, dismissal is only warranted where the plaintiff can prove no set of facts in support of his claims that would entitle him to relief.  *Id.* at *3.

The Complaint's fraud allegations under Section 10(b) of the Exchange Act are subject to the heightened pleading requirements of Federal Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA").  *Id.* (citation omitted.)  To plead scienter under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. §78u-4(b)(2).  Scienter is adequately pled by demonstrating either that a defendant knowingly made a false statement or recklessly disregarded "a substantial risk that it was false."  *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008) ("*Tellabs II*").  A strong inference of scienter arises if, "[w]hen the allegations are accepted as true and taken collectively," a reasonable person would "deem the inference of scienter at least as strong as any opposing inference[.]"  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007) ("*Tellabs*").  Thus, "defendants cannot defeat a complaint by 'cherry picking' particular

allegations that, standing alone, might not meet the heightened pleading standard under Rule 9(b) or the PSLRA." *Norfolk County Ret. Sys. v. Ustian*, No. 07 C 7014, 2009 WL 2386156, at *11 (N.D. Ill. July 28, 2009) (citations and quotation marks omitted).

While the Court also must consider opposing inferences, it only need entertain those that are both plausible and "rationally drawn <u>from the facts alleged</u>." *Tellabs*, 551 U.S. at 314.   Finally, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324; *see also In re Top Tankers, Inc. Sec. Litig.*, 528 F. Supp. 2d 408, 413-14 (S.D.N.Y. 2007) ("[C]ourts since *Tellabs* have concluded that even if the plaintiff demonstrates only that an inference of scienter is at least as compelling as any nonculpable explanation for the defendant's conduct, the 'tie . . . goes to the plaintiff.'").

To determine whether the Complaint satisfies the pleading requirements, the Court will consider the Complaint in its entirety, as well as other sources that courts may examine when ruling on Rule 12(b)(6) motions – in particular, documents incorporated into the Complaint by reference – and matters of which a court may take judicial notice. *Corus Bankshares*, 2010 WL 1338070, at *1 (citing *Tellabs*, 551 U.S. at 322-24) (cautioning that "courts must consider the complaint in its entirety" and determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.")   To the extent Defendants' arguments rely on the "truth" of matters in SEC filings of other companies to assert that other companies made "the same accounting mistakes," (*see, e.g.,* Mem. of Law in Supp. of Defs.' Mot. to Dismiss the Consolidated Class Action Compl. ("Def. Br.") at 16-18), and on other documents not referenced in the Complaint to assert that these accounting issues were complex (*see, e.g.,* Def. Br. at 20 (relying on speeches and comment letters that do not concern Huron)), those arguments are improper because the truth and significance of the contents of

10

the SEC filings and other documents relied upon by Defendants are subject to dispute.  *GE Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997) (citing *Hennessy v. Penril Datacom Networks, Inc.,* 69 F.3d 1344, 1354 (7th Cir. 1995)) (affirming decision not to take judicial notice of an SEC filing because "there was considerable argument over the significance of the 10-K form").  As this Court has found, "to the extent that the Seventh Circuit has allowed judicial notice of documents such as SEC filings generally, it has done so for purposes other than establishing the truth of the matter in question."  *Corus Bankshares,* 2010 WL 1338070, at *9 n.3.

With regard to "control person" claims under Exchange Act § 20(a), Plaintiffs have alleged that Defendants Holdren, Burge and Lipski exercised general control over the operations of Huron and that they had the power and ability to control the specific acts constituting the accounting fraud at issue here.  *See, e.g.,* ¶¶159-64.  Nothing more is required to state a violation of Exchange Act § 20(a).  *See In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003).  Moreover, "[d]etermination of whether an individual defendant is a 'controlling person' under §20(a) is a question of fact that cannot be determined at a pleading stage."  *Id.* (citations omitted).

As set forth below, the Complaint easily satisfies these pleading standards.

## IV.  <u>ARGUMENT</u>

### A.  **Huron's Admissions Concerning Defendants' Accounting Violations Raise a Strong Inference of Scienter**

In the Restatement, Huron admitted that, for thirteen consecutive quarters, it materially overstated its reported income because it improperly accounted for compensation expenses as goodwill.  The Restatement was massive, both in scope and in size, as it wiped out nearly 50% of the purportedly "strong" profits Huron reported for a more than three year period.  ¶121.

11

Moreover, the Restatement did not merely correct the Company's accounting.  Indeed, in the Restatement, Huron made the extraordinary admission that its former senior management <u>knew</u> about the redistributions that caused the Company's financial statements to be overstated:

> [S]enior management did not properly take into account the impact of the selling shareholders' redistribution of the acquisition-related payments when determining the appropriate accounting treatment. In some cases, senior management was unaware of the redistributions. In other cases, <u>senior management was aware of the redistributions but</u> either misunderstood or <u>misapplied</u> the appropriate accounting guidance.

¶49.[6]

Huron's admission that its senior officers <u>knew</u> about the redistributions to Huron's employees and misapplied the appropriate accounting rules is compelling evidence of scienter. "Aware" means that Defendants knew or, at a minimum, were reckless.  The classic definition of recklessness includes misrepresentations and omissions that are "so obvious that the actor <u>must have been aware</u>." *See Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977); *Takara Trust v. Molex Inc.*, 429 F. Supp. 2d 960, 979 (N.D. Ill. 2006) (scienter consists of "a danger of misleading buyers or sellers that is either known to the defendants or is so obvious that the actor must have been aware").  In the words of Judge Posner:

> [R]ecklessness in [the Section 10(b)] context is "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant <u>must have been aware</u> of it" . . . . When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk.

*Tellabs II,*, 513 F.3d at 704.  Allegations of GAAP violations accompanied by allegations that the Individual Defendants "controlled and approved the issuance" of the  allegedly materially false public financial statements and had direct access to the company's financial information are sufficient to

---

[6] Although Defendants halfheartedly suggest that the Restatement merely references "unnamed senior management" (Def. Br. at 13), Huron has itself publicly acknowledged that Huron's senior management included Holdren and Burge. *See, e.g.,* Huron's Form 10-K for the year ended December 31, 2007 (stating that Huron relied "heavily on [its] senior management team, including Gary Holdren . . . and Gary Burge.").

allege scienter.  *See Rehm v. Eagle Finance Corp.*, 954 F. Supp. 1246, 1255 (N.D. Ill. 1997).

Moreover, "[i]t is certainly not routine to state that the terminated employees 'knew or should have

known' about accounting improprieties.  One can only assume that [the Company] had a factual basis

for such statements."  *In re McKesson, Inc. Sec. Litig.*, 126 F.Supp.2d 1248, 1274 (N.D. Cal. 2000).

## 1.     Plaintiffs Need Not Plead That Defendants Knew the Details of the Redistributions

As the Court is undoubtedly aware, it is highly unusual for a plaintiff in a securities fraud

action to be able to allege direct evidence of actual knowledge at the pleading stage.  Typically, in a

restatement case, Defendants contend that they had no knowledge of the facts requiring the

restatement, and/or that they did not make the improper accounting decisions.  In this case, however,

neither of those arguments can be made.  While Defendants concede that the Individual Defendants

knew about the redistributions and "misapplied" the accounting rules, they contend that Plaintiffs

have failed to plead scienter because they have not shown that Defendants were aware of the precise

"details" of the redistributions.  Def. Br. at 12-15.  However, the Company's admission that its senior

management either "misunderstood <u>or misapplied</u> the appropriate accounting guidance" is a stark

admission that the Company itself was unable to conclude that the accounting errors were the product

of an innocent mistake or misunderstanding.  ¶¶11, 49.  To the contrary, the Company admitted that it

was at least as likely that <u>its senior management understood the appropriate accounting guidance, but

misapplied that guidance when accounting for the earn-out payments</u>.

Moreover, although Defendants assert that Plaintiffs fail to plead "pertinent facts" about the

redistributions (which pertinent facts Defendants naturally fail to identify), the mere fact that the

Individual Defendants were aware that money was being redistributed to employees who were not

selling shareholders of the companies being acquired, and to Huron employees hired <u>after</u> the

acquisitions occurred, is fully sufficient to establish their scienter.  Plaintiffs do not need to allege that

Defendants knew the names of the employees receiving these payments, or how much each received, or when.  All Plaintiffs need to allege is that Defendants knew that the acquisition-related payments were being used to compensate not only the selling shareholders of these companies, but also to compensate employees who were ineligible to receive a payment that was accounted for as goodwill.  *See Ustian*, 2009 WL 2386156, at \*10 (finding scienter where "the errors were too basic, there were too many of them, and the bottom line discrepancies were too big" to permit an inference that the faulty accounting was the result of incompetence.)[7]

### 2.    Although Not Required, Plaintiffs Actually Do Plead That Defendants Knew the Details of the Redistributions

Even though Plaintiffs need not allege that Defendants knew the intimate details about the payments, the Complaint does so.  For example, with respect to one of the acquisitions improperly accounted for (Wellspring), the Complaint alleges that Defendants not only knew about the earn-out payments, but were fully informed about the methodology under which those payments were made.  ¶50.  Indeed, the Company's own SEC filings reveal that the "distribution methodology" for the "amounts" distributed in connection with the Wellspring acquisition were disclosed to senior management as of March 31, 2009 – or four months before the restatement was announced.  *Id.*; Def. Ex. D.[8]  That SEC filing further stated that, even prior to March 31, 2009, "the direct payments of amounts to certain Huron employees from funds which would otherwise have constituted earn-out payments were discussed with Huron's management."  Def. Ex. D at 9.

_____

[7] Defendants' heavy reliance on *In re Cadence Design Sys. Sec. Litig.*, 654 F. Supp. 2d 1037 (N.D. Cal. 2009) is misplaced.  (Def. Br. 13).  In *Cadence*, the court dismissed the complaint because plaintiffs had only alleged in "remote and speculative ways" that defendants knew or suspected the details of allegedly improperly accounted transactions.  *See Cadence Design,* 654 F. Supp. 2d. at 1046, 1050.  Here, by contrast, the Complaint is replete with detailed and direct allegations – including Huron's unambiguous admissions in the Restatement – that Defendants were aware of the payments at issue. *See, e.g.,* ¶¶48-51.

[8] References to "Def. Ex. _" are to exhibits attached to the Declaration of J. Wes Earnhardt in support of Defendants' Motion to Dismiss the Consolidated Class Action Complaint, filed on March 30, 2010.

14

Defendants respond to these particularized allegations by raising fact issues that cannot be decided on a motion to dismiss.  For example, Defendants claim that the March 31 date was inserted in the amended Wellspring agreement only because that was the end of the 2009 first quarter, which was the last quarter to be restated.  *See* Def. Br. at 15.  Besides being inappropriate for a motion to dismiss, this argument makes no sense.  If Defendants truly had no knowledge of these facts before July 30, 2009 – the date the amended Wellspring agreement was signed and one day before the Company announced the restatement – then logically they should have disclaimed knowledge through July 30, 2009.  ¶50.  Indeed, given that the Defendants knew the Company was restating its public financial statements, had they been able to represent truthfully that they had no knowledge of these facts until the date of the amended agreement, they undoubtedly would have done so.[9]

Defendants also argue that it is irrelevant that the Company admitted that Huron's senior management discussed the direct payments to Huron employees from funds which otherwise would have constituted earn-out amounts, supposedly because those funds ultimately were not earn-out payments that were covered by the Restatement.  Def. Br. at 14.  This argument also raises fact issues that cannot be decided on a motion to dismiss.  For one thing, Defendants provide no support for their contention that these payments were not part of the Restatement.  Second, the disclosure comes in an amended agreement that the Company has admitted was necessary to avoid further GAAP violations – specifically, so that "future earn-outs will be distributed only to the applicable selling shareholders and only in accordance with their equity interests . . . with no continuing employment required" (¶50) – and was signed on the eve of Huron's announcement of its Restatement.  The only plausible inference that can be drawn from this statement is that it means exactly what it says – namely, that the

---

[9] Defendants' argument does not hold water for another reason.  Huron's 2009 First Quarter Form 10-Q was not filed until April 30, 2009.  If Defendants truly did not have knowledge of the facts at the time Huron's financial statements were filed, the pertinent date would have been April 30, not March 31.

payments would have otherwise constituted earn-out payments but for the fact that they were made to ineligible Huron employees with the Individual Defendants' knowledge.[10]

Defendants also assert that the Complaint's detailed allegations concerning the Individual Defendants' knowledge of the accounting errors are insufficient to meet the pleading standards because the Complaint sometimes refers to Defendants collectively.  Def. Br. at 9.  Contrary to Defendants' argument, Plaintiffs are not relying on a presumption that Holdren and Burge must have known about the redistributions simply because of their positions at the Company.  In fact, Huron has expressly admitted that the Defendants were aware of the redistributions.[11]

**3.    Huron's Admission of Defendants' "Misapplication" of the "Accounting Guidance" Supports a Strong Inference of Scienter**

The Company's carefully chosen language (that senior management "<u>either misunderstood or misapplied</u> the appropriate accounting guidance") in the Restatement means that the Audit Committee itself concluded, after an investigation, that <u>it was at least as likely as not</u> that senior management

---

[10]  Even if Defendants' interpretation could be accepted at this stage – and it cannot – it does not help them. At minimum, these facts show that the Individual Defendants were acutely aware that earn-out payments were being distributed to employees who were otherwise not entitled to receive them – and undermines any contention that they were unaware of the pertinent details.

[11]  Defendants have misapplied the concept of impermissible "group pleading" – a "presumption that statements in group published documents are attributable to officers who have daily involvement in company operations" *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008) – to make their argument.  Here, there is no doubt that Holdren and Burge are responsible for the challenged statements, and the Complaint simply "collectivizes" certain defendants for ease of reference without relying on any presumption that group-published documents were attributable to them by virtue of their positions within the company.  The law, unsurprisingly, permits this.  *See, e.g., Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 860 (N.D. Ill. 2009) (holding that allegations of scienter directed at groups of defendants who are in "positions of authority" are permissible); *Dardick v. Zimmerman*, 149 F. Supp. 2d 986, (N.D. Ill. 2001) (explaining that "there is of course no question that it is not fatal for any complaint to collectivize 'defendants' in certain respects – for example, in describing the duties of disclosure…").  The cases cited by Defendants are therefore inapposite.  *See Greer v. Advanced Equities, Inc.*, No. 08 C 4958, 2010 WL 152002, at *7 (N.D. Ill. Jan. 15, 2010) (rejecting plaintiffs' argument that "it is reasonable to assume that [fraudulent statements in prospectuses] are the collective action of the officers or individuals who drafted, approved or distributed the documents" as improper group pleading); *Roth v. Officemax, Inc.*, 527 F. Supp. 2d 791, 798 (N.D. Ill. 2007) (noting that plaintiffs "have not alleged in the [a]mended [c]omplaint that any of the individual defendants knew about the problems that caused the restatement of the [c]ompany's financials").

understood the appropriate accounting, and consciously misapplied it.  *See, e.g., Tellabs,* 551 U.S. at

326 (a strong inference of scienter arises when a reasonable person would "deem the inference of

scienter at least as strong as any opposing inference."); *Top Tankers*, 528 F. Supp. 2d at 413-14

(regarding competing inference of scienter, a 'tie . . . goes to the plaintiff.'").

Indeed, the inference that these were "innocent" accounting errors is not plausible, or at least

is far outweighed by the facts showing that the accounting errors were intentional or, at minimum,

reckless.  Defendants here overstated the Company's net income for thirteen consecutive quarters.

Significantly, during this substantial time period the supposedly "innocent" accounting errors always

managed to cut in Huron's favor – that is, the "errors" always boosted Huron's publicly reported

profits, and never reduced them.  *See, e.g., In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 506 (W.D.

Penn. 2002) (finding scienter based on the magnitude and two-year duration of the accounting

irregularities).  Moreover, when Huron's independent auditors asked management to provide them

with facts relating to the acquisition-related payments, Huron's senior management repeatedly

misrepresented those facts in their management representation letters.  *See, e.g., Takara Trust*, 429 F.

Supp. 2d at 980 (finding scienter because the CEO and CFO had incorrectly represented to the auditor

that "there are no transactions . . . that had not been properly recorded in the accounting records, and

that no matters had come to management's attention . . . that required consideration as adjustments to

or disclosures in the financial statements.").

In reality, the GAAP violations that Huron has admitted to were blatant and the applicable

GAAP rules simple and straightforward.  First, it is beyond question – and defendants do not even

attempt to dispute – that no accounting rule permits an acquiring company to book payments to

people with no ownership interest in the acquired company as goodwill.  But in this case, that is

exactly what Defendants did.  ¶¶44-48 (alleging that payments were made both to (a) rank-and-file

employees at the acquired businesses, and (b) even more egregiously, Huron employees hired after

17

the date of the acquisitions).  Second, the accounting rules also do not permit payments made to selling shareholders in amounts that are inconsistent with the selling shareholders' ownership interests at the time of the acquisition to be booked as goodwill – but Defendants did that as well.  *See, e.g.,* ¶¶40-41, 45, 48.  Third, even if payments to selling shareholders would otherwise qualify as goodwill (which here they typically did not), if the substance of an agreement for contingent payments is to provide compensation for services, as evidenced by conditioning those payments on continuing employment with the acquiring company and/or upon the achievement of personal performance measures (again, as they were here), such payments must be recorded as compensation expenses, not goodwill (an asset).  ¶37, 40, 46.  Because these admitted accounting violations concern "relatively straightforward" accounting errors, a strong inference of scienter readily may be inferred.  *See Ustian*, 2009 WL 2386156, at *7.  This is especially true where, as here, "the errors were too basic, there were too many of them, and the bottom line discrepancies were too big (and the inconsistencies in the errors too small) to raise a compelling interference that the errors were a result of mere incompetence."  *Id.* at *10.

In response, Defendants essentially invent a new legal standard for pleading scienter – one that the Seventh Circuit has never adopted.  According to Defendants, Plaintiffs must show not only that Holdren and Burge knew the relevant details of the redistributions at issue and misapplied the accounting, but also "that the accounting judgments which were made were such that no reasonable accountant would have made the same decision if confronted with the same facts."  Def. Br. at 15 (quoting *Payne v. Deluca*, 433 F. Supp. 2d 547, 580 (W.D. Pa. 2006)).  But, as set forth above, that is not the law in this Circuit.[12]  Moreover, even if it were, Plaintiffs easily satisfy it.  The facts show that,

---

[12] The out-of-Circuit district court opinions cited by Defendants in support of this argument are inapposite and, if anything, underscore the strength of the Complaint.  For example, in *Payne,* the court concluded that plaintiffs could not establish recklessness concerning the company's accounting practices because there was no

rather than being confused, (1) the Audit Committee was so concerned when it learned of the redistributions that it immediately informed PWC; and (2) the "reasonable auditor" here – PWC – immediately recognized that the redistributions had been accounted for improperly.  As the Complaint alleges, no reasonable auditor could conclude, for example, that payments made to employees hired after acquisitions occurred can be treated as goodwill.

**a.     The Comparison with Huron's Supposed Peers Is Inapposite**

Defendants' argument that SEC filings <u>of other companies</u> "show that other presumably reasonable accountants made the same accounting mistakes under nearly identical circumstances" is specious and an argument that the Court cannot credit at the pleading stage.  Def. Br. at 16-18.  It is black-letter law that Defendants may not rely on matters outside of the pleadings to prove the truth of factual matters that are subject to reasonable dispute.  *See, e.g., See GE Capital.*, 128 F.3d at 1081.  But that is precisely what Defendants do when, for example, Defendants urge the Court to conclude that other companies had "difficulty with th[e same] accounting treatment."   Def. Br. at 16.[13]

---

restatement, the company "employed the same [accounting] method" for three years, and it had received an unqualified opinion from its outside auditor for each of those years supporting its accounting.  433 F. Supp. 2d at 580.  In *In re Medicis Pharm. Corp. Sec. Litig.*, Lead Case No. CV-08-1821-PHJ-GMS, 2009 WL 4755406 (D. Ariz. Dec. 2, 2009), the court recognized that (a) where an accounting violation is prominent or obvious, a strong inference of scienter may be raised even without any other allegations supporting an inference of scienter and (b) an accounting violation may itself be indicative of scienter where it is combined with particular allegations about management's role in the company.  *See id.* at *5. There, however, the restatement impacted the company's net revenues by less than 0.058%, the alleged accounting errors were merely technical in nature, and plaintiffs alleged no facts showing how defendants would benefit from the alleged accounting errors.  *See id.* at *2.  Lastly in *Cutsforth v. Renschler*, 235 F. Supp. 2d 1216 (M.D. Fla. 2002), plaintiffs "failed to establish that there was a GAAP violation" at all, and also "failed to explain in this case why the alleged [GAAP violation] was, as they contend, so simple and clear."  *Id.* at 1260.  In addition, no allegations supported that defendants <u>had not</u> withheld critical information from investors and plaintiffs had "provided no cogent explanation how the defendants gained from [the alleged accounting errors]."  *Id.* at 1261.

[13] That the "no reasonable accountant" standard for evaluating the Complaint that Defendants champion would require the exact type of detailed weighing of facts from outside the Complaint – which is impermissible on a motion to dismiss – also shows that the standard they advance is wrong.

Moreover, even a cursory review of the other companies' statements shows substantial factual differences with Huron which, rather than refute scienter, actually undermine Defendants' argument because they reveal that these other "corrections" pale in comparison to Huron's significant accounting issues. For example, FTI Consulting, Inc., which made an "immaterial correction" (Def. Ex. G) concerning one payment which required increasing expenses in an amount of $8 million out of $3 billion (or 0.3%),[14] is hardly comparable. Moreover, at FTI there were no resulting resignations of any employees, let alone senior officers, or indication of knowledge by anyone at FTI. *See* Gilden Decl., Ex. A. Similarly, Charles River Associates International, Inc. ("CRA") did not restate its financial statements, and only made an immaterial correction concerning one $5 million transaction that was "not material." Def. Ex. H. The transaction impacted expenses between the end of 2006 and 2008, when CRA incurred cost-of-services expenses of approximately $496 million – meaning the transaction which Defendants hang their hat on constituted approximately one percent of the Company's expenses. Gilden Decl., Ex. B (CRA, Annual Report (Form 10-K), at FS-2 (p. 56) (Feb. 12, 2009)). In sum, Defendants' comparison to other companies is unavailing, and even if other companies violated GAAP, that does not refute a strong inference of Defendants' scienter.[15] The "everyone else is doing it" defense cannot be accepted at the pleading stage. *United States v. Shanahan*, No. 4:07-CR175JCN(DDN), 2008 WL 2225731, at *8 (E.D. Mo. May 28, 2008) (rejecting

---

[14] FTI, Annual Report (Form 10-K), at 73 (Feb. 26, 2010), attached as Exhibit A to the Declaration of Carol V. Gilden in Support of Lead Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Class Action Complaint (the "Gilden Decl."), filed herewith.

[15] Defendants also refer to two other companies which supposedly also improperly accounted for contingent payments. Def. Br. at 17 n.8. In both of those situations there was only one improperly booked transaction per company, no one resigned, and there was no claim that anyone at the Company knew of the facts that caused the correction in the accounting. Def. Exs. J and K.

defendants' claim that accounting rule is ambiguous because 250 companies violated GAAP provision concerning options backdating).[16]

### b.      The GAAP Rules Are Simple and the Violations Blatant

Defendants' attempts to complicate the simple accounting rules at issue are equally unavailing.  Def. Br. at 18-23.  Here, it simply is not possible for Defendants to claim that they were unaware of the true facts, or to claim credibly that the issues were overly "complex," as evidenced by the facts that the Audit Committee immediately initiated an investigation upon learning of the side agreements, concluded that Defendants had hidden the nature of the earn-out payments from the Company's outside auditor, and, as a result, replaced the Company's senior management.  Indeed, Huron's own Restatement – which clearly, simply and succinctly describes the GAAP violations – never offered the supposed "complexity" of accounting issues as a reason for the Restatement.  Instead, the Restatement clearly stated that Defendants' accounting practices had been hidden from the Audit Committee and PWC.

In any event, Defendants' protests may be disregarded in these circumstances because:

> The more serious the [accounting] error, the less believable are defendants' protests that they were completely unaware of [the company's] true financial status and the stronger is the inference that defendants must have known about the discrepancy.  The evidence may ultimately show that the [defendants] were not in a position to detect the errors notwithstanding . . . any information they received, but that is not a basis for dismissal.

*In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1020-1021 (N.D. Ill. 2004).

---

[16] Defendants cite to *Medicis*, 2009 WL 4755406, at *9, for the proposition that when other companies also misapply GAAP, a strong inference of scienter is absent.  Def. Br. at 18.  But in *Medicis* the restatement was clearly immaterial, amounting to $1.1 million in revenues for a five-year period total of $1.906 billion, or less than 0.058%.  *Id.* at 2.  More importantly, the GAAP issue concerned the timing of revenue recognition so that the revenue among quarters shifted in a seesaw pattern – revenues were inflated in certain periods, and deflated in others.  *Id.*  Here, in stark contrast, the Restatement was a result of Huron <u>always</u> inflating net income.  ¶52.  Defendants also cite to *Goodman Life Income Trust v. Jabil Circuit, Inc.*, 595 F. Supp. 2d 1253 (M.D. Fla. 2009) to argue that the fact that four companies supposedly had issues applying EITF 95-8 establishes a trend and suggests that EITF 95-8 is complex.  Def. Br. at 18.  *Goodman* concerned options backdating, which as stated above, involved more than 250 companies, not four as is the case here.

21

Defendants do not deny that the accounting rules cited by Plaintiffs govern the accounting at issue, but instead claim – without any basis and without identifying any other relevant accounting rules – that other accounting pronouncements "may" be relevant to the Complaint's allegations. However, the admitted GAAP violations are clear and Defendants' speculations should be disregarded. First, FAS 141 clearly precluded Huron from treating the redistributions as goodwill when, in reality, they reflected salary and bonus expenses of the merged company:

> If the substance of the agreement for contingent consideration is to provide compensation for services or use of property or profit sharing, the additional consideration given shall be recognized as an expense of the appropriate periods.

¶37. As previously noted, when payments are being made to people who do not even own what is supposedly being purchased (the "excess value" of the business), those amounts can never be recorded as goodwill, and the payments are simply compensation expenses.

Disregarding these key facts and FAS 141, Defendants focus significant attention on EITF 95-8, "Accounting for Contingent Consideration Paid to Shareholders of An Acquired Enterprise In A Purchase Business Combination." ¶39. However, as its title indicates, EITF 95-8 does not even contemplate payments of supposed "goodwill" amounts to non-shareholders. Moreover, as applied to selling shareholders only, one of the key criteria under EITF 95-8 is whether "all selling shareholders receive the same amount of contingent consideration on a per share basis." ¶40. Here, the Company admitted that it violated GAAP because selling shareholders were not paid in proportion to their ownership interests. ¶¶42, 45, 48. Further, when payments contingent on continuing employment are booked as purchase consideration, these payments raise the strongest suspicions under EITF 95-8: "A contingent consideration arrangement in which the payments are automatically forfeited if employment terminates is a strong indicator that the arrangement is compensation for post combination services." ¶40. Again, the Company has admitted that the payments that violated GAAP were tied to continuing employment. ¶¶46, 48.

22

Defendants again ask the Court to rely on materials cited nowhere in the Complaint to argue that Callidus Software, Inc. ("Callidus"), another company, accounted for payments contingent on continued employment as part of a purchase price and that the SEC allowed it.  Def. Br. at 21.  Of course, unless Defendants can show that Huron asked the SEC for its guidance – which it did not – or that Defendants had Callidus' letter to the SEC in their possession while engaging in the improper accounting – which, tellingly, they do not – one wonders how this could be relevant to an assessment of Defendants' scienter.  Furthermore, Callidus' letter explaining its accounting to the SEC explained that the contingent payments to the shareholders were, unlike here, consistent with their ownership stake.  Def. Ex. O, at 4 ("Upon achievement of this contingency [of continued employment], the $1.9 million total payment will be made to each of the shareholders of the Acquired Entities in proportion to their ownership percentage.").  Even more importantly, the Callidus example shows that payments contingent on continuing employment, without more, constituted a red flag of such importance that the SEC Staff sent a letter to Callidus demanding an explanation after the Staff reviewed Callidus' SEC filings.  Def. Ex. N.  Only after a lengthy response from Callidus, largely focused on the fact that the contingent payments were proportional to the ownership percentages, was the SEC satisfied. Significantly, unlike Callidus, the Defendants never asked the SEC for guidance, or even shared the information that led to the Restatement with their auditor.

Defendants also assert that the "Restatement was necessary only because Huron's Audit Committee decided that the selling shareholders' actions should be imputed to Huron," and from this incorrect statement contend (applying the wrong legal standard, as discussed above) that Plaintiffs must plead "specific facts showing that the Audit Committee's ultimate conclusion that the redistributions should be imputed to Huron was so obvious that no reasonable accountant could have reached the opposite conclusion."  Def. Br. at 23.  In fact, Huron's own Restatement makes perfectly clear that the actions of the selling shareholders were required "under GAAP, including guidance

23

promulgated by the SEC," to be imputed to Huron given the nature of those payments. Restatement, Def. Ex. A at 1. Thus, contrary to Defendants' contention, the Restatement was not discretionary at all. Moreover, Defendants' attempts to pin fault on the selling shareholders are contradicted by the admitted facts, and by logic: even leaving aside the Company's admissions that Defendants knew about the redistributions, if the selling shareholders were truly acting on their own and without Defendants' knowledge (as Defendants intimate), why then would the redistributions be conditioned on continuing employment with the Company and be tied to "personal performance measures" that would have been adjudged by Huron, not selling shareholders?

In sum, the notion that Defendants simply made "mistakes" for three and a half years is not credible, and is contradicted by numerous well-pled allegations of the Complaint.

### B.     Defendants' Extensive Accounting Experience Further Raises a Strong Inference of Scienter

In addition to the Company's acknowledgements that Defendants knew about the misapplication of accounting rules, it is impossible to claim credibly that Defendants did not understand the requisite accounting rules in light of their extraordinarily extensive accounting experience and backgrounds. ¶¶12, 55-57. Indeed, the Individual Defendants are some of the most highly accomplished accountants in the country. Holdren, Burge, and Lipski are all CPAs who have practiced for decades. ¶12. Holdren, Huron's CEO, has been a CPA since 1978, and before he founded Huron, was a partner at Andersen, where he reached the highest levels of the firm, serving on Andersen's U.S. Management Committee from 1991 to 1998 and on its Executive Council from 1994 to 1998. ¶23. Similarly, Burge has been a CPA since 1976, and Lipski has been a CPA since 1979. ¶¶23, 55. Accordingly, each of these Defendants have spent their professional lives learning and applying accounting rules, touting their accounting experience, and even issuing statements about proper accounting.

24

Moreover, Defendants parlayed their decades of accounting experience into founding and expanding Huron, a consulting firm specializing in the resolution of accounting and financial reporting issues.  ¶¶ 12, 27, 55-57.  The Company marketed its Accounting and Financial Consulting group as foremost accounting experts, stating that, "[t]his segment is comprised of certified public accountants, economists, certified fraud examiners, chartered financial analysts and valuation experts."  ¶27.  In fact, this segment's accounting expertise was particularly focused in business acquisitions – the context of the accounting at issue in this case.  "Our Accounting and Financial Consulting segment assists corporations with . . . valuation analysis related to business acquisitions."  ¶27.  Accordingly, if any of the Individual Defendants truly had any doubt about the applicable accounting rules, they could have sought the advice from any of the dozens of their own accounting experts (as well as PWC).

In response, Defendants argue that the Court should ignore these specific, concrete reasons showing that Defendants understood the applicable accounting rules and therefore must have acted with at least recklessness, because they assert that Holdren and Burge's "professional experience in accounting and financing cannot save plaintiffs' deficient allegations."  Def. Br. at 24.  Although the Complaint's allegations must be considered collectively, *Tellabs*, 551 U.S. at 322-24, even viewed in isolation, Plaintiffs' detailed allegations about these Defendants' accounting experience can be considered by the Court to find that the Individual Defendants understood the applicable accounting rules.  *See Corus Bankshares*, 2010 WL 1338070, at *4-5 (distinguishing the fraud-by-hindsight theory alleged in *DiLeo v. Ernst & Young* from a plaintiff alleging "specific, concrete reasons for his contention that [the defendant] should have known . . . that [its] statements about the adequacy of its reserves were misleading" (citing *DiLeo v. Ernst & Young*, 901 F.2d 624, 626-27 (7th Cir. 1990)).[17]

---

[17] *See also In re Paincare Holdings Sec. Litig.*, 541 F. Supp. 2d 1283, 1293 (M.D. Fla. 2008) (denying a

"A dose of irony is that Huron makes its money providing financial and legal consulting services, including forensic style investigative work," wrote *The Wall Street Journal* shortly after the announcement of the Restatement in an article entitled, *Huron Takes Big Hit As Accounting Falls Short*. ¶56.  That article quoted analyst Sean Jackson of Avondale Partners, expressing the market's disbelief that Defendants did not know about Huron's accounting improprieties: "One of their businesses is forensic accounting – they're experts in this . . . investors are saying 'These guys had to know what happened with the accounting or they should have known.'" *Id.*

### C. Defendants' False Representation Letters to Huron's Auditor Further Support a Strong Inference of Scienter

If Defendants truly had any difficulty with the application of GAAP with respect to the redistributions, Defendants undoubtedly would have presented all the facts to Huron's auditor, PWC, to ask PWC for its guidance on how to account for the payments.  Instead, Defendants issued representation letters to PWC which falsely claimed that:  (1) Defendants had provided PWC with complete and accurate information, including with respect to the earn-out payments; and (2) there were no undisclosed agreements relating to those payments of which they were aware.  ¶¶51, 68-70. Huron later admitted in its Restatement that, while Defendants were aware of the redistributions of payments, "the facts and circumstances surrounding [those payments] were not fully described in representation letters previously provided to [Huron's] independent auditors."  ¶¶11, 49, 51.  It was

---

motion to dismiss because "details of the [i]ndividual [d]efendants' . . . experience and accounting backgrounds, by which they knew of the GAAP standards" helped support a finding of scienter).  The cases cited by Defendants are irrelevant because Huron has expressly admitted that the Defendants knew the circumstances of the accounting errors at issue.  *See Bally I*, 2006 WL 3714708, at *9 (finding that plaintiffs' arguments about defendants' backgrounds "[were] attempts at an endrun around the requirement that plaintiffs set forth particularized facts to suggest that defendants acted knowingly and recklessly"); *Goodman,* 595 F. Supp. 2d at 1277 (finding that "plaintiffs offer no facts other than generalized accounting knowledge to support the allegation that any defendant knew, before the restatement, that Jabil misapplied APB 25"); and *Branca v. Paymentech*, No. Civ. A. 3:97-cv-25072, 2000 WL 145083, at *10 (N.D. Tex. Feb. 8, 2000) (finding that "Plaintiffs have pleaded no facts indicating that at the time the allegedly false statements were made, Defendants had actual knowledge of contradictory facts").

instead the "Audit Committee [which] notified the Company's independent auditors who had not previously been aware of the [payments]."  (Restatement, Def. Ex. A, at 29).

The fact that Defendants issued false representation letters raises a strong inference of scienter because it shows that Defendants were attempting to conceal their fraud.  *See Takara Trust*, 429 F. Supp. 2d at 980 ("conscious decision not to reveal the [accounting] errors . . . to [defendants'] independent auditor" supported a strong inference of scienter); *In re Nature's Sunshine Prods. Sec. Litig.*, 486 F. Supp. 2d 1301, 1309-11 (D. Utah 2007) (defendant's false representation letters to auditor were "[e]vidence that [the] defendant has taken steps to cover-up a misdeed [and] strong proof of scienter"); *cf. McConville v. S.E.C.*, 465 F.3d 780 (7th Cir. 2006) (false representation letter to auditor supported scienter finding).

In response, Defendants argue that the fact that their representation letters to PWC were inaccurate or incomplete is by itself insufficient to establish scienter.  Def. Br. at 34-35.  Plaintiffs have alleged far more than just that Defendants misrepresented facts to their auditor.  Plaintiffs have also alleged (and the Company has admitted) that Defendants knew of the redistributions that necessitated the massive restatement, yet failed to accurately and completely describe those payments to the auditor.  ¶¶11, 49-51.  Those facts, taken together, are sufficient to establish scienter.

Also, Defendants acknowledge that the representation letters they sent to PWC did "not contain full descriptions of the facts" but assert that this is "unsurprising" because Defendants allegedly were unaware of some of the redistributions.  Def. Br. at 35.  Of course, this ignores the fact that the Restatement establishes that Defendants did know of other redistributions, and that they withheld that information from PWC as well.  Given their extraordinary experience in accounting, any

27

argument that Defendants misstated highly material facts to PWC because they were somehow confused can be made to the jury.[18]

In sum, Defendants fail to offer any innocent, plausible explanation for why such material facts were not disclosed to PWC.  That is because there is none.  Indeed, if Defendants had believed that their accounting for the earn-out payments was appropriate, or if they were truly confused about the accounting, then there would have been no reason for them not to have shared this information with the Company's outside auditor.

### D.    The Magnitude, Scope and Duration of the Restatement Further Support a Strong Inference of Scienter

In this District, "the magnitude and nature of the accounting errors may belie a defendant's claim that she or it was unaware of any improprieties."  *Ustian*, 2009 WL 2386156, at *10 (citation omitted).  Put simply, if "the errors were too basic, there were too many of them, and the bottom line discrepancies were too big (and the inconsistencies in the errors too small)" they can conclusively dispel a "compelling alternative narrative inference that the errors were a result of mere incompetence." *Id.*[19]

Here, the Restatement covered more than three years of earnings and was enormous, reducing net income by $57 million, or nearly 50%, from $120 million to $63 million.  ¶8.  In 2008 alone,

---

[18] Defendants' knowledge of the facts that should have been provided to the auditor distinguishes each of the cases cited by Defendants on this issue (Def. Br. at 34).  *See SEC v. Lucent Techs.*, Inc., 610 F. Supp. 2d 342, 367 (D.N.J. 2009); *Bally I*, 2006 WL 3714708, at *8; *Zucco*, 552 F.3d at 1002-04; *Ley v. Visteon Corp.*, 543 F.3d 801, 812 (6th Cir. 2008); *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 248 (8th Cir. 2008); *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006).

[19] *See also Takara*, 429 F. Supp. 2d at 980 ("GAAP violations may support an inference of scienter depending on: the magnitude of the accounting error, a defendant's prior notice of the error, or a defendant's responsibility for calculating and disseminating financial information."); *In re Lernout & Hauspie Sec. Litig.*, 208 F.Supp.2d 74, 87 (D. Mass. 2002) ("Considered together, the violations of GAAP in the financial statements and the sheer magnitude of those overstatements contribute much to a strong inference of scienter.").

28

Huron overstated net income by <u>300%</u>, reporting net income of $40 million when it was only $10 million. ¶52. Even the Company admitted that the magnitude of the Restatement was significant:

> [I]n light of these determinations and <u>given the magnitude of the accounting errors</u> underlying the restatement, [the] Board of Directors concluded that it was appropriate for the Company to appoint a new Chairman, a new Chief Executive Officer, a new Chief Financial Officer and a new Chief Accounting Officer.

(Restatement, Def. Ex. A at 2).

In addition to the magnitude of the Restatement, the regularity and precision with which Huron inflated earnings to meet or beat Wall Street's expectations strongly supports an inference of scienter. As set forth above, Huron's accounting errors always served to <u>increase</u> the Company's publicly reported profit. Moreover, in virtually every quarter of the thirteen-quarter Class Period, the magnitude of the false earnings allowed Huron to report results at or above the market's range of earnings expectations. ¶32. As set forth in the chart in paragraph 32 of the Complaint, Huron's false earnings during the Class Period regularly managed to beat Wall Street's expectations by a few cents, even though the Company's true earnings fell further and further behind those expectations over time. *See also Middlesex Retirement System v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1183 (C.D. Cal. 2007) ("[T]he [c]ourt finds it highly improbable that a failure to comprehend the proper accounting treatment . . . would so consistently benefit [d]efendants."). While Defendants claim that Huron's massive restatement should be disregarded, relying heavily on *Bally I* (Def. Br. at 10), that reliance is misplaced. There, the court was unwilling to find that a restatement contributed to an inference of scienter because, unlike here, that company "<u>did not consistently overstate revenues and income</u>" but rather "<u>the revenue for some quarters was at times understated and losses for some quarters were at</u>

times overstated." *Bally I*, 2006 WL 3714708, at * 8.   Here, the accounting manipulations were pervasive, massive, lengthy and always in Defendants' favor.[20]

Scienter also can be strongly inferred from the fact that the accounting manipulations concerned the very line item on which Wall Street analysts were then focused – expenses.   ¶¶6, 31, 43, 47.   Huron appeared more profitable and efficient than its competitors precisely because it had improperly reduced its expenses, and Wall Street analysts recommended the stock precisely for this reason.   On October 17, 2006, for example, Sun Trust analyst Robinson Humphrey initiated coverage of Huron with a "Buy rating" because Huron "operates at superior margins at every level of the income statement despite its relatively small size."   ¶31.   Other analysts echoed this sentiment, stating that: "the outperformance was driven by revenue and by profit margins" ¶79;   "outperformance was driven by better-than-expected revenue growth and profit margins" ¶110; and Huron continued beating analyst expectations, "primarily due to a better-than expected gross margin" ¶95.   *See, e.g., In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 725-26 (S.D. Ohio 2006) (holding that because the particular line items manipulated "were analysts' and investors' primary area of focus . . . , [the company's] alleged manipulation of these areas raises a strong inference of . . . scienter"); *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 979 (S.D. Ind. Sept. 12, 2007) ("plaintiffs have alleged in detail repeated and prolonged concealment and deception concerning some of the largest and most critical issues that the new [company] management team confronted. The combination of the nature,

---

[20] The other cases relied on by Defendants for this point are also inapposite. *See DiLeo,* 901 F.2d at 627 (finding it impossible to tell from the complaint why plaintiffs believed that "the problems were so apparent that reserves should have been jacked up" and "why failure to increase the reserves amounted to fraud."); *In re Career Educ. Corp.*, No. 03-c8884, 2007 WL 1029092, at *1 fn. 3 (N.D. Ill. Mar 29, 2007) (noting that the restatement was "not a focus of plaintiffs' third amended complaint."); *In re Allscripts, Inc. Sec.Litig.*, No. 00c6796, 2001 WL 743411, at *11 (N.D. Ill. June 29, 2001) (finding in a case that did not involve a restatement that "the amount of [improperly recognized] revenue is modest in comparison to the [c]ompany's total revenue.")

duration, scope, and financial magnitude of the alleged misstatements and omissions provides a sufficient foundation for the required strong inference of . . . scienter.").

**E.      Holdren's and Burge's Forced Resignations Further Support a Strong Inference of Scienter**

"[W]hen corporate reshuffling occurs in tandem with financial restatements, these changes add one more piece to the scienter puzzle." *In re UTStarcom, Inc. Secs. Litig.*, 617 F. Supp. 2d 964, 975-976 (N.D. Cal. 2009) (internal quotations omitted); *see also Sw. Carpenters Pension Trust v. Merge Techs., Inc.*, Case No. 06-c-349, 2008 U.S. Dist. LEXIS 108223, at *21 (E.D. Wis. Mar. 31, 2008) ("[R]esignations 'add to the overall pleading of circumstantial evidence of fraud.'" (quoting *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370 (S.D.N.Y. 2007))).[21]

Here, the circumstances of the Individual Defendants' "resignations" strongly support an inference of scienter.  Defendant Holdren and Burge "resigned" their positions, without receiving the more than $22 million in severance to which they were collectively entitled, on the very same day that the Audit Committee and the Board concluded that Huron's financial statements were materially inaccurate and needed to be restated.  ¶¶64-65.  Such severance could only be withheld if their employment was terminated for good cause or if they resigned for a reason that was not a strictly defined "good reason."[22]  ¶65.

There are no allegations in the Complaint (or contentions in the Motion to Dismiss) from which the Court could draw the plausible inference that Holdren or Burge resigned for a "good"

---

[21] *See also In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 534 (S.D.N.Y. 2009); *Middlesex Ret. Sys. v. Quest Software, Inc.*, Case No. CV 06-6863 DOC (RNBx), 2008 WL 7084629 (C.D. Cal. July 10, 2008).

[22]  The defined "good reasons" were (i) any material breach of the Employment Agreement by the Company; (ii) any material adverse change in status, position or responsibilities of the Executive; (iii) assignment of duties to the Executive that are materially inconsistent with the Executive's position and responsibilities described in the Employment Agreement; or (iv) requiring the Executive to be principally based at any office or location more than fifty (50) miles from the current offices of the Company in Chicago, Illinois.  *See* Def. Ex. T, at 8.

reason under their employment agreements.   Indeed, the Company itself has admitted that the

Individual Defendants were forced to resign because of the magnitude of the accounting errors.   ¶8.

Thus, the only plausible inference that can be drawn from Holdren's and Burge's departure from

Huron without any severance is that they were terminated for cause, defined as: "the Executive's

misconduct that results in material financial detriment to the Company or its affiliates or a material

detrimental effect on the business or the reputation of the Company or its affiliates."   ¶65 (quoting a

publicly disclosed Amended and Restated Senior Management Agreement, dated January 29, 2007).[23]

Indeed, it would be ludicrous to contend that Holdren and Burge voluntarily forfeited more than $22

million in severance to which they would otherwise be entitled.   It is far more plausible, and

compelling, that the Individual Defendants were terminated for cause.

Defendants further rely on cases holding that "[w]here a resignation occurs slightly before or

after the defendant corporation issues a restatement, a plaintiff must plead facts refuting the

reasonable assumption that the resignation occurred as a result of restatement's issuance itself in order

for a resignation to be strongly indicative of scienter."   Def. Br. at 31 (quoting *Zucco Partners*, *LLC v.*

*Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009)).   Not only is that not the law in this Circuit, but

Lead Plaintiffs have pled numerous facts establishing that it was not merely the restatement itself that

led to the termination of Holdren and Burge, but the facts necessitating the restatement – including

Huron's admission that "senior management <u>was aware</u> of the redistributions" at issue.[24]

---

[23] This also sets this case apart from *In re Bally Total Fitness Secs. Litig.*, No. 04C3530, 2007 WL 551574
(N.D. Ill. Feb. 20, 2007) (*Bally II*), on which Defendants heavily rely.   In *Bally II* there were documents
definitively showing that one of the officer defendants resigned, and was not terminated.   *Id.* at *5.

[24] Defendants claim that the fact that Holdren and Burge did not formally leave the Company until a few
months after their resignations were announced weakens the inference of scienter.   Def. Br. at 32.   This does
not, and also ignores the facts that: (1) the resignations were announced contemporaneously with the
announcement of the accounting errors; and (2) that keeping senior management employed for a short
transition time while new management became acquainted with the practices and protocols of the company
would be not only reasonable, but likely necessary.   *Cf. Middlesex*, 2008 WL 7084629, at *2, 9-10 (finding

### F.    Holdren's Massive Insider Trading Further Supports a Strong Inference of His Scienter

Although allegations that a defendant had the motive and opportunity to benefit from a fraud are not necessary to plead scienter, the Complaint alleges that Holdren engaged in significant, suspicious insider trading during the Class Period, which further supports a strong inference of scienter.  *See Tellabs*, 551 U.S. at 325 ("personal financial gain may weigh heavily in favor of a scienter inference.").[25]   Stock sales that are unusual or suspicious may constitute circumstantial evidence of scienter.  *Pugh*, 521 F.3d at 695.  The amount of stock sold, the amount of profit made, and whether the sales were consistent with prior trading practices are each relevant factors in determining whether insider sales should be deemed unusual.  *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277 (3d Cir. 2006).

The Complaint alleges that Holdren personally profited from the fraud by selling more than 275,000 shares of Huron stock – 21% of his holdings – at artificially inflated prices during the Class Period for proceeds in excess of $16 million.  ¶¶72-73.  The Complaint further alleges that such sales were dramatically out of line with prior trading practices because, prior to the Class Period, Holdren did not sell <u>any</u> shares.  ¶74.  These allegations are sufficient to demonstrate Holdren's scienter.[26]  The

---

that resignation "four months" after announcement of fraud was still probative of scienter).

[25] Lead Plaintiffs' motive allegations are also supported by the fact that both Holdren and Burge received substantial cash bonuses and stock awards during the Class Period as a result of Huron's artificially inflated performance.  ¶154; *see Ustian*, 2009 WL 2386156, at *10 ("Personal profit, coupled with [other] motives . . . lend weight to not only a cogent inference of scienter, but a compelling one.").

[26] *See, e.g.*, *Asher v. Baxter Int'l, Inc.*, No. 02-5608, 2005 WL 331572, at *2, 8 (N.D. Ill. Feb. 3, 2005); *Tatz v. Nanophase Techs. Corp.*, No. 01-8440, 2002 WL 31269485, at *6-7 (N.D. Ill. Oct. 9, 2002); *In re Spyglass*, 1999 WL 543197, at *6-7 (N.D. Ill. Jul. 21, 1999).  Defendants' arguments to the contrary are without merit.  Def. Br. at 37.  Unlike the cases cited by Defendants, this case is not primarily about insider selling, and courts have found scienter based on insider selling allegations that are orders of magnitude less significant than those here.  *See, e.g.*, *In re Qwest Communs. Int'l, Inc. Secs. Litig.*, 396 F. Supp. 2d 1178, 1196 (D. Colo. 2004) ("$410,000 is a substantial sum, and reasonably can be seen as a significant gain from the alleged deception.").  Moreover, the magnitude of Holdren's sales on a percentage-of-holding basis – 21% of his holdings – is also well above what courts have held sufficient to demonstrate scienter.  *See, e.g.*, *Batwin v. Occam Networks, Inc.*, No. 07-2750, 2008 WL 2676364, at *14 (C.D. Cal. July 1, 2008) (sale of

33

stock sales were also unusual because they were made at the same time Holdren touted Huron's supposed earnings growth (¶¶73, 86, 92, 106, 109, 112).  *See Spyglass*, 1999 WL 543197, at *6 (stock sales unusual "where defendants are publicly indicating that prospects for the company are improving.  If defendants sincerely believed such statements, they would be motivated to hold the stock, not sell it.").

Defendants raise several specious contentions to try to soften the impact of Holdren's substantial insider trading, each of which should be rejected.  First, Defendants argue that the pre-Class Period is too small to draw meaningful inferences.  Def. Br. at 36.  However, the duration of the pre-Class Period – over 18 months – is longer than periods other courts have considered in comparing class period and pre-class period trading activity.  *See, e.g.*, *In re Quintel Entm't Inc. Sec. Litig.*, 72 F. Supp. 2d 283, 296 (S.D.N.Y. 1999); (examining stock sales for the fourteen months prior to class period); *Cardinal Health,* 426 F. Supp. 2d at 732 (pre-class period that was half as long as class period was sufficient to show unusual trading).  Moreover, the absence of any sales by Holdren during the pre-Class Period is completely inconsistent with <u>any</u> comparable timeframe during the Class Period.  In fact, during the Class Period, the fewest number of shares Holdren sold during a period of time equal to the pre-Class Period is 93,420, resulting in a recovery of almost $5.2 million.  ¶73 (May

---

18% of defendants' collective holdings held sufficient to show scienter, including for one defendant who sold only 7% of his holdings for $34,541); *Ross v. Abercrombie & Fitch Co.*, 501 F. Supp. 2d 1102, 1117 & n.5 (S.D. Ohio 2007) (inference drawn from insider sales was "at least as compelling" as the one from the fact that defendants retained between 73% and 74% of their holdings); *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1313 (C.D. Cal. 1996) (20% of holdings sold for $6.3 million held sufficient); *see also Takara Trust*, 429 F. Supp. 2d at 977 n.10 ("with regard to stock sales as evidence of scienter, the Seventh Circuit refused to hold that one percent of a defendant's stock was *per se* too little"). Finally, Holdren's consistent sales throughout the Class Period suggests that he would have continued to sell shares had the Audit Committee not discovered the fraud.  *See Middlesex*, 527 F. Supp. 2d at 1185 ("As the alleged scheme took place over several years, there was no reason for Defendants to quickly sell large percentages of their shares"); *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 15 (D. Mass. 2004).
.

15, 2007 – November 28, 2008).  Thus, there is no question that Holdren's sale of 275,500 shares

during the Class Period was dramatically out of line with the total absence of sales before the Class

Period.[27]

Defendants also challenge the insider trading allegations on the ground that some of Holdren's

shares were allegedly acquired as compensation (a fact drawn from outside the Complaint).  Def. Br.

at 36.  However, none of Defendants' cited authority supports their position that the source of an

executive's stock would be relevant to a motive analysis.[28]  Whether Holdren acquired stock as

compensation, as a gift, or through a purchase, the financial incentive from a sale of that stock is the

same.  Defendants also rely on materials outside the Complaint to claim Holdren sold some of his

stock pursuant to a non-discretionary § 10b5-1 trading plan.  Even if true, the existence of a § 10b5-1

trading plan does not negate an inference of scienter at this phase of the litigation.  *See, e.g.*, *Stocke v.*

*Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1193 (D. Nev. 2009) ("[A] 10b5-1 trading plan does not

provide an absolute defense to a claim of insider trading.  Rather, it requires an additional factual

finding of good faith.  Not only can [the court] not make such factual findings when considering a

motion to dismiss, but [the court] must also draw all inferences in favor of the non-moving party.");

---

[27] Defendants claim that Holdren and Burge were not permitted to sell their shares for a portion of the pre-Class Period due to alleged lock-up periods (and concede that they could indeed sell stock for much of the pre-Class Period).  (Def. Br. at 36 n.24.)  However, that allegation does not appear in the Complaint and Defendants may not rely on matters outside of the pleadings to prove the truth of their contents, as this Court recently held.  *See Corus Bankshares*, 2010 WL 1338070, at *9 n.3; *see also Rubenstein v. Collins*, 20 F.3d 160, 170 n.38 (5th Cir. 1994) (defendants' explanations for stock sales were inappropriate at motion to dismiss because it is "impossible" for a court to consider such evidence at pleading stage); *In re Hi/fn Inc. Sec. Litig.*, No. 99-4531, 2000 WL 33775286, at *10 (N.D. Cal. Aug. 9, 2000) ("[A]lthough defendants assert that adequate explanation exist for the timing of their stock sales, the Court concludes that plaintiffs' allegations present questions of fact as to those explanations which are not best resolved on a motion to dismiss.").  In any event, even assuming it is true that Holdren and Burge could not sell stock throughout the pre-Class Period, that fact is irrelevant because, as Defendants admit, there were times during the eighteen-month period in which they <u>could</u> sell stock.

[28] Defendants cite *Pugh* and *Burlington*, which held that suspicious stock sales can support an inference of scienter but made no distinction between sales of stock received as compensation and sales of stock received in other ways.  *Pugh*, 521 F.3d at 695; *Burlington*, 114 F.3d at 1424.  Here, the sales are suspicious primarily because they are significant in quantity and are inconsistent with Holdren's pre-Class Period activity.

*accord UTStarcom,* 617 F. Supp. 2d at 976 n.16; *In re Able Labs. Sec. Litig.*, No. 05-2681, 2008 WL

1967509, at *27 n.40 (D.N.J. Mar. 24, 2008); *In re Infosonics Corp. Derivative Litig.*, No. 06-136,

2007 WL 2572276, at *9 (S.D. Cal. Sept. 4, 2007); *Cardinal Health*, 426 F. Supp. 2d at 734.[29]

Defendants' other arguments also lack merit.  First, the fact that Holdren's sales occurred

throughout the Class Period does not undermine an inference of scienter, but is entirely consistent

with the ongoing nature of the fraud alleged in this case.  Here, Holdren was not able to dump all his

stock just before the several-year fraud came to light because he could not predict when the fraud

would be revealed.  ¶7.  *See Middlesex Ret.,* 527 F. Supp. 2d at 1185-86 (because the nature of the

several-year fraud scheme "was such that there was no preordained date on which the allegations . . .

would be revealed" the timing of stock sales were "of little significance").[30]  Second, Defendants

argue that some of Holdren's sales were made by the "Holdren Family Trust" and therefore should

not be considered.  Def Br. at 38 n.25.  Yet again, this assertion is based on Defendant-friendly

inferences on facts outside of the Complaint and should be ignored.  In any event, there is no dispute

that the shares allegedly held by the Trust were reported as being "beneficially owned" by Holdren

himself, which raises the logical inference that Holdren had the direct or indirect power to dispose of

those shares.  Def. Ex. V.[31]  Finally, Defendants also rely on other material outside of the Complaint

to claim that one of Holdren's numerous stock sales was made in order to pay taxes.  Def Br. at 37.

Even if the Court were to consider the Defendants' extraneous material, which is wholly improper as

---

[29] Defendants cite three cases in which courts held that sales pursuant to a § 10b5-1 trading plan were not suspicious.  Def. Br. at 37.  However, those courts did so apparently without considering whether such a determination was proper at the pleading stage.  The courts that have squarely confronted that question, cited above, have held that a determination at the pleading stage is improper.

[30] At any rate, the timing of Holdren's sales was indeed suspicious.  For example, Holdren went on a selling spree – selling over 100,000 shares – during the second half of 2008, when the fraudulent inflation of Huron's financials was at its peak.  ¶¶32, 73.

[31] *See also* 17 C.F.R. § 240.13d-1(a) (requiring filing of Schedule 13D when a person acquires beneficial ownership of shares); *id*. § 240.13d-3(a) (defining "beneficial owner" as one who has voting power and/or investment power, which includes the power to dispose of the security).

discussed above, Defendants' argument would only apply to a single transaction comprising merely 5% of the total proceeds from Holdren's class period sales, so its impact on the Court's analysis would be de minimis. Thus, Defendants' arguments should be rejected.

### G. The Detailed Statements from Confidential Sources Also Raise a Strong Inference of Defendants' Scienter

Allegations based upon Confidential Witnesses ("CWs") provide further evidence of scienter where, as here, the Complaint describes with particularity the bases for the CWs' knowledge and that the witnesses were in a position to know that information. *Tellabs II*, 513 F.3d at 711-12. Where, as here, the accounts of multiple confidential sources are corroborated by multiple sources – including one another – the inference of scienter is strengthened. *Id.*, 513 F.3d at 712 (approving of confidential source information "set forth in convincing detail" and that is "corroborated by multiple sources") [32]

### 1. The Statements of the Confidential Witnesses Are Probative of Scienter

The CW statements in the Complaint further demonstrate that the Defendants either knew or recklessly disregarded the employee compensation expenses associated with the acquired firms. For instance, CW 3, a Director of Restructuring at Huron during the Class Period, confirmed that Huron's acquisitions of other firms were handled personally by Holdren and that "[n]othing got approved without Holdren's say so – including the final deals for the acquisitions." ¶59. CW 3 further described Holdren as "cutting deals with selling shareholders and employees – including stay bonuses." ¶59. That Holdren was intimately involved in the transactions at the core of this case was further confirmed by CW 5, a Director at Huron and S&W during the Class Period, who explained that Holdren personally negotiated the sale of S&W with S&W's co-founders, including the "sign on"

---

[32] Defendants' reliance upon *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753 (7th Cir. 2007) to argue that CWs must be "steeply discounted," (Def. Br. at 25), ignores the fact that *Tellabs II* "circumscribes *Higginbotham's* broad pronouncement that confidential witness allegations will 'usually' be steeply discounted, clarifying that the weight accorded to anonymous sources will depend in large part on the level of detail with which they are described." *Inst'l Inv's Group v. Avaya, Inc.*, 564 F.3d 242, 262 (3d Cir. 2009).

and retention bonuses for former S&W employees.  ¶60.  CW 7, an accounting director at Huron throughout the Class Period, further explained that Lipski and Burge would have been involved in the accounting for the payments at issue, and that Holdren was "involved in every facet of the business, including Investor Relations, M&A, etc."  ¶61.

Each of these CW statements is probative of Holdren's and Burge's knowledge of the transactions at issue.  Accordingly, their statements that:  (1) the final deals of the acquisitions did not get approved without Holdren's approval; (2) Holdren personally handled the deals with the selling shareholders; and (3) Lipski and Burge were involved in the accounting for the payments at issue, are indicative of Holdren's and Burge's knowledge of the terms of the acquisition-related payments.[33]

Moreover, a strong inference of scienter is bolstered because the witnesses' accounts corroborate one another, as well as Huron's own admissions in the Restatement.  *See, e.g., Tellabs II*, 513 F.3d at 712; *In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861, 874-75 (D. Minn. 2007).  The CW statements, taken collectively, further paint a detailed picture of a Company in which the Individual Defendants "manage[ed] to meet earnings," "us[ed] accounting issues to inflate their earnings and exploit some of the accounting rules under FAS," were "very hands-on" in their management style, and participated in monthly accounting meetings with every Huron department to go over the financials and status of each department (¶¶59-61).  *See Silverman v. Motorola, Inc.*, No. 07C4507, 2008 WL 4360648, at *14 (N.D. Ill. Sept. 23, 2008) (recognizing that, although "general statements . . ., by themselves, are not enough to create a 'strong inference' of scienter," they can be considered collectively); *Schleicher*, 529 F. Supp. 2d at, 972 (denying motion to dismiss where, as here, "plaintiffs . . . have not relied solely on such (temporarily) confidential witnesses, but have used such witnesses to corroborate information from other sources").

---

[33] Defendants ignore these CW statements in their motion, however, instead focusing on the CW statements that describe the background or general management style of the Defendants.  *See* Def. Br. at 28-30.

38

2.      **The Witnesses Were in a Position to Know the Information Provided and Are Described with Requisite Particularity**

The Complaint describes with particularity the witnesses' titles, positions and tenure at Huron and the basis for the witnesses' knowledge.  ¶¶59-63.  Based on these descriptions, the witnesses were in a position to know the information attributed to them.  *Id.*  For example, CW 5 was a director at both Huron and the acquired company S&W during the Class Period.  Accordingly, he was ideally situated to observe how that acquisition occurred, who was involved and who was informed of the particularities of the acquisition (in fact, it is hard to imagine someone who would have been in a better position to do so).  Similarly, as an accounting director of Huron during the Class Period, CW 7 had firsthand knowledge of who at Huron was aware of and participated in the Company's accounting.[34]  Accordingly, the CW accounts easily meet the Seventh Circuit's requirements because they "are numerous and consist of persons who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify."  *Tellabs II*, 513 F.3d at 712.[35]

This is wholly consistent with the Court's ruling in *Last Atlantis Capital LLC v. AGS Specialist Partners*, 533 F. Supp. 2d 828 (N.D. Ill. 2008), where allegations sourced by a lone confidential witness whose tenure and basis for his or her knowledge were "vague" and were not "corroborated by multiple sources," (and therefore not indicative of "the source's insight into the

---

[34] This stands in contrast to the cases cited by Defendants where the confidential source's position was completely unrelated to the information provided by the source.  *See* Def. Br. at 27 (citing *City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*, 388 F. Supp. 2d 932, 944 (S.D. Ind. 2004) (rejecting statements by a marketing representative regarding inflation of school students' grades); *In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1163 (S.D. Cal. 2008) (rejecting statements by an engineer regarding accounting issues)).

[35] Defendants cite to *In re Dell, Inc. Sec. Litig.*, 591 F. Supp. 2d 877, 895 (W.D. Tex. 2008), arguing that the CWs are of limited relevance since many of them did not work at Huron throughout the entire Class Period. Def. Br. at 27.  *Dell* makes clear, however, it is only for those times that a confidential source is not employed by the Defendants that such source's statements are of limited relevance.  *See Dell*, 591 F. Supp. 2d at 895-96 (finding that statements made by source that "did not even work for Dell during the class period" are not probative of scienter).  Here, all of the CWs were employed by Huron during the Class Period and their statements are probative of scienter regarding the time periods during which they were employed.

39

alleged actions taken by defendants") were discounted, but not ignored.  *Id.*  Unlike in *Last Atlantis*, here there are statements attributed to CWs whose positions and tenure with the Company put them in positions to have great insight into the Defendants' actions and have been corroborated by Defendants' own subsequent admissions in the Restatement.  These facts put to rest any doubt as to the reliability of the CWs' statements and further giving rise to a strong inference of scienter.

## V.    **CONCLUSION**

Considering all the allegations of Defendants' knowledge or recklessness collectively, the Complaint gives rise to a strong inference of scienter at least as compelling as any non-culpable inference.[36]  Accordingly, for the reasons stated herein, Defendants' motion should be denied.[37]

---

[36] As shown herein, plaintiffs have alleged primary violations of Section 10(b) and Rule 10b-5.  Those primary claims, coupled with the Complaint's allegations that the Individual Defendants controlled the Company (*see* ¶¶70-72) – which the Defendants do not contest – are sufficient to state an Exchange Act §20(a) violation.  *Foss v. Bear Stearns & Co., Inc.*, 394 F.3d 540, 543 (7th Cir. 2005).

[37]   While the Complaint cleary should be sustained, if the Court dismisses any of Lead Plaintiffs' claims, Lead Plaintiffs should have the opportunity to replead.  Fed. R. Civ. P. 15(a).

Respectfully submitted,

Dated:  May 14, 2010

**COHEN MILSTEIN SELLERS**
  **& TOLL PLLC**

By: /s/ Carol V. Gilden_____
Carol V. Gilden
190 South LaSalle Street, Suite 1705
Chicago, Illinois 60603
Tel.: (312) 357-0370
Fax:  (312) 357-0369
cgilden@cohenmilstein.com
Attorney ID: 06185530

-and-

Steven J. Toll
Daniel S. Sommers
Matthew K. Handley
Joshua M. Kolsky
1100 New York Avenue N.W.
West Tower, Suite 500
Washington, DC 20005-3964
Tel: (202) 408-4600

**LABATON SUCHAROW LLP**

By: ___/s/ Javier Bleichmar_____
Christopher J. Keller
Javier Bleichmar
Sidney S. Liebesman
140 Broadway
New York, NY 10005
Tel:  (212) 907-0700
Fax:  (212) 818-0477

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**

By:  /s/   Avi Josefson_____
Steven B. Singer
Jerald D. Bien-Willner
Jeroen van Kwawegen
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel: (212) 554-1400
Fax: (212) 554-1444

-and-

Avi Josefson
2835 N. Sheffield Avenue, Suite 409
Chicago, Illinois 60657
Tel: 773-883-5382

***Co-Lead Counsel for the Court-appointed Lead
Plaintiffs and the Class***

41

## <u>CERTIFICATE OF SERVICE</u>

     I, Carol V. Gilden, hereby certify that on this 14th day of May, 2010, in accordance with Federal Rule of Civil Procedure 5(a) and Northern District of Illinois L.R. 5.5 and 5.9, I caused a copy of the foregoing to be electronically filed with the Clerk of Court and served on all counsel of record through the Northern District of Illinois' CM/ECF system

/s/   Carol V. Gilden
  Carol V. Gilden
  COHEN  MILSTEIN
   SELLERS & TOLL PLLC
  190 South LaSalle Street, Suite 1705
  Chicago, IL 60603
  Tel.:  (312) 357- 0370
  Fax:  (312) 357- 0369
  cgilden@cohenmilstein.com
  Attorney ID:  06185530

42