IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JASON HUGHES, Individually and on )
behalf of all others similarly )
situated, )
                )
       Plaintiffs, )   No. 09 C 4734
                )
   v. )
                )
HURON CONSULTING GROUP, INC., GARY )
E. HOLDREN, GARY L. BURGE, AND WAYNE )
LIPSKI. )
                )
       Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiffs have brought a class action pursuant to the Private Securities Litigation Reform Act ("PSLRA"), in which they assert that defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act, and SEC Rule 10b-5. Before me is defendants' motion to dismiss the complaint, which I deny for the following reasons.

I.

Defendant Huron is a corporation founded in 2002 by a number of partners and professionals formerly employed by Arthur Andersen, the well-known business and financial services firm that collapsed in the wake of the Enron accounting scandal.[1] Huron describes itself in public filings as "a leading provider of consulting

---

[1]Unless otherwise noted, the facts recited here are taken from the complaint and are presumed to be true, as is appropriate on a motion to dismiss. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007).

services," providing, among other services, accounting and
financial consulting services to corporate clients across a variety
of industries.  Huron's Form 10-K/A, Declaration of J. Wes
Earnhardt, Exh. A at 6-7.  These services include "assist[ing]
corporations with complex accounting and financial reporting
matters," including in the area of acquisitions and divestitures.
*Id*. at 7.  Defendants Holdren, Burge, and Lipski are three of
Huron's former senior managers.[2]

On July 31, 2009, Huron announced that it would restate its
financial results for the fiscal years 2006, 2007, and 2008, as
well as for the first quarter of 2009, due to improper accounting
of payments made in the course of Huron's acquisition of other
companies.  The restatement revealed that in several instances,
Huron had accounted for payments made to selling shareholders of
the acquired firms as "goodwill."[3]  This accounting treatment was
highly advantageous to Huron, since goodwill--unlike expenses--does
not offset income.  As the company acknowledged in the restatement,
however, a number of its payments to selling shareholders did not
meet the requirements for goodwill treatment under Generally

---

[2]Plaintiffs assert only the Section 20(a) claim against
defendant Lipski.  Because defendants' challenge to the complaint
focuses on the scienter requirement of Section 10 and Rule 10b-5,
unless otherwise noted, references in this opinion to the knowledge
or intent of "individual defendants" are only to defendants Holdren
and Burge.

[3]"Goodwill" is the difference between the purchase price paid
for a business and the fair value of the net assets acquired.

Accepted Accounting Principals ("GAAP"), and should instead have been booked as expenses.[4] Huron's restatement further revealed that its improper accounting had allowed it to report aggregate net income during the thirteen quarter period at issue that was nearly double what it would have been if Huron's accounting had been in accordance with GAAP.  The restatement caused Huron's stock prices to collapse, plummeting nearly 70% on the first trading day after it was announced, and causing massive losses to investors.

Under GAAP, acquisition-related payments may be booked as goodwill only if the payments are made exclusively to the selling shareholders (i.e., not to non-shareholding employees); in proportion to the shareholders' respective ownership interests; and without strings attached, such as continued employment or the achievement of performance goals.  Plaintiffs cite Financial Accounting Statement No. 141 ("FAS 141"), *Business Combinations*, in force at the relevant time, which states, "If the substance of the agreement for contingent consideration is to provide compensation for services....the additional consideration given shall be

_____

[4]This is not quite how defendants characterize the accounting error.  They insist that the payments Huron made to selling shareholders were appropriately accounted for as goodwill and were not restated, and that the restatement was required only because of the later redistribution by the selling shareholders of Huron's original payments.  I see no meaningful distinction, however, since Huron acknowledges that its senior management knew (in at least some cases) that the payments would be redistributed, and defendants do not contend that whether the payments were made directly or indirectly to the end recipients makes a difference under the relevant GAAP principles.

recognized as an expense of the appropriate periods." Plaintiffs argue that this provision made clear that an acquiring company may not include future salaries or bonuses of selling shareholders as part of the cost of acquisition.

In its restatement, Huron acknowledged that, inconsistently with GAAP, some payments it made to selling shareholders were redistributed disproportionately to the shareholders' ownership interests, as well as to non-shareholding employees of the acquired companies and to Huron employees hired after the acquisition. Huron further acknowledged that at least some payments were dependent, in part, on continued employment with the company, or on the achievement of personal performance goals.   Huron also acknowledged that at least some of these redistributions were made with the knowledge of Huron's senior management, which "either misunderstood or misapplied the appropriate accounting guidance." Earnhardt Decl. Exh. A at 2.

## II.

A motion to dismiss tests the sufficiency of the complaint, not its merits. *See, e.g., Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990).   In resolving a Rule 12(b)(6) motion that challenges a complaint brought under Section 10(b), I must, as with any motion to dismiss, accept all factual allegations in the complaint as true.   *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007).   A plaintiff proceeding under the PSLRA,

4

which Congress intended "to screen out frivolous suits, while allowing meritorious actions to move forward," *id*. at 324, is subject to heightened pleading standards. *Id*. at 324.  This means that "any private securities complaint alleging that the defendant made a false or misleading statement must...'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' § 78u-4(b)(2)." *Id*. at 321.  It is in this respect that defendants contend plaintiffs' complaint is lacking.

In *Tellabs*, the Supreme Court fleshed out the PSLRA's requirement that scienter be pled with particularity, holding that plaintiffs "must plead facts rendering an inference of scienter *at least as likely* as any plausible opposing inference." *Tellabs*, 551 U.S. at 328 (original emphasis).  The Court emphasized that "[t]he inquiry...is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Id*. at 322-23 (original emphasis).  As the Court explained, "[t]he strength of an inference cannot be decided in a vacuum.  The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?" *Id*. at 323. Although the inference of scienter must be more than merely "reasonable," it need not be irrefutable,

or even the "most plausible of competing inferences." *Id*. at 324. It must, however, be "cogent and compelling." *Id*.

In their complaint, plaintiffs group the factual allegations of scienter into five categories: 1) the individual defendants' extensive accounting knowledge and the "straightforward" nature of the accounting rule defendants violated; 2) the statements of confidential witnesses attesting to the actual knowledge or recklessness of the individual defendants; 3) the resignation without severance of the individual defendants; 4) defendants' misrepresentations to their outside auditors; and 5) "unusual and suspicious" insider stock sales by Holdren.[5]  The parties devote the majority of their copious briefs (each side having sought and been granted leave to file oversized briefs) to bickering about whether these types of allegations are or are not sufficient to support a "strong inference of scienter."  Indeed, both sides have marshalled abundant authority for their respective positions on the strengths of the individual categories.  While the reasoning in these cases may be instructive, however, none suggests a dispositive bright-line rule.  Nor could they: the Supreme Court has taken pains to make clear that "the inquiry is inherently comparative," and competing inferences must be assessed on the basis of the underlying facts, taken as a whole. *Tellabs*, 551 U.S.

---

[5]Plaintiffs also make passing reference to unspecified bonuses received by the individual defendants, but these allegations are not fleshed out enough to warrant comment.

at 323-24. Ultimately, while I agree that certain of the allegations, standing alone, may not create a "strong inference" of scienter, I find that taken together, in light of plaintiffs' theory of the case, the allegations are sufficient to entitle them to discovery.

In their battle over the trees, the parties largely lose sight of the forest of plaintiffs' theory. Plaintiffs claim that defendants' improper accounting of acquisition-related payments was a deliberate attempt to manipulate these transactions in a manner that allowed Huron to have its cake and eat it, too. Huron "incentivized" key personnel at the acquired firms to remain at Huron post-acquisition by offering retention and performance bonuses, while disguising these payments as "goodwill," rather than accounting for them as what they were: employee compensation expenses. In this way, defendants "hid" substantial expenses from investors, making the company appear more profitable than it really was. Crucial to plaintiffs' theory is the allegation that as the acquisitions were taking place, defendants had "contemporaneous knowledge" of side agreements among selling shareholders to reallocate material amounts of Huron's acquisition payments 1) among themselves in amounts disproportionate to their ownership, and 2) to employees who were not eligible recipients of "goodwill" payments.

7

Huron acknowledges all of these facts in its restatement, and it also acknowledges that although its senior management was aware of at least some of the redistribution agreements, the managers did not disclose the agreements to Huron's independent auditors. Thus, Huron admits many of the essential facts on which plaintiffs' theory of liability rests, leaving only the question of whether the defendants appreciated (or, at a minimum, recklessly disregarded) the accounting implications of the redistribution agreements. Still, defendants insist that the improper accounting was nothing more than an innocent mistake in the application of "complicated" accounting rules, which "counter-intuitively" imputed to Huron payments it did not itself make.

Defendants' lengthy and notably fact-intensive argument about the "complexity" of the accounting principles at issue is misplaced in the context of this dispute. To begin with, if anyone could have understood the requirements under GAAP for treating acquisition-related expenses as goodwill, it was defendants. At the very least, once defendants became aware of the "side agreements" among selling shareholders (if, indeed, defendants were not active participants in the creation of such agreements, as discussed below), they certainly had the wherewithal to appreciate that the redistribution of Huron's acquisition-related payments could materially affect Huron's accounting for those payments. "When the facts known to a person place him on notice of a risk, he

cannot ignore the facts and plead ignorance of the risk." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008)(citing *AMPAT/Midwest, Inc. v. Illinois Tool Works* Inc., 896 F.2d 1035, 1042 (7th Cir. 1990)). Yet in this case, with knowledge of the side agreements and the understanding that purportedly "complex" accounting principles guided the treatment of such agreements, defendants not only went ahead to account for Huron's payments to the selling shareholders just as if no side agreements existed, but also failed to disclose the agreements to their independent auditors. It would be a remarkable coincidence indeed if the very agreements that undermined defendants' favorable accounting treatment were the items defendants innocently omitted from review by Huron's auditors.

Moreover, the notion that defendants were unaware of the accounting consequences to Huron of the selling shareholders' redistribution agreements is difficult to credit in light of the respective effects those agreements had on Huron, on the one hand, and the selling shareholders on the other. As noted above, Huron benefitted handsomely from the selling shareholders' redistribution of Huron's payments because those payments could then be used to entice key employees to stay with the company (and to achieve their performance goals), without Huron's having to account for additional employment-related expenses. The selling shareholders, on the other hand, were obvious losers under the deal: the

redistribution caused them to forego a portion of Huron's payments to them.  One cannot help wondering why the selling shareholders would agree to give away a portion of their acquisition proceeds, unless doing so were a negotiated condition of the acquisition. Defendants offer no alternative explanation.  The inference that these extremely sophisticated accounting and financial professionals identified an accounting "loophole," which they knew to be improper but believed could be papered over with side agreements, is at least as compelling as the inference that they innocently failed to appreciate that their accounting was inconsistent with GAAP.  Moreover, Huron's public explanation for the accounting error--though stopping shy of acknowledging deliberate malfeasance on the part of Huron's senior management-- states that management "misunderstood *or* misapplied" GAAP. Earnhardt Decl. Exh. A at 2. (Emphasis added) Although defendants obviously focus on "misunderstood," this statement clearly contemplates the possibility that management understood but deliberately misapplied the applicable principles.

Nevertheless, defendants insist that plaintiffs plead nothing more than a "must have known" theory, based on allegations of defendants' accounting and financial expertise.  Citing *In re Bally Total Fitness Sec. Litig.*, No. 04 C 3530, 2006 WL 3714708 at *9 (N.D. Ill. July 12, 2006); *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 595 F. Supp. 2d 1253, 1277 (M.D. Fl. 2009);

and *Branca v. Paymentech, Inc.*, No. Civ.A.3:97-CV-2507-L, 2000 WL 145083, at *10 n.20, *11 (N.D. Tex. Feb. 8, 2000), defendants argue that such allegations are insufficient to plead scienter.  This argument is without merit.  To be sure, allegations that defendants possess a "background in accounting" (as alleged in *Bally*), "generalized accounting knowledge" (as alleged in *Goodman*), or "accounting and finance training" (as alleged in *Branca*), do not amount to particularized allegations compelling a "strong inference" of fraud.  In this case, however, I understand plaintiffs' description of defendants' professional experience not as proof of their fraudulent acts, but rather as the canvas upon which the *tableau* of fraud is painted.  As stated above, the concrete fraud plaintiffs allege is defendants' goodwill accounting for acquisition payments in spite of their knowledge of (or, indeed, involvement in), side agreements that rendered goodwill accounting for those payments improper.  Surely defendants' self-proclaimed expertise in transactions of precisely the type they claim to have innocently (and massively) flubbed in this case is within scope of the "underlying facts" I may--and indeed must--consider in assessing which of the competing inferences asserted is the more compelling.  *Tellabs*, 551 U.S. at 323.

I conclude in view of the foregoing considerations that plaintiffs have adequately pled scienter.  To the extent the particular factual allegations not expressly addressed here--the

11

statements of confidential witnesses, the suspiciously timed stock trades, and the individual defendants' resignations--may further contribute to a "strong inference" of scienter, these allegations are merely icing on the cake, and I need not linger on whether they are sufficient, alone or in combination, to plead scienter. Taking the complaint as a whole, I am satisfied that plaintiffs have stated a claim under Section 10(b) and Rule 10b-5.[6]

III.

For the foregoing reasons, defendants' motion to dismiss is denied.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: August 6, 2009

---

[6]Defendants make no independent argument for the dismissal of the Section 20(a) claim, other than to say that it falls with their Section 10 claim.