**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| JASON HUGHES, Individually and on Behalf of all Others Similarly Situated, | Master File No. 09-CV-4734 |
| Plaintiffs, | Honorable Elaine E. Bucklo |
| v. | |
| HURON CONSULTING GROUP, INC., et al. | |
| Defendants. | |

**LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION**

## TABLE OF CONTENTS

**Page(s)**

I. PRELIMINARY STATEMENT ....................................................................................... 1

II. STANDARD FOR JUDICIAL APPROVAL OF CLASS ACTION
SETTLEMENTS.......................................................................................................... 5

III. THE SETTLEMENT MEETS THE SEVENTH CIRCUIT STANDARD FOR
APPROVAL ................................................................................................................. 7

    A. The Strength of Lead Plaintiffs' Case Compared to the Amount of
    Settlement ............................................................................................................. 7

        1. Establishing Scienter.................................................................................. 7

        2. Establishing Damages ................................................................................ 8

        3. Collectability Concerns.............................................................................. 9

    B. The Complexity, Length and Expense of Further Litigation Supports
    Approval of the Settlement ................................................................................. 10

    C. The Lack of Opposition to the Settlement and Plan of Allocation to Date
    Strongly Supports Final Approval ...................................................................... 11

    D. The Settlement Is the Product of Good Faith, Arm's-Length Negotiations ........ 12

    E. Counsel for Lead Plaintiffs Strongly Endorse the Settlement ............................. 13

    F. The Stage of the Proceedings and the Amount of Discovery Completed............ 14

IV. THE COURT SHOULD AFFIRM ITS CERTIFICATION OF THE CLASS............... 15

V. THE PLAN OF ALLOCATION IS FAIR AND REASONABLE................................. 16

VI. CONCLUSION........................................................................................................... 17

i

## TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*Anderson v. Torrington Co.*,
    755 F. Supp. 834 (N.D. Ind. 1991) ...............................................................6

*Armstrong v. Bd. of School Dir. of City of Milwaukee*,
    616 F.2d 305 (7th Cir. 1980) ...............................................................5, 6

*Beecher v. Able*,
    575 F.2d 1010 (2d Cir. 1978)...............................................................16

*In re Chicken Antitrust Litig. Am. Poultry*,
    669 F.2d 228 (5th Cir. 1982) ...............................................................16

*Class Plaintiffs v. City of Seattle*,
    955 F.2d 1268 (9th Cir. 1992) ...............................................................16

*In re Computron Software Litig.*,
    6 F. Supp. 2d 313 (D.N.J. 1998) ...............................................................16

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)...............................................................8

*EEOC v. Hiram Walker & Sons, Inc.*,
    768 F.2d 884 (7th Cir. 1985) ...............................................................5

*GE Capital Corp. v. Lease Resolution Corp.*,
    128 F.3d 1074 (7th Cir. 1997) ...............................................................5

*Gautreaux v. Pierce*,
    690 F.2d 616 (7th Cir. 1982) ...............................................................5

*In re Global Crossing Sec. & ERISA Litig.*,
    225 F.R.D. 436 (S.D.N.Y. 2004) ............................................................... 13-14

*Great Neck Capital Appreciation Inv. P'ship, L.P. v.
PricewaterhouseCoopers, L.L.P.*,
    12 F.R.D. 400 (E.D. Wis. 2002) ............................................................... *passim*

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*,
    142 F.R.D. 588 (S.D.N.Y. 1992) ...............................................................16

*In re Ikon Office Solutions, Inc., Sec. Litig.*,
    194 F.R.D. 166 (E.D. Pa. 2000). ...............................................................10, 16

*Isby v. Bayh*,
   75 F.3d 1191 (7th Cir. 1996) ...................................................5, 10, 13, 14

*Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co.*,
   834 F.2d 677 (7th Cir. 1987) ...........................................................5

*Metro. Hous. Dev. Corp. v. Village of Arlington Heights*,
   616 F.2d 1006 (7th Cir. 1980) ..........................................................5

*In re Mexico Money Transfer Litig.*,
   164 F. Supp. 2d  1002 (N.D. Ill. 2000) ...............................................13

*In re Nat'l Student Mktg. Litig.*,
   68 F.R.D. 151 (D.D.C. 1974) ...........................................................10

*Rubenstein v. Republic Nat'l Life Ins. Co.*,
   74 F.R.D. 337 (N.D. Tex. 1976) ........................................................10

*White v. NFL*,
   822 F. Supp. 1389 (D. Minn. 1993) ....................................................16

## STATUTES

Fed. R. Civ. P. 23 (a) ....................................................................16

Fed. R. Civ. P. 23 (b)(3)………………………………………………………16

Fed. R. Civ. P. 23 (e) ………………………………………..………………………5

## I.     PRELIMINARY STATEMENT

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, the Court-appointed Lead Plaintiffs, the Public School Teachers' Pension & Retirement Fund of Chicago, the Arkansas Public Employees Retirement System, the City of Boston Retirement Board, the Cambridge Retirement System, and the Bristol County Retirement System ("Lead Plaintiffs"), on behalf of themselves and the Class,[1] submit this memorandum in support of their motion for final approval of the settlement of this consolidated securities class action lawsuit (the "Action") for $27 million in cash and 474,547 shares of Huron common stock, valued at $11 million[2] (the "Settlement"), with Defendants Huron Consulting Group, Inc. ("Huron" or the "Company"), Gary E. Holdren, Gary L. Burge, and Wayne E. Lipski (collectively, "Defendants"), affirmance of certification of the Class for settlement purposes only and approval of the Plan of Allocation. The terms of the Settlement are set forth in the Stipulation of Settlement dated January 18, 2011 (the "Stipulation"), which has been previously submitted to the Court.[3]

The Settlement, valued at approximately $38 million, is the result of extensive, arm's-length negotiations by well-informed counsel with a thorough understanding of the strengths and weaknesses of Lead Plaintiffs' claims.  These negotiations included a mediation actively supervised by former United States District Court Judge Layn R. Phillips, an experienced and

---

[1] In its Order for Notice and Hearing, dated January 20, 2011, the Court certified for settlement purposes only a Class of all persons or entities who purchased or otherwise acquired Huron common stock between April 27, 2006 and July 31, 2009, inclusive, and who were damaged thereby.  Excluded from the Class are the Defendants; the officers and directors of Huron during the Class Period; members of the immediate families and the legal representatives, heirs, successors, or assigns of the individual defendants and the excluded Huron officers and directors; any entity in which any Defendant has a controlling interest; and the Holden Family Trust.  Also excluded from the Class are those Persons and entities that timely and validly request exclusion from the Class.

[2] This value is based on Huron Consulting Group, Inc.'s common stock's closing price of $23.18 on November 24, 2010, the date of the agreement in principle to settle.

[3] All capitalized terms shall have the same meaning as in the Stipulation, filed with the Court on January 19, 2011 (ECF No. 128).

highly-respected mediator with extensive experience in the mediation of complex civil actions, followed by several subsequent settlement discussions between the Parties and with Judge Phillips.  Lead Counsel have significant experience in securities and other complex class action litigation, and have negotiated numerous substantial class action settlements throughout the country.  It is their informed opinion that the Settlement is an excellent result in light of the substantial expense, risk, delay and uncertainty of pursuing this Action through trial and any subsequent appeals.  Indeed, this Settlement is an extraordinary result given the particularly significant risks faced by Lead Plaintiffs in recovering from Defendants due to Huron's financial condition.

The Settlement was reached at a point at which Lead Plaintiffs and Lead Counsel had a thorough understanding of the facts and challenges posed by the claims and defenses, and the factors that would impact a future recovery.  This understanding was informed by an extensive investigation that included: (i) reviewing Huron's filings with the Securities and Exchange Commission ("SEC"), securities analysts' reports and advisories about the Company, wire and press releases and other publicly available documents; (ii) identifying and interviewing numerous former Huron employees; (iii) fact discovery, which included reviewing over 400,000 pages of documents produced by Defendants and Huron's outside auditor, PricewaterhouseCoopers LLP ("PwC"); and (iv) researching the applicable law with respect to the claims asserted in the Action and the potential defenses thereto.  Lead Plaintiffs vigorously litigated the Action, filing a detailed consolidated complaint and successfully opposing Defendants' contentious motion to dismiss.  Lead Counsel also consulted extensively with an expert concerning loss causation and damages and with an experienced financial consultant,

Hugh R. Lamle, to assist Lead Plaintiffs in evaluating Huron's financial condition and ability to satisfy a judgment and fund the Settlement.[4]

In reaching the Settlement, Lead Counsel considered the numerous risks associated with continuing the litigation. Despite Lead Plaintiffs' success at opposing the motion to dismiss and their belief that they could prove all of the requisite elements of the claims asserted under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), Defendants would certainly have continued to vigorously challenge these allegations were the Action to continue. Particularly, Defendants would have maintained that Lead Plaintiffs could not prove scienter and would have contested the calculation of damages. Importantly, even if Lead Plaintiffs succeeded at trial in proving liability, they faced the very real risk that Huron would be unable to satisfy a judgment because of its financial condition and depleting resources. In light of these obstacles to recovery at trial, the certain recovery of $27 million in cash and approximately $11 million in stock from Defendants represents an excellent result for the Class.

Lead Plaintiffs and Lead Counsel have concluded that the Settlement is an excellent result and in the best interests of the Class. As explained below, this conclusion is based on all the circumstances present here, including the substantial risks, expense, and uncertainties in continuing the litigation through class certification, summary judgment, trial, and appeal; the relative strengths and weaknesses of the claims and defenses asserted; a complete analysis of the

---

[4] The Court is respectfully referred to the accompanying Joint Declaration of Steven B. Singer, Carol V. Gilden and Jonathan M. Plasse in Support of (A) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation and (B) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Joint Declaration" or "Joint Decl."), submitted herewith. The Joint Declaration is an integral part of this submission and, for the sake of brevity, the Court is respectfully referred to it for a detailed description of, *inter alia*, the history of the Action through the submission of the Settlement to the Court; the nature of the claims asserted in the Action; the investigation undertaken; the negotiations leading to the Settlement; the risks and uncertainties of continued litigation; and a description of the services provided by Lead Counsel.

evidence obtained and the legal and factual issues presented; past experience in litigating complex actions similar to the present action; an analysis of Huron's finances and ability to satisfy a judgment; and the serious disputes between the Parties concerning the merits of the Action and potential damages.

The reaction of Class Members to date also strongly favors the proposed Settlement. Pursuant to the Order for Notice and Hearing, dated January 20, 2011, as of April 1, 2011, copies of the Notice of (I) Pendency and Proposed Settlement of Class Action; (II) Settlement Fairness Hearing; and (III) Motion for Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice") were mailed to over 57,700 potential Class Members. In addition, a Summary Notice was published in *Investor's Business Daily* and transmitted over *PR Newswire*.[5] The Notice informed potential Class Members of their right to object or to request exclusion from the Class by April 22, 2011. To date, not one Class Member has objected to any aspect of the Settlement, Plan of Allocation or Lead Counsel's request for attorneys' fees and expenses. Further, only two requests for exclusion have been received and neither request satisfies the requirements established by the Court, as set forth in the Notice, for a valid request for exclusion. If any objections are received after the date of this submission, Lead Plaintiffs will address them, as well as requests for exclusion, in a supplemental submission to be filed with the Court on April 29, 2011.

---

[5] *See* ¶¶2-6 of the Affidavit of Jose C. Fraga Regarding (A) Mailing of the Notice and Proof of Claim; (B) Publication of the Summary Notice; and (C) Requests for Exclusion Received to Date, submitted by The Garden City Group, Inc. ("GCG"), the Claims Administrator in the Action (the "Fraga Affidavit" or "Fraga Aff."), submitted as Exhibit 1 to the Joint Declaration.

For all the reasons discussed herein and in the Joint Declaration, it is respectfully submitted that the Court should approve the Settlement as fair, reasonable and adequate; affirm its certification of the Class for settlement purposes only; and approve the Plan of Allocation.

## II. STANDARD FOR JUDICIAL APPROVAL OF CLASS ACTION SETTLEMENTS

The Seventh Circuit recognizes "an overriding public interest in favor of settlement" of class action litigation. *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996); *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 888-89 (7th Cir. 1985); *Metro. Hous. Dev. Corp. v. Village of Arlington Heights*, 616 F.2d 1006, 1013 (7th Cir. 1980).

In deciding whether a class action settlement merits final approval under Federal Rule of Civil Procedure 23(e), courts must determine whether the proposed settlement is fair, reasonable, and adequate. *Isby*, 75 F.3d at 1196; *Hiram Walker*, 768 F.2d at 889; *Gautreaux v. Pierce*, 690 F.2d 616, 631 (7th Cir. 1982). The Seventh Circuit has identified the following factors that a Court may consider in evaluating the fairness of a class action settlement:

> 1) the strength of the plaintiffs' case on the merits measured against the terms of the settlement; 2) the complexity, length, and expense of continued litigation; 3) the amount of opposition to the settlement among affected parties; 4) the presence of collusion in gaining a settlement; 5) the stage of the proceedings; and 6) the amount of discovery completed.

*GE Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1082 (7th Cir. 1997); *see also Isby*, 75 F.3d at 1199.

The proceedings to approve a settlement should not be transformed into an abbreviated trial on the merits. *See, e.g., Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co.*, 834 F.2d 677, 684 (7th Cir. 1987); *Armstrong Bd. of School Dir. of City of Milwaukee*, 616 F.2d 305, 314-15 (7th Cir. 1980). Courts should hesitate to substitute their own judgment for the judgment of the litigants and their counsel. As the Seventh Circuit has written:

> Because settlement of a class action, like settlement of any litigation, is basically a bargained exchange between the litigants, the judiciary's role is properly limited to the minimum necessary to protect the interests of the class and the public. Judges should not substitute their own judgment as to optimal settlement terms for the judgment of the litigants and their counsel.

*Armstrong*, 616 F.2d at 315.

Finally, "[a] strong presumption of fairness attaches to a settlement agreement when it is the result of this type of arm's length negotiation." *Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*, 212 F.R.D. 400, 410 (E.D. Wis. 2002) (citing *Anderson v. Torrington Co.*, 755 F. Supp. 834, 838 (N.D. Ind. 1991)) (settlement reached after two-day mediation).

The record here demonstrates that the Settlement was the product of precisely this type of negotiation, which included a mediation and continued extensive negotiations with Defendants' Counsel. The mediation occurred before Judge Phillips, a retired federal judge and experienced mediator, and involved the participation of Lead Plaintiffs, sophisticated institutional investors. *See* Joint Decl. ¶¶32-24. Moreover, Lead Counsel, who conducted the negotiations for the Class, are highly regarded, have many years of experience in conducting complex securities litigation, and were thoroughly conversant with the strengths and weaknesses of the case at the time the Settlement was reached. *Id.* ¶53, and Ex. 3 to Exs. 7A-7C. Lead Counsel's decision, therefore, should be given great deference. *Armstrong*, 616 F.2d at 315.

As explained below, and in the Joint Declaration, when examined under the applicable criteria, the Settlement is an outstanding result for the Class and should be approved by the Court. Lead Counsel believe that there are questions as to whether a more favorable monetary result against Defendants could or would be attained after trial and the inevitable post-trial motions and appeals. The Settlement achieves an immediate and substantial recovery for Class

Members, especially in light of Huron's financial position and depleting resources. The Settlement obtained is unquestionably superior to the distinct possibility that, were this litigation to proceed to trial, there might not be any recovery at all. Analysis of the relevant factors demonstrates that the Settlement merits this Court's approval.

## III. THE SETTLEMENT MEETS THE SEVENTH CIRCUIT STANDARD FOR APPROVAL

### A. The Strength of Lead Plaintiffs' Case Compared to the Amount of Settlement

The Settlement, valued at approximately $38 million, obtained for the benefit of the Class is well within the range of reasonableness in light of all of the risks of continued litigation. Here, the risk posed by Huron's financial condition and ability to satisfy a future judgment, along with the risk of an adverse ruling on the merits, demonstrates the significant value of the Settlement to the Class. As discussed herein and in the Joint Declaration, Lead Plaintiffs faced the possibility that: (i) they would be unable to establish the scienter of the Defendants, which is well-recognized as a difficult and uncertain element in any securities fraud case; (ii) even if Lead Plaintiffs prevailed on establishing liability, Defendants would challenge the calculation of damages and loss causation; and (iii) importantly, even if Lead Plaintiffs succeeded at trial they would be unable to collect a recovery from Defendants.

#### 1. Establishing Scienter

Defendants staunchly maintained that Lead Plaintiffs would be unable to prove that Defendants acted with the requisite scienter. The difficulty of establishing scienter is a substantial risk in any action under Section 10(b). Here, Defendants would have vigorously argued that they did not intend to defraud shareholders and were not severely reckless in their accounting for acquisition-related payments. They would have presented evidence that the

7

Generally Accepted Accounting Principles ("GAAP") provisions at issue in this case are complicated and unclear, and that even if accounting errors were made, they were not made intentionally or recklessly.  Defendants also would contend that, in many cases, they did not have all of the facts when making the accounting decisions, and did not even know of the payments that were accounted for improperly.  Defendants would also have presented expert testimony in support of their contention that GAAP is subject to interpretation and, when confronted with a battle of experts, there would be no assurance as to what a jury will find.  *See* Joint Decl. ¶¶26-27.  Although Lead Plaintiffs believed that they had strong evidence that could establish Defendants' scienter, it is far from clear that a jury would have agreed when faced with competing testimony from witnesses—the majority of whom would be friendly to Defendants.

### 2. Establishing Damages

Lead Plaintiffs faced risks not only in establishing the liability of Defendants, but also with respect to the calculation and proof of damages.  Specifically, Defendants would argue that plaintiffs could not demonstrate loss causation under *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336 (2005).  For instance, Defendants would have argued that the stock drops that occurred between July 31, 2009 and August 3, 2009 were not solely related to the alleged fraud and, accordingly, that loss causation could not be established for all alleged damages.  Defendants were also prepared to present evidence – including expert testimony – that much of the decline that occurred was attributable to the fact that Huron revised its full year 2009 guidance downward as a result of factors distinct from the restatement for accounting irregularities.  Additionally, Defendants would challenge the amount of damages calculated by Lead Plaintiffs and the methodologies employed.  *See* Joint Decl. ¶28.

8

Such damages issues would no doubt be vigorously contested were the litigation to continue and would involve a battle of experts, with each side presenting complicated issues to be decided by a jury, with the attendant risks of a lesser or no recovery.  At trial, the loss causation and damage assessments of Lead Plaintiffs' and Defendants' experts would certainly vary substantially.  The reaction of a jury to such expert testimony is highly unpredictable and, in such a battle, Lead Counsel recognize the possibility that a jury could find there were no damages or only a fraction of the amount of damages Lead Plaintiffs contend.  *Id.*

### 3.    Collectability Concerns

Lead Plaintiffs also faced a very real risk that, were they to succeed at trial, Huron would be unable to satisfy the judgment due to its extremely limited available cash and insurance.  Lead Plaintiffs retained an experienced financial consultant, Hugh R. Lamle, President of M.D. Sass Investor Services, Inc., an investment management firm located in New York City, to assist them in evaluating Huron's financial condition.  An analysis of the Company's Form 10-Q for the quarter ending September 30, 2010, revealed that Huron had only approximately $6 million in cash at the time the Settlement was reached.[6]  Moreover, after an examination of the Company's finances, Mr. Lamle concluded that the Company would be unable to issue debt securities to the Class to satisfy Lead Plaintiffs' settlement demands.  The only significant source for a cash recovery, Huron's insurance coverage, was a wasting asset being depleted by the defense costs of the ongoing litigation and the SEC's investigation, and would be further depleted by a pending derivative action.  Had the Action proceeded through trial and appeals, this insurance would likely have been exhausted.  *See* Joint Decl. ¶¶5, 29-31.  Therefore even if Lead Plaintiffs succeeded at trial, they could ultimately recover an amount far less than the Settlement Amount.

---

[6] The cash portion *alone* of the Settlement is more than four times the cash the Company had on hand.

Instead of risking the loss of the available insurance, as would be the case if the Action was not settled, Lead Plaintiffs obtained **all** of the remaining insurance coverage in the Settlement. *See* Joint Decl. ¶5. Moreover, because of Huron's constrained financial condition, the proposed Settlement is structured as a combination payment of immediately available cash and Huron common stock, in order to maximize the benefit to Class Members while recognizing the financial realities of the Company. In light of all of the potential obstacles to recovery at trial, the certain recovery provided by the Settlement of at least $27 million in cash and approximately $11 million in stock represents an excellent result for the Class.

## B. The Complexity, Length and Expense of Further Litigation Supports Approval of the Settlement

In determining the fairness of a settlement, courts also consider "the likely complexity, length and expense of the litigation." *Isby*, 75 F.3d at 1199. There is no doubt that this securities class action involves complex factual and legal issues. As discussed herein and in the Joint Declaration, the various obstacles with which the Class would necessarily be confronted "flow from the complexities and difficulties inherently involved in shareholder securities fraud litigation." *In re Nat'l Student Mktg. Litig.*, 68 F.R.D. 151, 155 (D.D.C. 1974). Courts have long recognized that securities fraud litigation is complex and uncertain. *See, e.g., Great Neck Capital*, 212 F.R.D. at 409 ("Shareholder class actions are difficult and unpredictable, and skepticism about optimistic forecasts of recovery is warranted.") (citing *Rubenstein v. Republic Nat'l Life Ins. Co.,* 74 F.R.D. 337, 347 (N.D. Tex. 1976)). Indeed, courts have recognized that "securities actions have become more difficult from a plaintiff's perspective in the wake of the PSLRA." *In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000).

If this case were tried rather than settled, the Parties would have to continue and complete a lengthy, extensive, and time-consuming discovery program involving the review and analysis

10

of additional documents, numbering in the hundreds of thousands of pages. Lead Plaintiffs would also have to undertake extensive depositions, including the depositions of the Defendants, other Huron senior management, employees, and former employees. Moreover, Lead Plaintiffs would likely need to depose several employees of PwC as well as third-parties, such as analysts. These depositions would involve enormous time, effort, and expense by the Parties and the deponents. In addition, the Parties would have necessarily continued with expert discovery on the issues of loss causation and damages.

Assuming Lead Plaintiffs obtained class certification, after additional discovery and briefing, and Lead Plaintiffs' claims survived Defendants' inevitable summary judgment motions, trial preparation would result in many additional hours of effort, at great additional expense. Continuing the litigation of the Action would involve numerous attorneys, experts, the introduction of voluminous documentary and deposition evidence, vigorously contested motions, and the expenditure of enormous amounts of judicial and financial resources.

Even if Lead Plaintiffs could recover a judgment greater than the Settlement Amount at trial, the additional delay of post-trial motions and the appellate process could last for months or even years. This delay poses a significant risk to recovery for the Class given Huron's financial condition and depleting insurance. Thus, were this Action to continue, the litigation would be complex, time-consuming, and expensive, with the possibility of obtaining a lesser recovery – or no recovery at all. Instead, the Settlement secures a substantial recovery for the Class without the delay, risk, expense and uncertainty of continued litigation.

### C. The Lack of Opposition to the Settlement and Plan of Allocation to Date Strongly Supports Final Approval

Notices were mailed to over 57,700 potential Class Members. *See* Joint Decl. Ex.1 ¶5. In addition, the Notice was posted on a dedicated website established for this Settlement and a

11

Summary Notice was published in *Investor's Business Daily* and transmitted over *PR Newswire*. The time for Class Members to object to the settlement expires on April 22, 2011. As noted above, to date, not one Class Member has filed an objection to the Settlement, Plan of Allocation, the Lead Counsel's request for attorneys' fees and expenses. In addition, to date, only two requests for exclusion from the Class have been received and neither satisfies the requirements for a valid request for exclusion. *See* Joint Decl. ¶9; *see also Great Neck Capital*, 212 F.R.D. at 410 ("A favorable reception by the class is evidence of the fairness of a proposed settlement."). If any objections or additional requests for exclusion are received, Lead Plaintiffs will address them in a supplemental submission to be filed with the Court on April 29, 2011.

> **D.    The Settlement Is the Product of Good Faith, Arm's-Length Negotiations**

The Settlement, as the descriptions of the proceedings above and in the Joint Declaration amply demonstrate, is the result of hard-fought and contentious litigation and no one could credibly suggest that it is the product of collusion among the Parties. *See* Joint Decl. ¶¶16-25. The Settlement was reached following extensive negotiations between the Parties, which included a formal mediation before Judge Phillips – a highly respected and skilled mediator with extensive experience in the mediation of complex securities class actions. During this mediation process, the Parties exchanged lengthy and detailed mediation statements, discussing the merits of the litigation, including the evidence adduced and the defenses asserted by Defendants. The Parties also extensively discussed and analyzed Huron's financial condition and ability to satisfy a judgment. Mr. Lamle, an experienced financial consultant, attended the mediation and assisted in structuring the Huron common stock as part of the Settlement. As discussed earlier, a number of courts have held that a settlement is presumed fair where, as here, it is the product of arm's-length negotiations between competent and experienced counsel. Through these negotiations

and the mediation, the Parties were able to reach agreement on the Settlement on the terms set forth in the Stipulation. *See* Joint Decl. ¶¶5, 31-36.

### E. Counsel for Lead Plaintiffs Strongly Endorse the Settlement

The opinion of the attorneys who engaged in the settlement negotiations and litigated the action is entitled to significant weight. *See, e.g., Isby*, 75 F.3d at 1200 ("the district court was entitled to give consideration to the opinion of competent counsel that the settlement was fair, reasonable, and adequate."); *In re Mexico Money Transfer Litig.,* 164 F. Supp. 2d 1002, 1020 (N.D. Ill. 2000) ("The court places significant weight on the unanimously strong endorsement of these settlements by Plaintiffs' well-respected attorneys.") (citing *Isby,* 75 F.3d at 1200).

Here, experienced counsel, who have weighed the risks of continued litigation, endorse the Settlement and the substantial benefits it confers on Class Members. The Settlement was achieved through arm's-length negotiations by experienced counsel on both sides, following an extensive investigation and litigation. Lead Counsel, who have many years of experience in litigating and trying securities fraud class actions, and who have negotiated numerous class-action settlements that have been approved by state and federal courts throughout the United States, have determined that the Settlement is fair, reasonable, and adequate. *See* Joint Decl. ¶53, and Ex. 3 to Exs. 7A-7C. Accordingly, this factor weighs heavily in favor of approval

Moreover, Lead Plaintiffs, who are sophisticated institutional investors, closely supervised this litigation. They participated in settlement negotiations, and have strongly endorsed the Settlement as fair, reasonable and adequate to the Class. *See* Declarations of Lead Plaintiffs, attached to Joint Decl. as Exhibits 2-6. The endorsement of a settlement by an institutional lead plaintiff that has played an active role in the litigation and settlement process provides additional support for the fairness of the settlement. *See, e.g., In re Global Crossing*

13

*Sec. & ERISA Litig.*, 225 F.R.D. 436, 462 (S.D.N.Y. 2004) (participation of sophisticated institutional investor lead plaintiffs in the settlement process supported approval of the settlement).

### F.    The Stage of the Proceedings and the Amount of Discovery Completed

To ensure that a plaintiff has had access to sufficient information to evaluate both its case and the adequacy of a proposed settlement, courts in the Seventh Circuit consider the stage of the proceedings and the discovery taken. *Isby*, 75 F.3d at 1199. Here, both the knowledge of Lead Counsel and the proceedings themselves have reached a stage where a well-founded evaluation of the claims and propriety of settlement could be made. Lead Counsel conducted a significant amount of formal and informal discovery in this litigation. For example, Lead Counsel reviewed a large volume of publicly available information concerning Huron, including: (i) the Company's SEC filings; (ii) Huron's annual and quarterly financial statements, and related earnings announcements; (iii) the Company's press releases; (iv) transcripts of Huron's quarterly analyst conference calls; (v) news articles and wire service reports about Huron and the accounting and finance consulting industry; and (vi) analysts' reports and advisories concerning the Company. *See* Joint Decl. ¶¶6,18.

In addition to their pre-filing investigation, in August and September 2010, when the stay of discovery was lifted following the denial of Defendants' motion to dismiss, Lead Plaintiffs served document requests on Defendants and on Huron's outside auditor, PwC. Defendants subsequently produced documents that they had turned over to the SEC in its investigation of Huron, and PwC produced its work papers concerning Huron during the relevant time period. These productions consisted of more than 400,000 pages of documents that Lead Counsel reviewed and analyzed. *See* Joint Decl. ¶¶22-25.

14

Lead Counsel also located and interviewed dozens of former Huron employees, twelve of whom were cited as confidential witnesses in the complaint and conferred with an expert in loss causation and damages and a financial consultant to analyze the financial condition of the Company and assist in structuring the Settlement. *See* Joint Decl. ¶¶18, 33, 66.

Additionally, the Action involved the filing of a consolidated complaint, briefing a contentious motion to dismiss, as well as participation in several arm's-length settlement negotiations over a lengthy period of time where the strengths and weaknesses of the parties' respective claims and defenses were fully explored. Thus, the Parties reached an agreement to settle the litigation at a point when they had a well-founded understanding of the legal and factual issues surrounding the claims. Having sufficient information to properly evaluate the case, Lead Plaintiffs and Lead Counsel were able to settle the litigation on terms highly favorable to the Class without the substantial expense, risk, uncertainty, and delay of continued litigation. *See Great Neck Capital*, 12 F.R.D. at 410 ("[T]he settlement was reached after PwC's motion to dismiss had been decided and after merits discovery was well underway. Thus, Plaintiffs' counsel's evaluation of the case was based on a reasonable amount of information."). This factor strongly supports approval of the Settlement.

## IV.   THE COURT SHOULD AFFIRM ITS CERTIFICATION OF THE CLASS

In presenting the proposed Settlement to the Court for preliminary approval, Lead Plaintiffs requested that the Court certify the Class for settlement purposes so that notice of the proposed Settlement, the final approval hearing and the rights of Class Members to request exclusion, object or submit proofs of claim could be issued. In its Order for Notice and Hearing, entered on January 20, 2011, this Court certified the Class. Nothing has changed to alter the propriety of the Court's certification and, for all the reasons stated in the Lead Plaintiffs'

Memorandum of Law in Support of Unopposed Motion for Preliminary Approval of Settlement (ECF No. 127), incorporated herein by reference, Lead Plaintiffs now request that the Court reiterate its prior certification (i) of the Class for purposes of carrying out the Settlement pursuant to Fed. R. Civ. P. 23(a) and (b)(3); and (ii) Lead Plaintiffs as Class Representatives, as well as its prior appointment of Lead Counsel as Class Counsel for the Class.

## V.      THE PLAN OF ALLOCATION IS FAIR AND REASONABLE

Lead Plaintiffs also seek approval of the Plan of Allocation for distributing the settlement proceeds.  The Plan of Allocation was set forth in the Notice mailed to Class Members. Assessment of a plan of allocation in a class action under Federal Rule of Civil Procedure 23 is "governed by the same standards of review applicable to approval of the settlement as a whole" – the plan must be fair and reasonable.  *Ikon*, 194 F.R.D. at 184 (quoting *In re Computron Software Litig.*, 6 F. Supp. 2d 313, 320 (D.N.J. 1998) ; *see also Great Neck Capital*, 212 F.R.D. at 410; *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1284 (9th Cir. 1992).  District courts enjoy "broad supervisory powers over the administration of class-action settlements to allocate the proceeds among the claiming class members . . . equitably."  *Beecher v. Able*, 575 F.2d 1010, 1016 (2d Cir. 1978); *accord In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. 1982).  An allocation formula need only have a reasonable, rational basis, particularly if recommended by "experienced and competent" class counsel.  *White v. NFL*, 822 F. Supp. 1389, 1420 (D. Minn. 1993); *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 596 (S.D.N.Y. 1992).

The objective of a plan of allocation is to provide an equitable basis upon which to distribute the net settlement fund among eligible class members.  Here, the Plan of Allocation was developed with the assistance of Lead Plaintiffs' consulting damages expert, with a focus on

providing a fair and reasonable allocation of the Net Settlement Fund based upon the information that was in the market at the time of a claimant's purchase and the strengths and weaknesses of the claims. This analysis included studying the market reaction to the announcement on July 31, 2009 that the Company's finances would be restated due to its accounting of acquisition-related payments and calculating the reasonable dollar amount of artificial inflation present in Huron stock throughout the Class Period that was allegedly attributable to the wrongdoing. *See* Joint Decl. ¶¶44-48.

As explained in the Notice, each Authorized Claimant will be entitled to recover his, her or its Recognized Claim calculated in accordance with the Plan of Allocation. If the total Recognized Claims exceed the Net Settlement Fund, as is typical, Authorized Claimants will be entitled to receive a *pro rata* share of the Fund, *i.e.* the percentage of their Recognized Claim determined by the ratio of the total Recognized Claims of all Authorized Claimants to the value of the Net Settlement Fund. Calculation of the Recognized Claim will depend upon several factors, including when the shares were purchased during the Class Period, and whether they were retained or sold after the Class Period, and if so, when. *See* Joint Decl. ¶¶43, 47-48.[7]

Accordingly, Lead Plaintiffs submit that the proposed Plan Allocation is fair and reasonable and should be approved.

## VI.    CONCLUSION

The Settlement here is an excellent result given the substantial recovery, the presence of skilled counsel for all Parties, the extensive settlement negotiations, the considerable risk, expense, and delay if the litigation were to continue, the risk that Defendants would not be able to satisfy a judgment and the certain and immediate benefit of the Settlement to the Class. Lead

---

[7] To date, Lead Plaintiffs have received no objections to the proposed plan.

Plaintiffs respectfully request that the Court: (i) approve the proposed Settlement as fair,

reasonable and adequate and enter the proposed Judgment; (ii) affirm its certification of the

Class; and (iii) approve the proposed Plan of Allocation.

Dated:  April 6, 2011

**COHEN MILSTEIN SELLERS**
 **& TOLL PLLC**

By /s/   Carol V. Gilden
Carol V. Gilden
190 South LaSalle Street, Suite 1705
Chicago, Illinois 60603
Tel: (312) 357-0370
Fax: (312) 357-0369
cgilden@cohenmilstein.com
Illinois Bar No: 06185530

-and-

Steven J. Toll
Daniel S. Sommers
Matthew K. Handley
Joshua M. Kolsky
1100 New York Avenue
N.W. West Tower, Suite 500
Washington, DC 20005-3964
Tel: (202) 408-4600
Fax: (202) 408-4699

**BERNSTEIN LITOWITZ BERGER &**
**GROSSMANN LLP**
By /s/  Avi Josefson
Avi Josefson
Steven B. Singer
Jeroen van Kwawegan
1285 Avenue of the Americas, 38th Floor
New York, New York 10019
Tel: 212-554-1400
Fax: 212-554-1444

-and-

Avi Josefson
2835 N. Sheffield Avenue, Suite 409
Chicago, Illinois 60657

18

Tel: 773-883-5382

**LABATON SUCHAROW LLP**
By /s/ Jonathan M. Plasse
Jonathan M. Plasse
Javier Bleichmar
Nicole M. Zeiss
140 Broadway
New York, New York 10005
Tel: 212-907-0700
Fax: 212-883-7053

*Co-Lead Counsel for the Court-appointed*
*Lead Plaintiffs and the Class*